**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AUBREY DRAKE GRAHAM,

               Plaintiff,

      v.

UMG RECORDINGS, INC.,

            Defendant.

No. 1:25-cv-399-JAV

**ORAL ARGUMENT REQUESTED**

---

## UMG RECORDINGS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    A.    The Parties .................................................................................................2

    B.    Drake and Lamar Engage in a Vitriolic Rap Feud...................................3

    C.    Not Like Us Is A Massive Commercial and Artistic Success .................8

ARGUMENT ..........................................................................................................................9

I.      LEGAL STANDARD...................................................................................9

II.    DRAKE FAILS TO STATE A CLAIM FOR DEFAMATION ........................................10

    A.    The Alleged Defamatory Material is Nonactionable Opinion and Rhetorical Hyperbole...................................................................11

    B.    Drake Cannot Allege That UMG Acted with Actual Malice .................17

III.   DRAKE FAILS TO STATE A CLAIM FOR "HARASSMENT IN THE SECOND DEGREE"..........................................................................................19

IV.   DRAKE FAILS TO STATE A CLAIM UNDER N.Y. G.B.L. § 349.............................22

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld*,
    603 N.E.2d 930 (N.Y. 1992) .................................................................................13

*People ex rel. Arcara v. Cloud Books, Inc.*,
    503 N.E.2d 492 (N.Y. 1986) .................................................................................10

*Armatas v. Maroulleti*,
    2010 WL 4340334 (E.D.N.Y. Oct. 22, 2010) .......................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................9

*Bahar v. Sanieoff*,
    2020 NY Slip Op. 33790(U) (Sup. Ct., N.Y. Cnty. Nov. 16, 2020) ......................20

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................9, 21

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
    151 F. Supp. 3d 287 (E.D.N.Y. 2015) ............................................................12, 13

*Bellin v. Zucker*,
    6 F.4th 463 (2d Cir. 2021) .....................................................................................9

*Biro v. Condé Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013).............................................................10, 17

*Bobulinski v. Tarlov*,
    2024 WL 4893277 (S.D.N.Y. Nov. 26, 2024).................................................10, 11

*Boehm v. Sportsmem, LLC*,
    2019 WL 3239242 (S.D.N.Y. July 18, 2019) .......................................................24

*Bollea v. World Championship Wrestling, Inc.*,
    610 S.E.2d 92 (Ga. App. 2005)..............................................................................18

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969)...............................................................................................21

*Brian v. Richardson*,
    660 N.E.2d 1126 (N.Y. 1995).....................................................................11, 12, 13

*Cablevision Sys. Corp. v. Communic'ns Workers of Am. Dist.*,
    16 N.Y.S.3d 753 (App. Div. 2015) .................................................................20

*Cosby v. Russell*,
    2012 WL 1514836 (N.D.N.Y. Feb. 8, 2012) ...............................................20

*Cruz v. NYCTA*,
    2025 WL 209598 (S.D.N.Y. Jan. 16, 2025) .................................................20

*Dfinity Found. v. N.Y. Times Co.*,
    702 F. Supp. 3d 167 (S.D.N.Y. 2023).................................................10, 11

*Dobkin v. HUB Int'l Ltd.*,
    202 N.Y.S.3d 92 (App. Div. 2023) ...............................................................25

*Dworkin v. Hustler Mag. Inc.*,
    867 F.2d 1188 (9th Cir. 1989) ...............................................................18, 19

*Galasso v. Saltzman*,
    839 N.Y.S.2d 731 (App. Div. 2007) .............................................................16

*Gisel v. Clear Channel Commc'ns, Inc.*,
    942 N.Y.S.2d 751 (App. Div. 2012) .............................................................15

*Hammer v. AKC*,
    803 N.E.2d 766 (N.Y. 2003) .........................................................................19

*Hayashi v. Ozawa*,
    2019 WL 1409389 (S.D.N.Y. Mar. 28, 2019) ...........................................12

*Hess v. Indiana*,
    414 U.S. 105 (1973)........................................................................................21

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender*
    *& Co.*,
    171 N.E.3d 1192 (N.Y. 2021)..................................................23, 24, 25

*Hobbs v. Imus*,
    698 N.Y.S.2d 25 (App. Div. 1999) ...............................................................13

*Hobish v. AXA Equit. Life Ins. Co.*,
    205 N.Y.S.3d 395 (App. Div. 2024) .............................................................25

*Hoppe v. Hearst Corp.*,
    770 P.2d 203 (Wash. App. 1989).................................................................18

*Hughes v. Twenty-First Century Fox, Inc.*,
    304 F. Supp. 3d 429 (S.D.N.Y. 2018).................................................17, 18

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988)................................................................................................15

*Immuno AG. v. Moor-Jankowski*,
   567 N.E.2d 1270 (N.Y. 1991)...........................................................................12

*Israel v. City of Syracuse*,
   2021 WL 4777256 (N.D.N.Y. Sept. 16, 2021) ................................................20

*JBCHoldings NY, LLC v. Pakter*,
   931 F. Supp. 2d 514 (S.D.N.Y. 2013) ..............................................................24

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991)................................................................................9

*Manko v. Volynsky*,
   1996 WL 243238 (S.D.N.Y. May 9, 1996) ......................................................20

*Mann v. Abel*,
   885 N.E.2d 884 (N.Y. 2008)..............................................................................11

*Miss Am. Pageant, Inc. v. Penthouse Int'l, Ltd.*,
   524 F. Supp. 1280 (D.N.J. 1981) .....................................................................18

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)...........................................................................................22

*Ortiz v. Ciox Health LLC*,
   179 N.E.3d 635 (N.Y. 2021)..............................................................................19

*People v. Dietze*,
   549 N.E.2d 1166 (N.Y. 1989)............................................................................21

*People v. Golb*,
   15 N.E.3d 805 (N.Y. 2014)................................................................................21

*People v. Stuart*,
   797 N.E.2d 28 (N.Y. 2003)................................................................................22

*Porrazzo v. Bumble Bee Foods, LLC*,
   822 F. Supp. 2d 406 (S.D.N.Y. 2011)...............................................................10

*Prac. Ctr. Concord Rusam, Inc. v. Bavrovska*,
   2019 NY Slip Op. 34624(U) (Sup. Ct., Westchester Cnty. Oct. 29, 2019) ............20

*Pyskaty v. Wide World of Cars, LLC*,
   856 F.3d 216 (2d Cir. 2017)..............................................................................24

*Ralin v. City of New York*,
844 N.Y.S.2d 83 (App. Div. 2007) .......................................................................20

*Rapaport v. Barstool Sports, Inc.*,
2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021) ............................................... *passim*

*Rapaport v. Barstool Sports Inc.*,
2024 WL 88636 (2d Cir. Jan. 9, 2024) ...............................................11, 12, 13, 14

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ...................................................................................9

*Salahuddin v. Jones*,
992 F.2d 447 (2d Cir. 1993) .................................................................................20

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
925 N.Y.S.2d 407 (App. Div. 2011) ...............................................................12, 14

*Senese v. Hindle*,
2011 WL 4536955 (E.D.N.Y. Sept. 9, 2011) .......................................................20

*Singh v. City of New York*,
217 N.E.3d 1 (N.Y. 2023) ....................................................................................25

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008) ...................................................................................9

