### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
|                      ) | |
| AUBREY DRAKE GRAHAM,    ) | |
|                      ) | |

```
                                    )
AUBREY DRAKE GRAHAM,                 )
                                    )
        Plaintiff                   )
                                    )
        v.                          )    Case No. 1:25-cv-0399
                                    )
UMG RECORDINGS, INC.,               )
                                    )
                                    )
        Defendant.                  )
                                    )
```

### BRIEF OF SCHOLARS CHARIS KUBRIN, JACK LERNER, ADAM DUNBAR, AND KYLE WINNEN AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Sameer M. Ashar (NY State Bar #3017738)
Jack I. Lerner (*pro hac vice* admission pending, CA State Bar #220661)
Delara Abbasi[*]
Alexander Avakian[*]
Madeleine Kavoossi[*]
Andrew Pratt[*]
Bonnie Wong[*]
UCI INTELLECTUAL PROPERTY, ARTS, AND TECHNOLOGY CLINIC
UNIVERSITY OF CALIFORNIA, IRVINE SCHOOL OF LAW
401 E. Peltason
Irvine, CA 92697
(949) 824-7684
jlerner@law.uci.edu

May 14, 2025               Counsel for *Amici Curiae*

[*] Law student interns in compliance with this Court's Plan for Student Practice, and certified law students pursuant to Rule 9.42 of the California Rules of Court.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

INTEREST OF AMICI ......................................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................. 2

ARGUMENT ...................................................................................................................... 3

    I.   Rap is an Established Musical Genre with Distinct Artistic Conventions that Courts Must Consider Before Treating Lyrics as Factual Representations. ......................................... 3

    A.  Rap Music Has A Long History As A Rebellious And Defiant Art Form That Has Developed Unique And Specific Artistic Conventions And Modes Of Expression .......... 3

    B.  The Normative Conventions of Rap as a Genre ................................................... 4

    C.  "Diss Tracks," Rap Battles, And Rap Feuds Are Part Of An Established Tradition In Rap Music Involving Outrageous Hyperbole And Exaggeration, Which Neither Fans Nor Performers Take As Literal ..................................................................................... 5

    II.  The Use of Rap Lyrics in Judicial Proceedings Threatens to Undermine Important Civil and Constitutional Rights ............................................................................................ 11

    A.  Treating Rap Lyrics as Factual Representations Undermines First Amendment Rights.. 11

    B.  Treating Rap Lyrics As Literal Makes It More Likely That Rap Lyrics Will Be Exploited To Introduce Prejudice And Racial Bias In Other Cases ............................................ 13

APPENDIX A: List of *Amici Curiae* ................................................................................... A-1

**TABLE OF AUTHORITIES**

**Cases**

*Bey-Cousin v. Powell*,
570 F. Supp. 3d 251 (E.D. Pa. 2021) .................................................................. 12

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) ............................................................................................. 2

*Haupt v. United States*
330 U.S. 631 (1947) ............................................................................................. 13

*People v. Coneal*,
41 Cal. App. 5th 951 (2019) ................................................................................. 4

*Rapaport v. Barstool Sports Inc.*,
2024 WL 88636 (2d Cir. Jan. 9, 2024) ................................................................ 2

*United States v. Jordan*,
714 F. Supp. 3d 158 (E.D.N.Y. 2024) .............................................................. 4, 5

**Statutes**

A.B. 2799, 2021-2022 Leg., Reg. Sess. (Cal. 2022) ................................................. 13

**Rules**

Federal Rule of Evidence 403 .................................................................................... 13

Federal Rule of Evidence 404 .................................................................................... 13

**Other Authorities**

50 Cent & Jeff O'Connell, Formula 50: *A 6-Week Workout and Nutrition Plan That Will Transform Your Life* (2013) ....................................................................... 5

David Caplan, *The Art of Rhymed Insult*, 88 *Va. Q. Rev* 119 (2012) ) ..................................9, 11

Jeff Chang, *Can't Stop Won't Stop: A History of the Hip Hop Generation* (2005) .......................3

Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*,
31 *Colum. J. L. & Arts* 1 (2007) ) ......................................................................... 5

Adam Dunbar & Charis E. Kubrin, *Imagining violent criminals: An experimental investigation of music stereotypes and character judgments*, 14 *J. Exp. Crim.* 507 (2018) ........................... 13

Paul Edwards, *How to Rap: The Art and Science of the Hip-Hop MC* (2009) .............................. 5

Stuart P. Fischoff, *Gangsta' Rap and a Murder in Bakersfield*, 29 *J. Applied Soc. Psychol.* 795 (1999) ...................................................................................................................... 14

Carrie B. Fried, *Bad Rap For Rap: Bias In Reaction To Music Lyrics,* 26 *J. Applied Soc. Psychol.* 2135 (1996) ............................................................................................... 14