*Stathatos v. William Gottlieb Mgmt.*,
2020 WL 1694366 (S.D.N.Y. April 6, 2020) .......................................................20

*Steinhilber v. Alphonse*,
501 N.E.2d 550 (N.Y. 1986) ...............................................................11, 12, 14, 15

*Stevens v. Brown*,
2012 NY Slip Op. 31823(U) (Sup. Ct., N.Y. Cnty. July 2, 2012) .........................20

*Sulehria v. New York*,
2012 WL 1288760 (S.D.N.Y. Feb. 8, 2012) .........................................................20

## Statutes

N.Y. Penal Law § 240.26 ..................................................................19, 20, 21, 22

N.Y. G.B.L. § 349 .......................................................................................... *passim*

## Other Authorities

Fed. R. Civ. P. 12(b)(6) ....................................................................................9, 10

**"Yeah, I want it all, that's why I strive for it / Diss me, you'll never hear a reply for it."**
**- Drake, "Successful"**

Plaintiff, one of the most successful recording artists of all time, lost a rap battle that he provoked and in which he willingly participated. Instead of accepting the loss like the unbothered rap artist he often claims to be, he has sued his own record label in a misguided attempt to salve his wounds. Plaintiff's Complaint is utterly without merit and should be dismissed with prejudice.

## <u>INTRODUCTION</u>

In the spring of 2024, two of the most popular recording artists in the world, Kendrick Lamar ("Lamar") and Aubrey Drake Graham ("Drake" or "Plaintiff") engaged in a high-profile rap battle. Over the course of approximately two months, they exchanged increasingly vitriolic and incendiary "diss tracks," sometimes responding within hours of each other. Drake encouraged the feud. For example, when he felt that Lamar was taking too long to respond, Drake released a second recording in which he goaded Lamar to continue the public rap battle. Lamar did just that, and collectively Drake and Lamar released a total of nine tracks taking aim at each other. Multiple commentators declared Lamar to be the "winner" of the battle.

"Not Like Us"—the penultimate track in the feud—is the subject of the Complaint. The recording and music video were released by Lamar, through defendant UMG, on May 4, 2024. "Not Like Us" was a massive commercial and artistic success. The record was the best-selling rap recording of 2024 and won the Grammy Award for Record of the Year, and the accompanying music video won the Grammy Award for Best Music Video. The song "Not Like Us" won the Grammy Award for Song of the Year and has become a ubiquitous cultural phenomenon—among other things, Lamar performed the song at the 2025 Superbowl halftime show to a record audience and "Saturday Night Live" parodied it in its recent 50th anniversary special.

"Not Like Us," like all of the recordings in the feud between Drake and Lamar, and like

the many notorious diss tracks throughout rap's history, consists of a series of hyperbolic insults. Drake has been pleased to use UMG's platform to promote tracks leveling similarly incendiary attacks at Lamar, including, most significantly, that Lamar engaged in domestic abuse and that one of Lamar's business partners and managers is the true father of Lamar's son. But now, after losing the rap battle, Drake claims that "Not Like Us" is defamatory. It is not. While the Complaint focuses almost entirely on "Not Like Us," it disregards the other Drake and Lamar diss tracks that surrounded "Not Like Us" as well as the conventions of the diss track genre, and, thus, critically ignores the context of the dispute. Assessed in context, as it must be, "Not Like Us" clearly conveys nonactionable opinion and rhetorical hyperbole—diss tracks are a popular and celebrated artform centered around outrageous insults, and they would be severely chilled if Drake's suit were permitted to proceed. Drake also alleges that "Not Like Us" constitutes "Second Degree Harassment," but sues under a criminal statute that does not proscribe speech and has no private right of action. Finally, Drake claims that UMG's promotion of "Not Like Us" violates New York General Business Law § 349, but fails to allege any of the elements for that claim.

Notably, less than three years ago, Drake himself signed a public petition criticizing "the trend of prosecutors using artists' creative expression against them" by treating rap lyrics as literal fact. *See* UMG's Request for Judicial Notice ("RJN") Ex. A. As Drake recognized, when it comes to rap, "[t]he final work is a product of the artist's vision and imagination." *Id.* Drake was right then and is wrong now. The Complaint's unjustified claims against UMG are no more than Drake's attempt to save face for his unsuccessful rap battle with Lamar. The court should grant UMG's motion and dismiss the Complaint with prejudice.

## STATEMENT OF FACTS

### A.    The Parties

Defendant UMG is a global music company. Compl. ¶ 26. UMG represents more than 220

artists and brands worldwide and holds a catalogue of more than 3.2 million recordings. *Id.* ¶¶ 44-45. UMG represents artists through, *inter alia*, recording, distribution, publishing and third-party licensing agreements, *id.* ¶¶ 41-42, and helps "maximize their commercial success through its world-class marketing, proprietary data analytics, [and] global distribution network," *id.* ¶ 46.

Drake is an internationally known rap artist. *Id*. ¶¶ 25, 31. Drake signed with UMG through UMG's Republic division in 2009 and extended his contract in 2022. *Id.* ¶ 49. Drake's partnership with UMG has been hugely successful. He is one of the "best-selling music artists of all time," *id.* ¶ 32, with over "170 million albums sold," *id.*, and a series of awards and accolades, including Billboard Music's Artist of the Decade in 2021, *id.* ¶ 33.

UMG also represents Lamar, through UMG's Interscope division. *Id.* ¶ 51. Lamar is a highly successful rap artist in his own right. *Id.* ¶ 26.

### B.    Drake and Lamar Engage in a Vitriolic Rap Feud

"Not Like Us," the recording at the center of this action, was released as part of a "rap beef" between Drake and Lamar. *Id.* ¶¶ 7, 23. The artists' feud reportedly traces its origins "back more than a decade," but broke into the public domain in early 2024, when Drake and Lamar began "trading diss tracks, sometimes within the same hour." *See* RJN Ex. T (Compl. ¶ 151, n.163).

Drake and Lamar's feud was not unique in the world of rap. Rap feuds, where artists trade "diss tracks" insulting each other, have "existed pretty much since the beginning of rap" in the 1970s. *Id.*[1] A number of storied feuds have occurred throughout rap history, including the "Roxanne Wars," involving Roxanne Shante and the rap group U.T.F.O., as well as feuds between Nas and Jay-Z, Lil Kim and Foxy Brown, and Megan Thee Stallion and Nicki Minaj. *Id.* Drake is

---

[1] As described in the "Pop Culture Happy Hour" podcast transcript cited by Drake, rap feuding is "[t]he art of blood sporting music…a speculative exercise that highly sensationalizes long-standing rumors." *Id.*

a prolific rap feud combatant, having traded diss tracks with a number of artists including Pusha T and Meek Mill. *See, e.g.*, RJN Ex. B ("Back to Back" lyrics, Drake diss track in Meek Mill feud); RJN Ex. C ("Duppy Freestyle" lyrics, Drake diss track in Pusha T feud).

The public feud between Drake and Lamar traces back to the October 2023 recording "First Person Shooter" by Drake and J. Cole, in which J. Cole rapped that he, Drake, and Lamar were the "*big three*" (*i.e.,* the top three rappers in the industry). *See* RJN Ex. T; Ex. D ("First Person Shooter" lyrics). In response, Lamar appeared on the March 2024 track "Like That," with artists Future and Metro Boomin, in which he rejected the notion that Drake and J. Cole were his equals, rapping "*Motherfuck the big three, n\*\*\*\*, it's just big me.*" *See* RJN Ex. E ("Like That" lyrics).