Henry Louis Gates, Jr., *The Signifying Monkey: A Theory of African American Literary Criticism* (1988) ....................................................................................................................... 3

Andre Gee, *Rappers Are Saying They're 'Cappin' in Songs. Here's Why*, *Complex* (Aug. 10, 2022) ...................................................................................................................... 4

Daniel Gilligan, *The Arts of "Diss Songs,"* 5 *Alfred J.* 14 (2015) ................................................. 9

Sandra Graham & Brian S. Lowery, *Priming unconscious racial stereotypes about adolescent offenders*. 28 *Law & Hum. Behav.* 483 (2004) .................................................... 14

Denise Herd, *Changing Images of Violence in Rap music lyrics: 1979-1997*, 30 *J. Pub. Health Pol'y* 395 (2009) ) ................................................................................................ 9, 10

Lily E. Hirsch, *Insulting Music: A lexicon of Insult in Music* 19 (2022) ) ................................. 6, 8

Mian Jia & Shuting Yao, *Yo I am Superman, You Kiddo Go Home: Ritual Impoliteness in Chinese Freestyle Rap Battles*, 42 *Text & Talk* (2021) ) ......................................... 7, 9

James D. Johnson et.al., *Converging Interracial Consequences of Exposure to Violent Rap Music on Stereotypical Attributions of Blacks*, 36 *J. Experimental Soc. Psychol.* 233 (2000) ) ...... 14

Joseph D. Johnson & Natalie Schell-Busey, *Old Message in a new bottle, Taking Gang Rivalries Online Through Rap Battle Music Videos on Youtube*, 4 *J. Qualitative Crim. Just. & Criminology* (2016) ) ...................................................................................... 9

Marcus W. Johnson, *Serious with Wordplay: Battle Rap as a Critical Literary Site and Model*, 3 *J. Culture & Values Educ*. 25 (2020) ) .............................................................. 7

Charis E. Kubrin, *Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music*, 52 *Soc. Probs.* 360 (2005) ............................................................................. 4

Charis E. Kubrin & Erik Nielson, *Rap on Trial*, 4 *Race & Just.* 185 (2014) ) ........................... 3

Jack Lerner, *Rap on Trial: A Brief History*, 27 *Chap. L. Rev.* 405 (2024) ) ................................ 12

Jack Lerner, Charis Kubrin, et al., *Rap on Trial Legal Guide 2d. Ed.* (2024) ) .......................... 12

Singhi Mavima, *Bigger By the Dozens: The Prevalence of Afro-Based Tradition in Battle Rap*, 3 *J. Hip Hop Stud*. 86 (2016) ) ...................................................................... 6, 7, 8, 9, 10

DiArron Morrison & Diana Watkins, *A Call (and Response) to Battle Rap*, 12 *J. Cont. Rhet.* 106 (2022) ) ........................................................................................................... 8

Erik Nielson and Andrea Dennis, *Rap on Trial: Race, Lyrics and Guilt in America* (2020) ) ...... 4

Lola Ogunnaike & John Leland, *Feuding for Profit: Rap's War of Words*, *N.Y. Times,* Nov. 3, 2002 at A1 .................................................................................................. 10

Enis Oğuz & Hale Işık-Güler, *Rap Devil versus Rap God: Impoliteness in a Rap Battle*, 21 *J. Pol. Res.* 127 (2025) ) ...............................................................................7, 9, 10, 11

Matthew Oware, *Battle Rap: An Exploration of Competitive Rhyming in Hip Hop, in African Battle Traditions of Insult* 147 (2023) ................................................................. 8

*The Oxford Handbook of Music* (Justin D. Burton & Jason Lee Oakes eds., online ed.. 2018) ................................................................................................................ 6, 8

Eithne Quinn, *Nuthin' But a G' Thang: The Culture and Commerce of Gangsta Rap* (2004) ..... 4

Tricia Rose, *Black Noise 2* (1994) ) ................................................................................3

Laurie A. Rudman & Matthew R. Lee, *Implicit and Explicit Consequences of Exposure to Violent and Misogynous Rap Music*, 5 *Group Process. & Intergroup Relat.* 133 (2002) ......14

H. Samy Alim et. al., *Moving the Crowd, "Crowding" the Emcee*: *The Coproduction and Contestation of Black Normativity in Freestyle Rap Battles,"* 22 *Discourse Soc.* (2011) .................................................................................................................7, 8

Daniel Silver et. al., *Genre Complexes in Popular Music*, 11 *PLoS One* (2016) ........................ 7

Venla Sykäri, *Interactive Oral Composition: Resources, Strategies, and the Construction of Improvised Utterances in a Finnish Freestyle Rap Battle*, 132 *J. Am. Folklore* 3 (2019) ...... 7