Drake responded in April 2024 with the track "Push Ups," distributed by UMG. *See* RJN Ex. F ("Push Ups" lyrics). The recording takes aim at Lamar, insulting, *inter alia,* his height ("*How the fuck you big-steppin' with a size-seven men's on?*" and "*Pipsqueak, pipe down, You ain't no big three...*") and his career ("*Your first number one, I had to put it in your hand,*" "*Your last one bricked, you really not on shit,*" and "*I'm at the top of the mountain... Just to have this talk with your ass, I had to hike down*"). He also encouraged the feud, stating: "*And that fuckin' song y'all got did not start the beef with us / This shit been brewin' in a pot, now I'm heatin' up[.]*"

Then, seemingly impatient with the time it was taking Lamar to respond, Drake released "Taylor Made Freestyle" on Instagram. *See* RJN Ex. G ("Taylor Made Freestyle" lyrics). The recording uses artificial intelligence to make it sound as if the voices of deceased rap icon Tupac Shakur ("Tupac") and rapper Snoop Dogg are rapping Drake's lyrics. In their voices, Drake taunts Lamar for his delay. More notably for present purposes, Drake urges Lamar in the voice of Tupac to "*[t]alk about [Drake] likin' young girls*" on Lamar's next track:

> *Kendrick, we need ya, the West Coast savior*
> *Engraving your name in some hip-hop history*

4

> *If you deal with this viciously / You seem a little nervous about all the publicity*
> *Fuck this Canadian lightskin, Dot*
> *We need a no-debated West Coast victory, man / Call him a bitch for me*
> *Talk about him likin' young girls, that's a gift from me*
> *Heard it on the Budden Podcast, it's gotta be true*

In the voice of Snoop Dogg, Drake then calls on Lamar to release a new diss track:

> *But still, you gotta show this fuckin' owl who's boss on the West[2]*
> *Now's a time to really make a power move*
> *'Cause right now it's looking like you writin' out the game plan on how to lose*
> *How to bark up the wrong tree and then get your head popped in a crowded room*
> *World is watching this chess game, but are you out of moves?*

And in his own voice, Drake raps:

> *Since "Like That," your tone changed a little, you not as enthused*
> *How are you not in the booth? It feel like you kinda removed*
> *You tryna let this shit die down, nah, nah, nah*
> *Not this time, n\*\*\*\*, you followin' through*
> *I guess you need another week to figure out how to improve*
> *What the fuck is taking so long? We waitin' on you*

Lamar responded with two tracks: "Euphoria" (released by UMG on April 30), followed by "6:16 in LA" (released by Lamar on Instagram on May 3). *See* RJN Ex. H ("Euphoria" lyrics), Ex. I ("6:16 in LA" lyrics). Lamar raps of Drake in "Euphoria": "*The famous actor we once knew is lookin' paranoid and now spiralin'*" and "*A pathetic master manipulator, I can smell the tales on you now / You're not a rap artist, you a scam artist with the hopes of being accepted.*" He criticizes Drake's music ("*I make music that electrify 'em, you make music that pacify 'em*"); attacks his use of Tupac's voice in "Taylor Made Freestyle" ("*...I'm ready to double the wage / I'd rather do that than let a Canadian n\*\*\*\* make Pac turn in his grave*"); attacks his parenting ("*I got a son to raise, but I can see you don't know nothin' 'bout that*"); and insults his character and racial identity:

---

[2] Drake uses the brand name OVO for various commercial endeavors, including his record label, OVO Sound, and clothing brand, OVO. Compl. ¶¶ 34-35. OVO uses an owl as the brand image. *Id.* ¶ 35.

*I hate the way that you walk, the way that you talk, I hate the way that you dress*
*I hate the way that you sneak diss, if I catch flight, it's gon' be direct…*
*How many more fairytale stories 'bout your life 'til we had enough?*
*How many more Black features 'til you finally feel that you're Black enough?*

Lamar's insults continue in "6:16 in LA," where he raps that members of Drake's OVO team are disloyal: "*Have you ever thought that OVO is workin' for me? / Fake bully, I hate bullies, you must be a terrible person / Everyone inside your team is whispering that you deserve it.*"

Drake responded approximately 14 hours later, on the evening of May 3, with the track "Family Matters," distributed by UMG. *See* RJN Ex. J ("Family Matters" lyrics). The track is a scathing attack on Lamar, laden with hyperbolic slurs. Drake attacks, among other things, Lamar's authenticity ("*You just actin' like an activist, it's make-believe*"); mocks his height ("*He always said I overlooked him, I was starin' straight / These bars go over Kenny head, no matter what I say*"); states that Lamar cheats on his fiancé ("*Why did you move to New York? / Is it 'cause you livin' that bachelor life? / Proposed in 2015 / But don't wanna make her your actual wife / I'm guessin' this wedding ain't happenin', right? / 'Cause we know the girls that you actually like / Your darkest secrets are comin' to light*"); and asserts that one of Lamar's children was fathered by one of his business partners and managers, Dave Free ("*Your baby mama captions always screamin', "Save me" / You did her dirty all your life, you tryna make peace / I heard that one of 'em little kids might be Dave Free / Don't make it Dave Free's / 'Cause if your GM is your BM secret BD / Then this is all makin' plenty fuckin' sense to me*").

Drake also raps that Lamar physically abuses his fiancé, stating "*When you put your hands on your girl / Is it self-defense 'cause she bigger than you?*" and "*They hired a crisis management team / To clean up the fact that you beat on your queen.*" The recording also makes various other allusions to violence, including gun violence. Drake opens that he has "*emptied the clip over friendlier jabs,*" asks "*Which one of my so-called n***** / Need a shell from the clip?*" and raps

"*Come get this ass whoopin', I'm handin' 'em out.*" The track closes with Drake stating "*You're dead / You're dead, you're dead / There's nowhere to hide, there's nowhere to hide.*" Multiple gunshots also sound at various points in the recording.

Lamar responded with two more back-to-back tracks, "Meet the Grahams" followed by "Not Like Us." In "Meet the Grahams," released approximately 30 minutes after "Family Matters," Lamar directs his insults to various members of Drake's immediate family and to Drake himself. *See* RJN Ex. K ("Meet the Grahams" lyrics).

"Not Like Us" was released on May 4. Like the diss tracks before it, "Not Like Us" consists of hyperbolic insults. *See* Compl., Ex. A. Lamar calls Drake names ("*Why you trollin' like a bitch? Ain't you tired?*" and "*It was God's plan to show y'all the liar*"); mocks Drake's OVO brand and image ("*What OVO for? The 'Other Vaginal Option'? Pussy*"; and "*What is the owl? Bird n***** and bird bitches*"); makes hyperbolic threats of violence ("*You think the Bay gon' let you disrespect Pac, n****? I think that Oakland show gone be your last stop, n*****");* attacks Drake's personal relationships, including alleging that Drake had relations with rapper Lil Wayne's girlfriend ("*Fucked on Wayne girl while he was in jail, that's conniving*"); and calls him a "*fuckin' colonizer,*" inferring Drake exploits other artists for fame and financial benefit.