Tia Tyree & Melvin Williams, *Black Women Rap Battles: A Textual Analysis of U.S. Rap Diss Song* 25 *Wom. & Music* 64 (2021) .......................................................8, 9, 10, 11

Elijah Wald, *The Dozens: A History of Rap's Mama* (2012) ...................................... 6

## **INTEREST OF AMICI**[1]

*Amici* are nationally-recognized experts on the use of rap lyrics in court. They are criminologists and scholars of criminal justice, freedom of expression, and intellectual property. *Amici* have authored landmark experimental studies demonstrating that rap evidence creates a strong risk of bias in the courtroom; a legal treatise on the use of rap lyrics in criminal proceedings; content analyses of rap music; and research on the intersection of race and the criminal justice system.[2] *Amici* have served as expert witnesses, been widely quoted in media, and presented their research to thousands of attorneys, judges, scholars, and members of the public.

As experts on rap music and its use in judicial proceedings, *amici* seek to provide this Court with the contextual framework necessary to examine rap lyrics—one that accounts for rap's history as artistic expression, its genre-specific practices, and, in particular, the unique role and normative conventions of battle raps, rap feuds, and "diss tracks." A thorough understanding of this context is necessary not only to assess the defamation claim at issue in this case[3] but to prevent the harms that arise when courts treat rap lyrics as confessions or factual representations.

---

[1] Amici have no personal or financial stake in this case, nor any relationship to the parties to this litigation. Neither the parties nor their counsel have authored this brief in whole or in part. On May 9, 2025, *Amici* contacted counsel for the parties via email to determine their position on this motion. Defendant indicated it will not oppose the motion. Plaintiff did not respond.
[2] A list of *amici curiae* professors and their institutional affiliations is provided in Appendix A. The views expressed by *amici* do not purport to represent the views of their affiliated institutions.
[3] *Amici* take no position on other causes of action alleged in Plaintiff's complaint.

## SUMMARY OF ARGUMENT

Drake's defamation claim rests on the assumption that every word of "Not Like Us" should be taken literally, as a factual representation. This assumption is not just faulty—it is dangerous. When rap lyrics are admitted, it is because they are treated as literal. This in turn opens the door to racial bias and stereotypes into the courtroom, as empirical studies have demonstrated. Treating rap lyrics as literal also threatens First Amendment speech protections, and the practice already has created a demonstrable chilling effect across the industry.

As this Court considers whether the song lyrics at issue are expressions of opinion or rhetorical hyperbole on the one hand, or assertions of fact on the other,[4] *amici* respectfully urge this Court to consider rap's history and artistic conventions—and to recognize that diss track lyrics are far from factual representations. As we demonstrate below, they are hyperbolic forms of creative expression consistent with the unique artistic practices and normative conventions of the genre. Diss tracks are an emblematic and long-standing feature of the history and cultural context of rap. They are understood by audiences not to represent factual assertions about the opposing artist, but rather to demonstrate skill and dominance meant to build allegiance and win competitions through clever wordplay, hyperbole, bluster, and demonstrations of disrespect. This Court should consider this context and find the rap lyrics at issue in this case are a form of rhetorical hyperbole, not factual assertions.

---

[4] *Rapaport v. Barstool Sports Inc.*, No. 22-2080-CV, 2024 WL 88636 (2d Cir. Jan. 9, 2024); *Brian v. Richardson*, 87 N.Y.2d 46, 51, N.E.2d 1126 (1995).

## ARGUMENT

**I.   Rap is an Established Musical Genre with Distinct Artistic Conventions that Courts Must Consider Before Treating Lyrics as Factual Representations.**

### A. Rap Music Has A Long History As A Rebellious And Defiant Art Form That Has Developed Unique And Specific Artistic Conventions And Modes Of Expression

Rap music is the verbal and musical element of hip hop, a cultural movement born in response to social conditions in predominantly Black urban communities, including economic decline, deindustrialization, urban neglect, and high crime.[5] Hip hop comprises multiple forms of artistic expression including breakdancing, DJing, graffiti, and MC'ing.[6]

Rap is an extension of the Black American tradition of oral storytelling and "signifying," a technique that incorporates exaggeration, metaphor, and wordplay.[7] The core of "signifying" is the intentional manipulation of language, contrasting between literal and figurative meanings to create ambiguous and intentionally complex messages.[8] When combined with rap's use of constantly evolving Black vernacular slang, and its tendency to create new words and attribute varied meanings to common words, rap is particularly susceptible to misinterpretation.