Taking up Drake's invitation in "Taylor Made Freestyle" to "*[t]alk about [Drake] likin' young girls,*" Lamar also makes various statements at issue in the Complaint, including: "*Say, Drake, I hear you like 'em young / You better not ever go to cell block one / To any bitch that talk to him and they in love / Just make sure you hide your lil' sister from him,*" and "*Why you trollin' like a bitch? Ain't you tired? / Tryna strike a chord and it's probably A minor."* He also raps: "*And

*Baka got a weird case, why is he around? / Certified Lover Boy? Certified pedophiles*";[3] and states, "*And your homeboy need subpoena, that predator move in flocks / That name gotta be registered and placed on neighborhood watch*."

Drake responded the following day with "The Heart Part 6." *See* RJN Ex. L ("The Heart Part 6" lyrics). There, Drake doubles down on his statement that one of Lamar's children was fathered by Mr. Free ("*And why isn't Whitney denyin' all of the allegations? / Why is she followin' Dave Free and not Mr. Morale?*[4]... *Dave leavin' heart emojis underneath pics of the child*," and "*Like if Dave really fucked your girl and got her pregnant, talk about breedin' resentment*"); and reiterates his claim of domestic abuse ("*I don't wanna fight with a woman beater, it feeds your nature*"). Drake states that he expected the alleged defamatory statements in "Not Like Us" ("*This Epstein angle was the shit I expected / TikTok videos you collected and dissected,*") and denies them ("*Only fuckin' with Whitneys, not Millie Bobby Browns, I'd never look twice at no teenager*"). The track also contains further references to violence, including "*I'll slit your throat with the razor*," and "*Yeah, bullets that I'm stuffin' in each chamber, your ass in extreme danger[.]*"

## C. Not Like Us Is A Massive Commercial and Artistic Success

Lamar is widely perceived to have won the rap feud. *See, e.g.*, RJN Ex. T ("[U]ltimately, I do think... Kendrick did come out on the superior end of that quarrel."); *id.* ("[W]e can say Kendrick has won"); *see also* RJN Ex. W (New Yorker article asking: "Has there ever been as clear a loser as Drake?"), Ex. X (New York Times article noting Lamar's "unofficially winning a high-profile diss war with Drake"). "Not Like Us" has also been a massive commercial and artistic success. It has been heard or viewed "nearly 6 billion times," *id.* ¶ 150, and was the bestselling rap

---

[3] "Baka" refers to OVO member Baka Not Nice who was arrested in 2014 on human trafficking and assault charges, and convicted of assault in 2015. *See infra* n.10.
[4] Lamar's 2022 album was titled "Mr. Morale & the Big Steppers."

song of 2024, *id.* ¶ 104. It set multiple records, including "most single-day streams for a rap song in the U.S.," *id.* ¶ 146, the fastest song to reach 300 million Spotify streams, *id.* ¶ 97, and "the most streamed song in a 7-day period" (96 million streams), *id.* ¶ 146. Within the first week of its release, "Not Like Us" debuted at No. 1 on the Billboard Hot 100 list and "ranked first on YouTube's Weekly Top Music Videos chart" from July 4 to August 8, 2024. *Id.* ¶ 146-47. It has maintained its popularity. "On October 7, 2024, Billboard reported that the Recording had reached '45.4 million in total audience impressions on radio,'" *id.* ¶ 148; it has also been "used in over 1,300,000 videos on TikTok," *id.* ¶ 120. *Rolling Stone* deemed it "the biggest moment in music this year." *Id.* ¶ 149. The song, recording, and video of "Not Like Us" were collectively nominated for five Grammy Awards (as voted on by over 13,000 music industry peers), including Record of the Year, Song of the Year, Best Rap Performance, Best Rap Song, and Best Music Video, and won in all five categories. *See* RJN Ex. M (Compl. ¶ 108 n.101).

<u>**ARGUMENT**</u>

## I.    **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *See Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). The Court can credit only "well-pleaded, nonconclusory factual allegations" and must disregard "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009). "In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007), such as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (cleaned up); *see also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). The latter category includes "the *fact* that press coverage … contained certain information," *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d

406, 425 (2d Cir. 2008), as well as other publicly available documents, *see also Porrazzo v. Bumble Bee Foods, LLC,* 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011). Courts will therefore often "take[] judicial notice" of documents that "provide[] necessary context" for a "defamation claim." *Bobulinski v. Tarlov*, 2024 WL 4893277, at *3 n.2 (S.D.N.Y. Nov. 26, 2024).

Courts in this District have observed that "[t]here is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Dfinity Found. v. N.Y. Times Co.*, 702 F. Supp. 3d 167, 173 (S.D.N.Y. 2023) (cleaned up). That is, "in defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013).

## II.    DRAKE FAILS TO STATE A CLAIM FOR DEFAMATION

Drake, who had no concerns using UMG's platform to publish slurs about Lamar during their rap feud, now claims that "Not Like Us" is defamatory. Compl. ¶ 205-07. These allegations—which are directly aimed at chilling legitimate artistic expression safeguarded by the First Amendment and New York law, *People ex rel. Arcara v. Cloud Books, Inc.*, 503 N.E.2d 492, 494-95 (N.Y. 1986)—are meritless.[5] Drake fails to state a claim for defamation because "Not Like Us" conveys nonactionable opinion and rhetorical hyperbole, not fact, and because Drake cannot adequately allege that UMG acted with actual malice.

To succeed on his defamation claim, Drake must establish: (1) a defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory

---

[5] Drake contends that the lawsuit "is not about the artist who created 'Not Like Us.'" Compl. ¶ 8; *see also id.* ¶ 23. Nonsense. As discussed herein, though this lawsuit is baseless against *any* target, it is plainly about Lamar's lyrics. Drake's repeated insistence to the contrary does not make it so; instead, it betrays his recognition that his *true* battle was, and is, with Lamar.

statement, and (5) special damages or per se actionability. *Rapaport v. Barstool Sports Inc.,* 2024 WL 88636, at *2 (2d Cir. Jan. 9, 2024). Where, as here, the plaintiff is a public figure, he must prove that the allegedly defamatory statement was made with actual malice, that is, "made with knowledge of its falsity or with reckless disregard of whether it was false." *Bobulinski*, 2024 WL 4893277, at *3.

### A.    The Alleged Defamatory Material is Nonactionable Opinion and Rhetorical Hyperbole

To be defamatory, a publication must convey fact, not opinion or rhetorical hyperbole. *See Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986). "Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Mann v. Abel*, 885 N.E.2d 884, 886 (N.Y. 2008). Whether a statement is fact or opinion is "a question of law for the court." *Rapaport,* 2024 WL 88636, at *2; *see also Dfinity Found.*, 702 F. Supp. 3d at 174 (question of fact versus opinion "is appropriately raised at the motion to dismiss stage"). To distinguish assertions of facts from nonactionable opinion, New York courts analyze: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995). At its crux, the question for the Court to resolve as a matter of law is what a reasonable person hearing or reading the statement would take it to mean. *Steinhilber*, 501 N.E.2d 550 at 553.

In this assessment, context is key. "The Court of Appeals of New York has consistently focused its analysis on the overall context in which the complained-of assertions were made."