It is therefore critically important that courts understand the history, norms, and artistic conventions of rap music as crucial factors in determining the meaning of rap lyrics. In the words of the California Court of Appeal, given "the figurative expressions which they are . . . they are

---

[5] Charis E. Kubrin & Erik Nielson, *Rap on Trial*, 4 *Race & Just.* 185, 186 (2014).
[6] *See* Tricia Rose, *Black Noise* 2 (1994); Jeff Chang, *Can't Stop Won't Stop: A History of the Hip-Hop Generation* 17 (2005).
[7] Henry Louis Gates, Jr., *The Signifying Monkey: A Theory of African American Literary Criticism* 53 (1988).
[8] *Id.*

not intended to be and should not be read literally on their face."[9]

## B. The Normative Conventions of Rap as a Genre

Courts frequently misinterpret rap lyrics as literal statements of fact, overlooking rap's distinct conventions arising from both historical traditions and intense market pressures. These misinterpretations, which can amount to criminalization of rap lyrics, pose a serious threat to artistic expression.[10] Two key normative conventions make rap particularly susceptible to misinterpretation in judicial proceedings.

First, stage names and public personas are a defining feature of the genre. Rap artists routinely create fictionalized characters under which they perform: Marshall Mathers performs as "Eminem"; Jeffery Williams performs as "Young Thug;" and so on. Rap artists often create a hypermasculine, street-hardened persona for their musical careers because such personas lead to greater commercial success.[11] But these personas rarely represent real-life identities. When asked about his song *High All the Time*, Curtis James Jackson III, known professionally as 50 Cent, explained "I don't drink and I don't use drugs, and I didn't back then either. I put that joint on

---

[9] *People v. Coneal*, 254 Cal. Rptr. 653, 666 (2019). *See also United States v. Jordan*, 714 F. Supp. 3d 158 (E.D.N.Y. 2024) (engaging in extensive review of history and context of rap music); Erik Nielson and Andrea Dennis, *Rap on Trial: Race, Lyrics and Guilt in America* (2020).

[10] Andre Gee, *Rappers Are Saying They're 'Cappin' in Songs. Here's Why*, *Complex* (Aug. 10, 2022), https://www.complex.com/music/a/andre-gee/rap-disclaimers-lyrics-cappin-monster-corleone.

[11] The rise of "gangsta rap" (a subgenre of rap focusing on street hustlers and urban life in the United States) in the 1980s popularized violent criminal personas among rap artists. Early rap groups like N.W.A and the Geto Boys found commercial success beyond the Black community, making these personas a powerful tool for broader appeal and marketability. See Eithne Quinn, *Nuthin' But a G' Thang: The Culture and Commerce of Gangsta Rap* (2004); Charis E. Kubrin, *Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music*, *52 Soc. Probs.* 360, 367 (2005); Kubrin & Nielson, *supra* note 5 at 198.

the first record because I saw artists consistently selling 500,000 with that content."[12]

Even as rap artists fabricate criminal personas, they also strive to appear authentic and proclaim they are "keepin' it real." But "keepin' it real" doesn't mean lyrics should be taken as fact. The term can mean rejecting "sanitized Hollywood depictions of life," revealing "the complexities and depth of life in the inner city," or even fabricating criminal activities to maintain a tough image—a common practice in the rap industry.[13] Without understanding the multilayered complexities of rap artists' claims to authenticity, courts can misconstrue rap lyrics as literal depictions of real life.

Second, braggadocio, hyperbole, and competitive wordplay are among rap's most defining artistic practices. As *amici* discuss below, these characteristics define rap battles and diss tracks, where exaggeration and lyrical cleverness take precedence over the truth.[14] Rappers use these battles to showcase their lyrical skills, focusing on creative insults designed to entertain and impress their audience. It is critically important that courts consider the particular artistic norms around rap battles when determining whether lyrics should be deemed factual representations.

### C. "Diss Tracks," Rap Battles, And Rap Feuds Are Part Of An Established Tradition In Rap Music Involving Outrageous Hyperbole And Exaggeration, Which Neither Fans Nor Performers Take As Literal.

Competition and verbal sparring have been integral to rap music since the art form's inception in the 1970s, drawing on a long tradition in African American culture. Rap battles and

---

[12] 50 Cent & Jeff O'Connell, *Formula 50: A 6-Week Workout and Nutrition Plan That Will Transform Your Life* 2-3 (2013).

[13] Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 *Colum. J. L. & Arts* 1, 19-20 (2007). *See also Jordan*, 714 F. Supp. 3d at 163.

[14] Paul Edwards, *How to Rap: The Art and Science of the Hip-Hop MC* 25 (2009).

"diss tracks" are often vicious, graphic, and hyperbolic, and rap lyrics regularly contain accusations of disreputable conduct, including illegal behavior. Audiences avidly follow rap feuds for their entertainment value and sheer drama. They expect exaggeration, insult, and lyrics that hit below the belt. They understand these performances are contests of verbal dexterity and lyrical domination—not factual arguments or a series of news reports.