*Rapaport*, 2024 WL 88636, at *2.[6] This includes both "the immediate context in which the disputed words appear," as well as "the larger context in which the statements were published, including the nature of the particular forum." *Brian*, 660 N.E.2d at 1130; *see also Hayashi v. Ozawa,* 2019 WL 1409389, at *3 (S.D.N.Y. Mar. 28, 2019) (courts must look "to the tone of the communication, its apparent purpose, and the setting in which it was made").

A statement's "tone and apparent purpose" may signal that it is not conveying "an accurate factual assessment offered by a disinterested observer." *Rapaport*, 2021 WL 1178240, at *12 (cleaned up). For example, tone may indicate nonactionable opinion where "it reflects a degree of anger and resentment," *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415 (App. Div. 2011); where the tenor is "rambling, heated, or speculative," or "often escalates into the hyperbolic," *Hayashi*, 2019 WL 1409389, at *5; or where a statement invokes "parody, loose, or figurative" language, *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 294 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016).

Likewise, the broader context informs whether a statement is reasonably understood to convey factual assertions. "[E]ven apparent statements of fact may assume the character of statements of opinion… when made in public debate, heated labor dispute, or circumstances in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." *Steinhilber*, 501 N.E.2d 550, at 556; *see also Immuno AG*, 567 N.E.2d, at 1280 (statements in a letter to the editor deemed nonactionable because "the common expectation of a letter to the editor is not that it will

---

[6] *See also Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991) (alleged defamatory "statements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying any facts") (emphasis omitted); *Rapaport v. Barstool Sports, Inc.,* 2021 WL 1178240, at *11 (S.D.N.Y. Mar. 29, 2021), *aff'd*, 2024 WL 88636 (2d Cir. Jan. 9, 2024) (based on the context, "a statement that is capable of being proven false may still be a non-actionable opinion").

serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion"); *Hobbs v. Imus*, 698 N.Y.S.2d 25, 26 (App. Div. 1999) (alleged defamatory statements by "shock talk" hosts did not state a claim for defamation as they "would not have been taken by reasonable listeners as factual pronouncements but simply as" the expression of views "in the crude and hyperbolic manner that has, over the years, become their verbal stock in trade").[7] Consistent with that observation, New York courts routinely hold that tone and context render allegedly defamatory publications nonactionable. *See, e.g.*, *Brian*, 660 N.E.2d at 1129 (allegations the plaintiff was involved in an illegal conspiracy nonactionable because they were published in op-ed pages, where there is a "common expectation" that articles will "contain considerable hyperbole, speculation, diversified forms of expression and opinion," and because "the predominant tone of the article, which was rife with rumor, speculation and seemingly tenuous inferences, furnished clues to the reasonable reader that [the article] was something less than serious, objective reportage"); *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 932 & 937 (N.Y. 1992) (statement alleging a permit application was "as fraudulent as you can get and [] smells of bribery and corruption" not actionable as the statement was made at a "heated public debate" using "colloquial and loose terms").

The recent case of *Rapaport v. Barstool Sports* is particularly instructive. There, actor Michael Rapaport alleged that statements by Barstool Sports accusing him, *inter alia,* of having herpes and abusing his ex-girlfriend—including several statements in a six-minute "diss track" in which defendants "rap[ped] a constant stream of insults and slurs about Rapaport against a backdrop of unflattering video clips and images"—were defamatory. *Rapaport*, 2021 WL

---

[7] The "burden rests with the plaintiff to establish that in the context of the entire communication a disputed statement is not protected opinion." *Bellavia Blatt & Crossett*, 151 F. Supp. 3d at 292.

1178240, at *15. The district court rejected the claim as a matter of law:

> [T]he statements were largely laden with epithets, vulgarities, hyperbole, and non-literal language and imagery; delivered in the midst of a public and very acrimonious dispute between the Barstool Defendants and Rapaport that would have been obvious to even the most casual observer; and published on social media, blogs, and sports talk radio, which are all platforms where audiences reasonably anticipate hearing opinionated statements.

*Id.,* at *15.[8] The Second Circuit affirmed, *Rapaport*, 2024 WL 88636, at *2-3, holding that "the district court appropriately considered that the statements at issue were made in the context of a hostile, vulgar, and hyperbolic feud," *id.,* at *4, in which the use of epithets, vulgarities, and hyperbole "function as a strong indicator to the reasonable reader that the statement is not expressing or implying any facts." *Id.* These conclusions apply equally here. Considered in context, as is required, "Not Like Us" conveys hyperbole and opinion, not facts.

Looking first to its tone, the four and one-half minute *rap diss track* consists of a series of "epithets, fiery rhetoric [and] hyperbole," *Steinhilber*, 501 N.E.2d at 556, endemic to the rap genre. Not surprisingly given the context, the recording reflects a considerable "degree of anger and resentment," *Sandals*, 925 N.Y.S.2d at 407, 415, and "[e]xaggerated, vitriolic words" pervade the recording "to attack all aspects of [Drake's] life," including his career, authenticity, brand, relationships, and character. *Rapaport*, 2021 WL 1178240, at *16. Exaggerated imagery in the music video reinforces that "Not Like Us" is not intended to reflect factual analysis. For example, the video opens with Lamar whispering to a clown that he sees "dead people"—a nod to the film The Sixth Sense, implying hyperbolically that Drake has been defeated in the rap battle. The video also shows Lamar beating an owl pinata with the disclaimer "NO OVHOES WERE HARMED

---

[8] As to the diss track video specifically, the Court had "no difficulty" finding that the video, "offered in the midst of a hostile public feud," and containing "[e]xaggerated, vitriolic words and imagery" attacking Rapaport's "career, popularity, relationships, appearance, age, and legal troubles" conveyed to viewers that the statements in were nonactionable opinion. *Id.,* at *15-16.

DURING THE MAKING OF THIS VIDEO," and staring down an owl in a cage. Compl. ¶¶ 84-85. This imagery reinforces the non-factual nature of "Not Like Us." Indeed, no reasonable listener would require a disclaimer that the pinata is not *literally* Drake and his crew; the imagery is satirical and vitriolic—all of which signals to the audience that the video does not convey sober factual analysis.

Likewise, the album image of Drake's Toronto house is "obviously doctored, further underscoring the non-factual nature of [Not Like Us]." *Rapaport,* 2021 WL 1178240, at *16. Again, no reasonable viewer would believe that the image of Drake's Toronto mansion with *13 sex offender markers* is real; the image is hyperbolic and exaggerated, conveying opinion, not fact. *Id.*; *cf. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) (rejecting claim arising out of magazine's "outrageous" artwork depicting television minster in manner that was "patently offensive and…intended to inflict emotional injury," where the "speech could not reasonably have been interpreted as stating actual facts about the public figure involved").

The broader context also reinforces that "Not Like Us" is nonactionable. "Not Like Us" did not emerge out of thin air. It was Lamar's culminating diss track in one of "the nastiest lyrical warfare rap [feuds]" in recent history. *See* RJN Ex. T. It followed the release of seven preceding tracks in which Drake and Lamar hurled increasingly vitriolic allegations at each other, including Drake's slurs that Lamar's son was fathered by someone else and that Lamar cheats on and *physically abuses* his fiancé. If ever there was circumstance for the audience to "anticipate the use of epithets, fiery rhetoric or hyperbole," *Steinhilber*, 501 N.E.2d at 556, this is it.