Historically, the creative use of language and verbal competition are found in cultural practices within the African American community. These practices, referred to as "dissing," "capping," "roasting," or "clowning," involve ritual exchange of insult. As one example, "the Dozens" is a verbal game of dissing someone's mother using highly exaggerated, often sexually loaded, humorous ritualized insults with expletives and profane language.[15]  Another example, "signifyin,'" is a style of verbal play where an individual denigrates another through witty play on words and irony.[16] These games of insult are meant to showcase the intellect, sharpness of tongue, and wit of the competitors.

 Rap music is a continuation of these cultural traditions.[17] In the words of rapper Ice Cube, "the essence and the origin of hip-hop is to battle. "[18] As a result, rap is an especially rich site of insult, where insults abound as a means of spice, rebellion, entertainment, and humor, building on the genre's traditional use of metaphor, play on words, and boasting.[19] Nowhere is this more evident than in rap battles and diss tracks—staples of the genre.

---

[15] *See* Singhi Mavima, *Bigger By the Dozens: The Prevalence of Afro-Based Tradition in Battle Rap*, 3 *J. Hip Hop Stud.* 86, 90 (2016); *see also* Elijah Wald, *The Dozens: A History of Rap's Mama* (2012).
[16] Mavima, *supra* note 15, at 96.
[17] *Id.* at 89.
[18] *The Oxford Handbook of Hip Hop Music* (Justin D. Burton & Jason Lee Oakes eds., online ed.. 2018).
[19] Lily E. Hirsch, *Insulting Music: A lexicon of Insult in Music* 19 (2022).

Rap Battles

A rap battle is a live contest between rappers, often performed before a crowd, where the objective is to outwit, outflow and out-diss one's opponent. Emerging from perceived transgressions, insults or disses, rap battles are "intensely competitive verbal displays"— "manifestations of impoliteness"[20] characterized by verbal aggression and "lyrical invectiveness."[21] In rap battles, two components are on display: one's linguistic and witty ability, as represented by what one raps, and one's profile as an artist, showcased by their presentation and performance in battle.[22]

Rap battles nearly always incorporate insult. Insults can be aimed at the persona adopted by the opponent, but they can also be intended as direct attacks on the individual,[23] emphasizing, for example, "opponents' drug use, fictional criminal personas, failure to provide for one's children, and irresponsible criminal records,"[24] among other topics. Indeed, "[p]hysical violence references and death threats are common in rap music and rap battles."[25] Whether a battler uses jokes, insults, bravado, aggression, narrations, creative language, visual performance, or audience participation, the objective is to be victorious by displaying superior word play.[26]

---

[20] Enis Oğuz & Hale Işık-Güler, *Rap Devil versus Rap God: Impoliteness in a Rap Battle*, 21 *J. Pol. Res.* 127, 128 (2025).

[21] H. Samy Alim et. al., *Moving the Crowd, "Crowding" the Emcee: The Coproduction and Contestation of Black Normativity in Freestyle Rap Battles,"* 22 *Discourse Soc.* 422, 425 (2011); Daniel Silver et. al., *Genre Complexes in Popular Music*, 11 *PLoS One* (2016).

[22] Mavima, *supra* note 15, at 93.

[23] Venla Sykäri, *Interactive Oral Composition: Resources, Strategies, and the Construction of Improvised Utterances in a Finnish Freestyle Rap Battle*, 132 *J. Am. Folklore* (2019).

[24] Mavima, *supra* note 15, at 93.

[25] *See* Oğuz & Işık-Güler, *supra* note 20, at 145; *see also* Mian Jia & Shuting Yao, *Yo I am Superman, You Kiddo Go Home: Ritual Impoliteness in Chinese Freestyle Rap Battles*, 42 *Text & Talk* (2021).

[26] Marcus W. Johnson, *Serious with Wordplay: Battle Rap as a Critical Literary Site and Model*, 3 *J. Culture & Values Educ.* 25, 26 (2020).

Importantly, battle rap artistic conventions are universal and widely understood in the rap community all over the world.[27]

Because of its rawness, "battling" is sometimes criticized as embodying the worst of the violence and misogyny that rap is accused of promoting. But battle rap is not a corruption of Black culture; it is the modern incarnation of long-held oral, competitive, and communal traditions that are seen throughout the African American experience.[28] Indeed, battles remain an important symbolic space for rappers to construct, contest, and negotiate individual and collective identities.[29] Many of rap's biggest stars including Jay Z, DMX, and Eminem got their start battling. Early in his career, for instance, Jay-Z engaged in career-building battles with rap artists such as Tupac, Nas and Mobb Deep.