Moreover, assessment of the broader context makes clear that "Not Like Us" relates to well-known controversies that *Drake himself acknowledged and perpetuated. See Gisel v. Clear Channel Commc'ns, Inc*., 942 N.Y.S.2d 751, 752 (App. Div. 2012) (statements not actionable

"considering the over-all context in which the statements were made;" "a reasonable listener would not have believed that the challenged statements were conveying facts about the plaintiff, rather than opinion" because the "statements were based on facts that were widely reported by Western New York media outlets and were known to [the] listeners"); *Galasso v. Saltzman,* 839 N.Y.S.2d 731 (App. Div. 2007) (statements that plaintiff was "a criminal" and "engaged in criminal conduct" not actionable where "listeners were familiar with the issues in dispute and with the respective sides' positions"). Facts and criticism concerning Drake's relationships with minors predate "Not Like Us" and have been widely reported. *See, e.g.*, RJN Ex. T (noting that Lamar is "indicting Drake for years of … rumors and speculations around his misbehavior around minors," and that "Millie Bobby Brown … is one of the things that most people are aware of when it comes to Drake and the rumors around him … She talked about texting with Drake when she was, you know, a minor").[9]

Notably, Drake *himself* called on Lamar to invoke these allegations in "Taylor Made Freestyle" (released before "Not Like Us"), in which he had Tupac's AI-generated voice rap that Lamar should "*talk about [Drake] likin' young girls.*" *See* RJN Ex. G. In "The Heart Part 6," Drake also affirmed that he understood Lamar's statements in "Not Like Us" to refer to the Millie Bobby Brown controversy, stating "*[t]his Epstein angle was the shit I expected,*" and "*Only fuckin' with Whitneys, not Millie Bobby Browns, I'd never look twice at no teenager.*" *See* RJN Ex. L.[10] Clearly Drake *himself* understands that Lamar's lyrics refer solely to well-known issues. Taken together

---

[9] *See also, e.g.,* RJN Exs. N-P (news articles covering video of an adult Drake kissing and fondling a 17-year-old at a concert); RJN Exs. Q-R (news articles covering criticism of an adult Drake's "friendship" with Millie Bobby Brown when the latter was fourteen).

[10] It has also been widely reported that OVO member Baka Not Nice was arrested in 2014 on human trafficking and assault charges, and convicted for assault in 2015. *See, e.g.*, RJN Ex. S (Complex article); Ex. U (Toronto Sun article). Lamar references this history in "Not Like Us": "*And Baka got a weird case, why is he around? / Certified Lover Boy? Certified pedophiles.*"

with the fact that "Not Like Us" was released in the context of a combative and vitriolic rap diss battle, it would be "obvious to even the most casual observer" that "Not Like Us" is not "an accurate factual assessment offered by a disinterested observer." *Rapaport*, 2021 WL 1178240, at *12-15.[11]

In sum, the tone and broader context in which "Not Like Us" was released makes plain that the recording, video, and album cover convey rhetorical hyperbole and opinion not based on anything beyond controversies that have been widely acknowledged, including by Drake himself. Drake fails to state an actionable claim for defamation.

### B.    Drake Cannot Allege That UMG Acted with Actual Malice

Drake's defamation claim fails for the independent reason that, as a matter of law, he cannot allege that UMG acted with actual malice. A public figure can only prevail on a defamation claim where "clear and convincing evidence" proves that a false and defamatory statement was published with actual malice—that is, with "deliberate or reckless falsification." *Biro*, 963 F. Supp. 2d at 279. "The element of actual malice in a defamation claim focuses primarily on what a defendant knew or believed at the time a purportedly false statement was made." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018). To survive a motion

---

[11] Drake alleges that statements in Lamar's "Euphoria," including "*don't tell no lie about me and I won't tell truths 'bout you*," and "*I know some shit …*" imply that "any future allegations levied by Lamar against Drake would be based in 'truth' and undisclosed fact, not rumor or opinion." Compl. ¶¶ 14, 168. These statements are plainly too vague to ascribe such content. And Drake omits the full statement, which is that "*I know some shit about n***** that make Gunna Wunna look like a saint.*" *See* RJN Ex. H. That has nothing to do with this case but rather refers to the rap artist Gunna, who was criticized for allegedly "snitching" in a criminal case. *See* RJN Ex. V (GQ article). Drake likewise understood this jab in the same way, rapping on "Family Matters," "*Can't be rappin' 'bout no rattin' that we can't read.*" *See* RJN Ex. J. Moreover, Drake again ignores the broader context that *both* parties traded these sorts of jabs. For example, Drake in "Family Matters" claimed with respect to his own unfounded allegations that "*Your darkest secrets are comin' to light.*" *Id*. He makes similar assertions in the "The Heart Part 6," rapping: "*What about the bones we dug up in that excavation? / And why isn't Whitney denyin' all of the allegations?*" *See* RJN Ex. L.

to dismiss, a defamation plaintiff must "allege specific facts that plausibly evidence actual malice in a clear and convincing manner." *Id.*

Courts recognize that in certain circumstances, such as works of fiction, parody, and satire, the actual malice inquiry must focus on what the publisher subjectively intended to *convey*. *Dworkin v. Hustler Mag. Inc*., 867 F.2d 1188, 1194-95 (9th Cir. 1989). For example, where "the speaker intends his statements as outrageous parodies or caricatures," there may be "no consciousness that the speaker is publishing something false, because the speaker does [not] think he [is] publishing a statement of fact," and therefore "lack[s] subjective knowledge or recklessness as to the falsification of a statement of fact required" to show actual malice. *Id.* (cleaned up); *see also Hoppe v. Hearst Corp.,* 770 P.2d 203, 208 (Wash. App. 1989) (affirming dismissal of defamation claim where no basis for contention that defendant intended satirical article to convey defamatory facts); *Miss Am. Pageant, Inc. v. Penthouse Int'l, Ltd*., 524 F. Supp. 1280, 1284 (D.N.J. 1981) ("It would seem too simplistic in the case of a fictional or satirical work simply to question whether the author/publisher had the subjective intent to publish a falsity, since such works are not intended to convey truth."); *Bollea v. World Championship Wrestling, Inc.*, 610 S.E.2d 92, 97 (Ga. App. 2005) (alleged defamatory statements by participant in World Championship Wrestling match not actionable as they "do not contain the necessary consciousness of falsity because the speaker [did] not think he [was] publishing a statement of fact"). So too here. There is no basis for a claim that any person at UMG had the subjective intent to publish false factual statements about Drake; UMG released a *rap diss track,* conveying fiery rhetoric and insults—not factual assessments, much less false ones. UMG engaged in the same conduct when it distributed Drake's "Family Matters," in which Drake rapped that Lamar engages in domestic abuse and is not the father of his son. Much like parody and satire, hyperbole, exaggeration and insults are endemic in

rap, particularly in diss tracks. Rappers know that their lyrics are exaggerated and nonfactual; that is part of the craft. The actual malice question is therefore what UMG *intended* to convey. *Dworkin*, 867 F.2d at 1194-95. And Drake has not alleged any specific facts plausibly evidencing in a clear and convincing manner that anyone at UMG intended to convey, or indeed believed that the public would understand "Not Like Us" as conveying, anything other than what it was: an incendiary diss track.[12]

## III.    DRAKE FAILS TO STATE A CLAIM FOR "HARASSMENT IN THE SECOND DEGREE"

Drake further asserts a criminal claim for "Harassment in the Second Degree," *see* N.Y. Penal Law § 240.26(3), on the theory that Kendrick Lamar issued "a call to violence" against Drake in "Not Like Us" with "threats of violence," and that the song thus amounts to incitement. Compl. ¶¶ 220-21. This claim fails for multiple reasons.