As battle rap evolved over time, battles shifted from primarily freestyle contests—improvisational verbal duels—to commercially released songs produced for mass audiences that involve the exchange of "written," or non-improvised verses, that are researched and composed with the opponent in mind.[30] These "diss songs" or "diss tracks" have become an integral part of the rap battle tradition.[31]

---

[27]  *See* DiArron Morrison & Diana Watkins, *A Call (and Response) to Battle Rap*, 12 *J. Cont. Rhet.* 106, 108-111 (2022); *see also* Matthew Oware**,** *Battle Rap: An Exploration of Competitive Rhyming in Hip Hop*, *in African Battle Traditions of Insult* 147, 147–64 (Springer 2023).

[28] *See* Mavima, *supra* note 15, at 86; s*ee also* DiArron Morrison & Diana Watkins, *A Call (and Response) to Battle Rap*, 12 *J. Cont. Rhet.*106 (2022).

[29] *The Oxford Handbook of Hip Hop Music*, *supra* note 18.

[30] Alim et al., *supra* note 21.

[31] Tia Tyree & Melvin Williams, *Black Women Rap Battles*: *A Textual Analysis of U.S. Rap Diss Song*. 25 *Wom. & Music* 64, 69 (2021) (explaining that rap does not have a monopoly on diss or insult, which can be found in rock, country, blues, and even folk music.); Hirsch, *supra* note 19, at 20.

<u>Diss Tracks</u>

Defined by insult, diss tracks are a well-known tradition in rap in which verbal threats are common and glorified.[32] In diss songs, artists verbally abuse, lay claim to territorial identities, and call into question the credibility of fellow artists. Diss tracks usually serve one of three purposes: to reclaim the respect of someone who has been put down; to put a person exhibiting hubris in their place; or to bait another person and rustle up drama. [33] Artists aim to exalt themselves by humiliating their competitors, even as diss tracks are often limited to verbal exchanges without real-life intentions,[34] and are understood by audiences as such:

> In insult verse, the accuracy of the charge matters less than its confident presentation. To be assertive is to be right; to be memorable is to win. . . . Rhyme works well for insult verse because it seeks to provoke a reaction, not prove a point. Rhymes protest and enliven previous ones by creating new uses: new distinctions, agreements, and contestations. A successful rhyme demands another.[35]

Research analyzing the content of diss tracks reveals common themes and approaches. One analysis shows that rappers market themselves in violent frameworks, establishing their masculinity and authenticity through the expression of an individual's hardships, a threat of violence, a rejection of effeminacy and homosexuality, and the maintenance of a demeanor of violence and criminality.[36] Another content analysis found that Black female rappers are commonly "tested" or "challenged" through diss tracks.[37] Lyrics by rappers including Azealia

---

[32] Denise Herd, *Changing Images of Violence in Rap music lyrics: 1979-1997*, 30 *J. Pub. Health Pol'y* 395 (2009); Joseph D. Johnson & Natalie Schell-Busey, *Old Message in a new bottle, Taking Gang Rivalries Online Through Rap Battle Music Videos on Youtube*, 4 *J. Qualitative Crim. Just. & Criminology* (2016); Mavima, *supra* note 15.

[33] Tyree & Williams, *supra* note 31, at 64.

[34] Jia & Yao, *supra* note 25; Oğuz & Işık-Güler, *supra* note 20, at 58.

[35] David Caplan, *The Art of Rhymed Insult*, 88 *Va. Q. Rev* 119, 121 (2012).

[36] Daniel Gilligan, *The Arts of "Diss Songs*," 5 *Alfred J.* 14 (2015).

[37] Tyree & Williams, *supra* note 31, at 79.

Banks, Eve, Foxy Brown, Lil' Kim, and MC Lyte, threatened to physically harm competitors ("I'll bruise jaws"; "We can go for the hands"), send crew members to incite violence ("Don't let me have to call the squad with me and get it crackin'"),[38] or kill, shoot, or stab the competitor. Rappers also accused their competitors of having had sex to gain recording deals or advance in the rap industry.

Yet another analysis finds that Eminem and Machine Gun Kelly utilized strategies commonly observed in rap battles and diss tracks including references to physical violence and explicit threats, which is common in this sub-genre. Both rappers tried to out-diss each other by verbalizing insults, curses, and dismissals, using irony and mocking in their lyrics.[39]

Verbal aggression in diss tracks are a critical way of drawing attention. As a result, diss tracks range from "authentic disagreements" to "contrived media spectacles"[40] Indeed, in the 1990s disparaging other rappers in rap battles and diss tracks became a popular industry tactic for increasing rap's commercial success.[41] Many of the conflicts or "beefs" between rival rappers are created as publicity stunts to raise flagging careers and sales, or create interest in new releases.[42]

Diss tracks by famous artists draw the attention of hundreds of millions of people, even those who are not hip-hop fans. Since responses to diss tracks take time, audiences learn details about the insults and attacks in the tracks, analyze them in detail, choose sides, and discuss them

---

[38] *Id.*

[39] Oğuz & Işık-Güler, *supra* note 20; Herd, *supra* note 32; Johnson & Schell-Busey, *supra* note 32.