First, there is no private right of action. "Where a penal statute does not expressly confer a private right of action on individuals pursuing civil relief, recovery under such a statute may be had only if a private right of action may fairly be implied." *Hammer v. AKC*, 803 N.E.2d 766, 768 (N.Y. 2003). This requires considering "whether creation of such a right would be consistent with the legislative scheme," which is not the case when there are "alternative enforcement mechanisms." *Ortiz v. Ciox Health LLC*, 179 N.E.3d 635, 638-39 (N.Y. 2021) (cleaned up).

Section 240.26 does not satisfy this test because nothing distinguishes it from every other run-of-the-mill criminal statute that lacks a private right of action. "Rarely is there a private right of action under a criminal statute: as a general rule, when a statute is contained solely within the Penal Law Section, the New York legislature intended it as a police regulation to be enforced only

---

[12] Drake has made obviously non-factual claims about himself in his own music, including that he has connections to organized crime and has been involved in mob hits. *See, e.g.*, RJN Ex. Z ("*I fuck with the mob and I got ties (Lotta ties, lotta ties) / Knock you off to pay their tithes (Do doo)*.").

by a court of criminal jurisdiction." *Senese v. Hindle*, 2011 WL 4536955, at *12 (E.D.N.Y. Sept. 9, 2011) (cleaned up). As with other criminal statutes, the fact that Second Degree Harassment "is included in the Penal Law, giving police officers the ability to enforce its provisions," means that "a private right of action is inconsistent with the legislative scheme." *Armatas v. Maroulleti*, 2010 WL 4340334, at *4 (E.D.N.Y. Oct. 22, 2010). Courts therefore routinely hold that § 240.26 "do[es] not create a private right of action." *Cablevision Sys. Corp. v. Communic'ns Workers of Am. Dist.*, 16 N.Y.S.3d 753, 754 (App. Div. 2015) (affirming dismissal of § 240.26 claim); *see also Cruz v. NYCTA*, 2025 WL 209598, at *5 (S.D.N.Y. Jan. 16, 2025) (dismissing § 240.26 claim); *Israel v. City of Syracuse*, 2021 WL 4777256, at *7 (N.D.N.Y. Sept. 16, 2021) (same); *Stathatos v. William Gottlieb Mgmt.*, 2020 WL 1694366, at *4 (S.D.N.Y. April 6, 2020) (same).[13]

Even if this statute did have a private right of action, the harassment claim would fail. The statute requires that UMG act with "with intent to harass, annoy or alarm" Drake. N.Y. Penal Law § 240.26. But at most, Drake merely asserts an intent to "devalue Drake's music and brand in order to gain leverage in negotiations," which is not an intent to harass Drake. Compl. ¶ 163. And regardless, this allegation is speculative, conclusory, and illogical. Drake does not even attempt to explain how a contract with Drake would be more profitable for UMG if Drake was "devalued"— after all any decreased "leverage" would presumably come from decreased revenues (and thus, decreased profits). *Id*. Moreover, Drake's allegations are contradicted by his allegations that UMG had the opposite incentive with respect to re-signing Lamar. *See id.*; *Salahuddin v. Jones*, 992 F.2d

---

[13] *See also Cosby v. Russell*, 2012 WL 1514836, at *11  (N.D.N.Y. Feb. 8, 2012); *Sulehria v. New York*, 2012 WL 1288760, at *10 (S.D.N.Y. Feb. 8, 2012); *Manko v. Volynsky*, 1996 WL 243238, at *2 (S.D.N.Y. May 9, 1996); *Ralin v. City of New York*, 844 N.Y.S.2d 83, 84 (App. Div. 2007); *Bahar v. Sanieoff*, 2020 NY Slip Op. 33790(U), at 3 (Sup. Ct., N.Y. Cnty. Nov. 16, 2020); *Prac. Ctr. Concord Rusam, Inc. v. Bavrovska*, 2019 NY Slip Op. 34624(U) (Sup. Ct., Westchester Cnty. Oct. 29, 2019); *Stevens v. Brown*, 2012 NY Slip Op. 31823(U), at 6-7 (Sup. Ct., N.Y. Cnty. July 2, 2012).

447, 449 (2d Cir. 1993) (disregarding "conclusory and inconsistent allegations").

Furthermore, § 240.26 does not proscribe pure speech, which is what is at issue here. Indeed, if § 240.26 *did* proscribe speech then it would be struck down—the New York Court of Appeals has invalidated multiple laws that purport to criminalize harassing speech. *See, e.g.*, *People v. Golb*, 15 N.E.3d 805, 813 (N.Y. 2014) (facially invalidating harassment statute that criminalized "any communication that has the intent to annoy"); *People v. Dietze*, 549 N.E.2d 1166, 1168 (N.Y. 1989) (facially invalidating harassment statute that proscribed "any 'abusive' language intended to 'annoy'").

Next, even if Drake could surmount these obstacles, his claim would still fail because he cannot meet the constitutional test for incitement in any event. Under the First Amendment, incitement can be proscribed only where the speech "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). There are two requirements, the speech must be both "intended to produce" and "likely to produce, *imminent* disorder." *Hess v. Indiana*, 414 U.S. 105, 109 (1973). Neither is satisfied.

First, even accepting Drake's nonsensical theory that UMG wanted to "devalue" his brand, Drake never alleges that UMG specifically intended to cause violence against him—and any such allegation would be utterly implausible. *Cf. Twombly*, 550 U.S. at 570.

Second, the lyrics of "Not Like Us" are not "likely to incite or produce" imminent lawless action, *Brandenburg*, 395 U.S. at 447, or even qualify as speech "which alarm[s] or seriously annoy[s]." N.Y. Penal Law § 240.26(3). It is a rap diss track. Drake attempts to contort violent metaphors in the lyrics into incitement. *See, e.g.*, Compl. ¶ 60 ("Like the sound of someone being beaten up, the Recording repeats '*wop, wop, wop, wop*' and then says Lamar will '*fuck 'em up*.'"). But as explained above, hyperbolic and metaphorical language is par for the course in diss tracks—

indeed, Drake's own diss tracks employed imagery at least as violent, such as gunshot sounds, *see* RJN Ex. J, and lyrics like "*You're dead, you're dead. There's nowhere to hide*," *id.*, "*I'll slit your throat with the razor,*" *see* RJN Ex. L, and "*Yeah, bullets that I'm stuffin in each chamber, your ass in extreme danger,*" *id.* In short, as with his defamation claim, Drake seeks to chill a form of artistic expression that he himself has embraced. Courts have rejected far stronger claims of imminent lawless action than rap diss track lyrics. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902, 905, 927-28 (1982) (statement that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck" was protected speech even though subsequently "shots were fired into [the] home" of boycott violators).