[40] Tyree & Williams, *supra* note 31, at 83; Mavima, *supra* note 15, at 92.

[41] Herd, *supra* note 32, at 402 (citing Mtume ya Salaam, *The Aesthetics of Rap*, 29 *J. Pop. Cult.* 303 (1995)).

[42] Lola Ogunnaike & John Leland*, Feuding for Profit: Rap's War of Words*, *N.Y. Times*, Nov. 3, 2002 at A1.

with other people in real life and on the internet. The battle between Eminem and Machine Gun Kelly, for example, inspired hundreds of videos and discussion posts on the internet.[43] While insult rhymes summon allegiances, they also reconfigure them. A diss track

> transforms the listener's participation into an alliance. To say an insult rhyme is to participate in it, to claim the status of an ally. Rhyme asks for the listener to experience it, not just hear it. No matter how repellent the subject it explores or how intimidating the stance it strikes, a rhyme aims to be joined.[44]

In short, the exchange of diss tracks "presumes the audience possesses prior knowledge of rap music, predominant artists, and their histories and rivalries."[45] Indeed, rappers are aware that their victory depends not on factual accuracy, but on the salience of their metaphors and images as well as on the audience's ability to make these context-dependent connections.

## II.  The Use of Rap Lyrics in Judicial Proceedings Threatens to Undermine Important Civil and Constitutional Rights

### A.  Treating Rap Lyrics as Factual Representations Undermines First Amendment Rights

Drake's complaint rests on the assumption that every word of "Not Like Us" should be taken literally, as a factual representation. *Amici* urge this court to recognize the danger that assumption poses to the First Amendment's guarantee of freedom of speech. When courts ignore rap music's history and artistic conventions, the effect is to deny rap the status of art and instead to flatten lyrics into literal confessions or statements of specific intent. As we discuss below, this problematic treatment has introduced racial bias and unfair prejudice in countless criminal cases. And it has created a demonstrable chilling effect across the industry, changing longtime artistic

---

[43] Oğuz & Işık-Güler, *supra* note 20.
[44] Caplan, *supra* note 35, at 126.
[45] Tyree & Williams, *supra* note 31, at 69.

11

practices—a phenomenon rappers, commentators, and policymakers are discussing with increasing urgency.[46]

The United States District Court for the Eastern District of Pennsylvania recently recognized this danger in a civil case involving rap lyrics, and established "a presumption that artistic expression is not a factual admission":

> In a society that treasures First Amendment expression, *courts should start with a presumption that art is art, not a statement of fact*. To rebut that presumption, the party offering the evidence must demonstrate that the art is the artist's attempt to tell a factual story. The mere fact that an artistic expression resembles reality is not enough because holding otherwise would risk chilling the free expression that our society holds dear.[47]

In that case, the court held that even a "first-person [narrative] that resembles real life" is not enough to overcome the presumption without some other indicia, "like the inclusion of factual detail that is not publicly available." *Id.* In light of the chilling effects that would occur absent this presumption—and particularly in the context of rap music—the court concluded that "The First Amendment requires no less."[48]

*Amici* respectfully urge this Court to consider the First Amendment implications of this case, to establish a similar presumption, and to reject Plaintiff's invitation to assume that diss track lyrics should be taken as assertions of fact.

---

[46] *See* Jack Lerner, Charis Kubrin, et al*., Rap on Trial Legal Guide* 2d. Ed. 87-89 (2024), (collecting examples); Jack Lerner, *Rap on Trial: A Brief History*, 27 *Chap. L. Rev.* 405, 437-441 (2024).

[47] *Bey-Cousin v. Powell*, 570 F. Supp. 3d 251, 254-55 (E.D. Pa. 2021) (emphasis added).

[48] *See Haupt v. United States* 330 U.S. 631, 642  1947) (speech-based evidence "is *to be scrutinized with care* to be certain the statements are not expressions of mere lawful and permissible difference of opinion" (emphasis added)).