Finally, Drake fails to allege—because he cannot—that UMG acted with "no legitimate purpose" in publishing and promoting "Not Like Us." N.Y. Penal Law § 240.26(3). "[T]he phrase 'no legitimate purpose' means the absence of a reason or justification to engage someone, other than to hound, frighten, intimidate or threaten." *People v. Stuart*, 797 N.E.2d 28, 41 (N.Y. 2003). Here, Drake expressly alleges that UMG's motives with respect to "Not Like Us" were financial. Seemingly recognizing this deficiency, Drake alleges that "[w]hile its initial motive was financial, UMG lost any legitimate purpose to continue its course of conduct in the face of Drake's public and private denials." Compl. ¶ 222. But this a cursory legal conclusion: Drake's denials about the song have nothing to do with whether UMG's motivations were *solely* "to hound, frighten, intimidate or threaten," *Stuart*, 797 N.E.2d at 41, which by Drake's own admission, they were not.

## IV.    DRAKE FAILS TO STATE A CLAIM UNDER N.Y. G.B.L. § 349

Finally, Drake purports to bring a claim under New York General Business Law § 349, which he asserts UMG violated by "covertly financially incentivizing third parties to play, stream, and promote the Recording and then by making materially false and misleading representations of the Recording's popularity to consumers." Compl. ¶ 227. These allegations are entirely bogus, but

in all events fail to state a claim.

To state a § 349 claim, a "plaintiff must allege that: (1) the defendant's conduct was consumer-oriented; (2) the defendant's act or practice was deceptive or misleading in a material way; and (3) the plaintiff suffered an injury as a result of the deception." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 171 N.E.3d 1192, 1197 (N.Y. 2021).

The centerpiece of this claim was the utterly false assertion that UMG "use[d] bots to stream" "Not Like Us." *See, e.g.*, Compl. ¶¶ 200, 228, 233. Drake based this theory on the claim that an anonymous individual alleged on a Twitch stream "that Kendrick Lamar's 'label' (i.e., Interscope) paid him via third parties to use 'bots' to achieve 30,000,000 streams on Spotify in the initial days following the [Not Like Us's] release." *Id.* ¶¶ 127-29. But this claim is then *directly refuted* by the very source that Drake cites: in the Twitch stream, the anonymous speaker (already a dubious source) claims that he was hired by "Anthony Saleh" who is "Kendrick[ Lamar's] manager." Compl. ¶ 127, n.124, at 39:21-39:23, 42:06-42:08.[14] UMG/Interscope are never accused.[15] Critically, after UMG notified Drake's counsel of the falsity of Drake's allegation via a Rule 11 letter and accompanying Rule 11 motion, Drake conceded the falsity and "agreed" to "withdraw… and correct" the meritless allegation. *See* Declaration of Rollin A. Ransom ¶ 2 & Ex. 1. Despite this concession, Drake has refused to actually amend the Complaint to withdraw the

---

[14] Jambisco Don (@JambiscoDon), Kendrick Lamar EXPOSED by *DJ Akademiks and HACKER Epic for BOT streams*, YouTube (June 18, 2024), https://www.youtube.com/watch?si=PoazLqeHTyBePEiq&v=rcsW2wteW0c&feature=youtu.be [https://perma.cc/8QKB-MX9V].

[15] To be clear, UMG disputes the contention that *anyone* paid for or otherwise used bots to inflate streams of "Not Like Us," as there is no evidence of any such stream manipulation, and the record evidence—filed in a separate legal proceeding that Drake initiated against UMG but then abandoned earlier this year—is to the contrary. *See* RJN Ex. Y (Affirmation from Spotify). But the specific claim that someone affiliated with UMG did so is entirely unsupported by the very source Drake cites.

admittedly false allegation until after UMG files this Motion to Dismiss.

What is left of the § 349 claim after subtracting the bogus "stream manipulation" theory is equally spurious. As an initial matter, all of the remaining allegations are made on "information and belief" without stating the basis therefor. *See, e.g.*, Compl. ¶ 132 ("Drake has also received information that UMG engaged in a classic pay-for-play scheme by paying to increase the air play of the Recording on the radio[.]"); *id.* ¶ 139 ("On information and belief, UMG employed a similar scheme by paying social media influencers to promote and endorse the Recording and Video."). This is of course improper pleading and warrants dismissal. *See Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir. 2017) ("information and belief" allegations require "allegations of fact" in support); *Boehm v. Sportsmem, LLC*, 2019 WL 3239242, at *2 n.1 (S.D.N.Y. July 18, 2019) (information and belief allegations "must be accompanied by a statement of the facts upon which the belief is founded, and cannot rest on pure conjecture and speculation"); *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) (similar).

Moreover, § 349 requires a plaintiff to allege that he "suffered an injury as a result of the deception," *Himmelstein*, 171 N.E.3d at 1197. Yet, (now that "artificial streaming" is out) Drake does not assert that any of UMG's other supposedly deceptive conduct injured him, save for putative misstatements concerning the popularity of "Not Like Us" on the radio. *See* Compl. ¶ 234 ("Plaintiff was separately injured as a direct and proximate result of Defendant's deceptive acts and practices in the radio industry because every time the Recording was played, Drake lost the opportunity for one of his songs to be played."). But these allegations are insufficient.

First, there is no "consumer-oriented" conduct. *Himmelstein*, 171 N.E.3d at 1197. The deceptive act Drake alleges is that UMG "marketed the Recording as 'chart-topping' despite knowing that it had paid third parties, including radio stations, to play and promote the Recording."

Compl. ¶ 229. But his Complaint alleges only that UMG marketed "Not Like Us" as "chart-topping" on "its website for licensing on television and in film." *Id.* ¶¶ 114-15. Statements aimed at the television and film industry concerning licensing rather than consumers are not "consumer-oriented" conduct. *See Singh v. City of New York*, 217 N.E.3d 1, 7 (N.Y. 2023) (no "consumer-oriented" conduct when deception "was directed solely at persons interested in obtaining licenses for the operation of taxicabs, not taxi consumers" and did not concern "products or services purchased [as] consumer goods").

Second, Drake does not allege that this statement was "deceptive or misleading in a material way." *Himmelstein*, 171 N.E.3d at 1197. Drake never alleges (nor could he) that "Not Like Us" would *not* have been chart-topping had it not been for the alleged payments at issue, nor does he include any allegations as to why the "chart-topping" claim would be material in any event.

Third, Drake's allegations of injury and causation are lacking. Drake's theory—that "every time the Recording was played, Drake lost the opportunity for one of his songs to be played," Compl. ¶ 234— is wildly speculative and not cognizable. *See  Hobish v. AXA Equit. Life Ins. Co.*, 205 N.Y.S.3d 395, 396 (App. Div. 2024) (rejecting "speculative" injury); *Dobkin v. HUB Int'l Ltd.*, 202 N.Y.S.3d 92, 94 (App. Div. 2023) ("[S]peculative causation [is] insufficient to support" § 349 claim). Nor does Drake allege that any lost radio opportunities were the result of any supposed UMG misstatements about the song's popularity, which means that he does not allege an injury that is "a result of the deception" at issue. *Himmelstein*, 171 N.E.3d at 1197. For all these reasons, Drake's § 349 claim fails.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's complaint should be dismissed with prejudice.

Dated: March 17, 2025

*/s/ Rollin A. Ransom*
Rollin A. Ransom (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
350 South Grand Street
Los Angeles, CA 60603
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: rransom@sidley.com

Nicholas P. Crowell
James R. Horner
Katelin Everson (admission pending)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: ncrowell@sidley.com
jhorner@sidley.com
keverson@sidley.com

*Counsel for Defendant UMG Recordings, Inc.*