**B.  Treating Rap Lyrics As Literal Makes It More Likely That Rap Lyrics Will Be Exploited To Introduce Prejudice And Racial Bias In Other Cases.**

The claim that "Not Like Us" should be taken literally not only threatens First Amendment rights; it has also functioned as a gateway to introduce racial bias and stereotypes in the courtroom. If rap lyrics are treated as literal, they are more likely to be found probative and to be admitted; if they are considered creative expression, they are less likely to be found relevant or to pass muster under Federal Rules of Evidence 403 and 404, and state equivalents. Literality is thus extremely important because, as the California Legislature found, "a substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence."[49]  Explicitly recognizing the connection between unfair prejudice and literality, in 2022 the Legislature required courts to presume "that the probative value of the creative expression for its literal truth is minimal" absent certain specified conditions.[50]

Research demonstrates that rap evidence can inject bias and racial prejudice into legal proceedings. This is particularly evident when considering how rap music triggers racially biased attitudes. That is, when people think about rap music, they are also thinking about race, which results in racially biased judgments.[51] This point is supported across three decades' worth of empirical studies. These studies demonstrate that exposure to rap music can result in individuals

---

[49] A.B. 2799, 2021-2022 Leg., Reg. Sess. (Cal. 2022).
[50] Id.
[51] Adam Dunbar & Charis E. Kubrin, *Imagining violent criminals: An experimental investigation of music stereotypes and character judgments*. 14 *J. Exp. Crim.* 507 (2018).

judging a person as more hostile[52] and having worse character,[53] particularly when that person is Black. In other words, the bias activated by rap as a genre likely relates to the genre's association with the Black community.

This also evident when considering how stereotypes about the genre affect the interpretation of the lyrics. Violent lyrics represented as rap music are, on average, interpreted as more literal and more threatening than identical lyrics represented as a different genre.[54] Similarly, individuals make inferences about a person's character based on whether they write rap lyrics,[55] including whether they are likable and involved in criminal activity.

In short, it is dangerous to assume that rap lyrics should be taken literally, because doing so opens the door to racial bias and prejudice in judicial proceedings. Introducing rap lyrics at trial is a way to invoke racial stereotypes without ever explicitly mentioning race, and to do so in a way that shapes how jurors perceive the evidence and the defendant.

*Amici* respectfully urge this court to be aware of the consequences that result from treating lyrics as factual assertions.

---

[52] Laurie A. Rudman & Matthew R. Lee, *Implicit and explicit consequences of exposure to violent and misogynous rap music*. 5 *Group Process. & Intergroup Relat*., 133 (2002); James D. Johnson et.al., *Converging interracial consequences of exposure to violent rap music on stereotypical attributions of blacks, 36 J. Experimental Soc. Psychol*. 233 (2000).
[53] Sandra Graham & Brian S. Lowery, *Priming unconscious racial stereotypes about adolescent offenders*. 28 *Law & Hum. Behav*. 483, 504 (2004).
[54] Adam Dunbar et. al., *The Threatening Nature Of "Rap" Music, 22 Psychol. Pub. Pol'y & L*., 280-292 (2016); Carrie B. Fried, *Bad Rap For Rap: Bias In Reaction To Music Lyrics, 26 J. Applied Soc. Psychol.* 2135 (1996).
[55] Stuart P. Fischoff, *Gangsta' Rap and a Murder in Bakersfield*, 29 *J. Applied Soc. Psychol.* 795, 805. (1999).

## <u>CONCLUSION</u>

For the foregoing reasons, *amici* respectfully urge this Court to grant the defendant's motion to dismiss as to plaintiff's defamation claim.

Dated: May 14, 2025                    Respectfully Submitted,

 /s/ *Jack I. Lerner*                    /s/
Jack I. Lerner
Sameer M. Ashar
Delara Abbasi[*]
Alexander Avakian[*]
Madeleine Kavoossi[*]
Andrew Pratt[*]
Bonnie Wong[*]
UCI INTELLECTUAL PROPERTY, ARTS, AND
    TECHNOLOGY CLINIC
UNIVERSITY OF CALIFORNIA, IRVINE SCHOOL OF LAW
401 E. Peltason
Irvine, CA 92697
(949) 824-7684
jlerner@law.uci.edu

Counsel for *Amici Curiae*

---

[*] Law student interns in compliance with this Court's Plan for Student Practice, and certified law students pursuant to Rule 9.42 of the California Rules of Court.

## APPENDIX A: List of *Amici Curiae*

*Institutional affiliations are listed for identification purposes only. The views expressed herein do not purport to represent the institutional views of the universities listed below.*

Charis E. Kubrin, Ph.D.
Professor of Criminology, Law & Society and (by courtesy) Sociology
School of Social Ecology
University of California, Irvine

Jack I. Lerner
Professor of Clinical Law
School of Law
University of California, Irvine

Adam Dunbar, Ph.D.
Assistant Professor of Criminal Justice
College of Liberal Arts
University of Nevada, Reno

Kyle Winnen
Doctoral Student
Department of Criminology, Law & Society
School of Social Ecology
University of California, Irvine

## **WORD COUNT VERIFICATION**

I, Jack I. Lerner, certify that according to the word count of the word-processing program used to prepare the foregoing memorandum of law, and exclusive of the portions of it that are excluded by Local Rule 7.1, there are 4,373 words in the document.