UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUBREY DRAKE GRAHAM, | 1:25-cv-399 (JAV) |
| Plaintiff, | |
| v. | |
| UMG RECORDINGS, INC., | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ....................................................................................................................4

STANDARD OF REVIEW ......................................................................................................6

ARGUMENT .......................................................................................................................6

I.      THE AC ADEQUATELY PLEADS DEFAMATION.......................................................6

        A.      The AC Adequately Alleges that the Defamatory Statements Are
               Statements of Fact...........................................................................................7

        B.      The AC Adequately Alleges that the Defamatory Statements Are Mixed
               Opinion .........................................................................................................17

        C.      The AC Adequately Alleges Actual Malice .........................................................20

II.     THE AC ADEQUATELY PLEADS A CLAIM UNDER NEW YORK
       GENERAL BUSINESS LAW § 349.................................................................................22

III.   THE AC ADEQUATELY PLEADS SECOND DEGREE HARASSMENT ..................25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A.S.A.P. Logistics v. UPS Supply Chain*,
   629 F. Supp. 3d 42 (E.D.N.Y. 2022) ...................................................................7

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001)...........................................................................6

*Asset Co. v. Katzoff*,
   2025 WL 919489 (S.D.N.Y. Mar. 26, 2025) ...........................................................23

*Baiqiao Tang v. Wengui Guo*,
   2019 WL 6169940 (S.D.N.Y. Nov. 20, 2019).........................................................26

*Bellavia Blatt & Crossett v. Kel & Partners*,
   151 F. Supp. 3d 287 (E.D.N.Y. 2015) ..............................................................8, 12

*Biro v. Condé Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012)................................................................17

*Biro v. Condé Nast*,
   807 F.3d 541 (2d Cir. 2015)..........................................................................20

*Blasetti v. Pietropolo*,
   213 F. Supp. 2d 425 (S.D.N.Y. 2002)............................................................26, 27

*Bobulinski v. Tarlov*,
   758 F. Supp. 3d 166 (S.D.N.Y. 2024)................................................................15

*Brian v. Richardson*,
   660 N.E.2d 1126 (N.Y. 1995).........................................................................11

*Burton v. Label*,
   344 F. Supp. 3d 680 (S.D.N.Y. 2018)................................................................6

*C.F. v. J.D.*,
   2024 WL 5279215 (N.Y. Sup. Ct. Dec. 17, 2024) ..................................................27

*Casper Sleep v. Mitcham*,
   2016 WL 7188788 (S.D.N.Y. Nov. 17, 2016)........................................................25

*Casper Sleep v. Mitcham*,
   204 F. Supp. 3d 632 (S.D.N.Y. 2016)................................................................22

*Daniel v. Safir*,
   175 F. Supp. 2d 474 (E.D.N.Y. 2001) ...............................................................26

*Davis v. Boeheim*,
  22 N.E.3d 999 (N.Y. 2014) .................................................................................................1, 7

*Delgado v. Sonnen*,
  2025 WL 1042343 (S.D.N.Y. Feb. 18, 2025) ...................................................................16, 17

*Delong v. Bell*,
  2022 BL 550806 (N.Y. Sup. Ct. July 7, 2022) ........................................................................26

*Duran v. Henkel*,
  450 F. Supp. 3d 337 (S.D.N.Y. 2020) .....................................................................................22

*Dwyer v. Allbirds*,
  598 F. Supp. 3d 137 (S.D.N.Y. 2022) .....................................................................................24

*E. Rémy Martin v. Sire Spirits*,
  2022 WL 94882 (S.D.N.Y. Jan 10, 2022) ...............................................................................10

*Feitosa v. Keem*,
  2023 WL 2267055 (W.D.N.Y. Feb. 28, 2023) .......................................................8, 10, 14, 16

*Friend v. Gasparino*,
  61 F.4th 77 (2d Cir. 2023) .......................................................................................................27

*Gaidon v. Guardian Life*,
  725 N.E.2d 589 (N.Y. 1999) ....................................................................................................22

*Galella v. Onassis*,
  487 F.2d 986 (2d Cir. 1973) .....................................................................................................26

*Gisel v. Clear Channel Commc'ns*,
  942 N.Y.S.2d 751 (App. Div. 2012) .........................................................................................19

*Glob. Network Commc'ns, v. City of New York*,
  458 F.3d 150 (2d Cir. 2006) .....................................................................................................14

*Goel v. Bunge*,
  820 F.3d 554 (2d Cir. 2016) .......................................................................................................6

*Goldfarb v. Channel One Russia*,
  663 F. Supp. 3d 280 (S.D.N.Y. 2023) .......................................................................................7

*Goshen v. Mut. Life*,
  774 N.E.2d 1190 (N.Y. 2002) ..................................................................................................24

*Hayashi v. Ozawa*,
  2019 WL 1409389 (S.D.N.Y. Mar. 28, 2019) .........................................................................11

*Hazlewood v. Netflix*,
2023 WL 6771506 (N.D. Tex. Oct. 11, 2023) ........................................................8

*Himmelstein v. Matthew*,
171 N.E.3d 1192 (N.Y. 2021) ...............................................................................23

*Hughes v. Twenty-First Century Fox*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018) ...................................................................20

*Immuno AG. v. Moor-Jankowski*,
567 N.E.2d 1270 (N.Y. 1991) ...............................................................................16

*Kritzia B. v. Onasis P.*,
978 N.Y.S.2d 846 (App. Div. 2014) ......................................................................27

*Lindell v. Mail Media*,
575 F. Supp. 3d 479 (S.D.N.Y. 2021) ...................................................................15

*Long v. Beneficial*,
330 N.Y.S.2d 664 (App. Div. 1972) ......................................................................26

*M.K.B. v. Eggleston*,
445 F. Supp. 2d 400 (S.D.N.Y. 2006) ...................................................................25

*M.V.B. Collision v. Allstate*,
728 F. Supp. 2d 205 (E.D.N.Y. 2010) ...................................................................25

*McNamee v. Clemens*,
762 F. Supp. 2d 584 (E.D.N.Y. 2011) .............................................................16, 18

*In re Methyl Tertiary*,
175 F. Supp. 2d 593 (S.D.N.Y. 2001) ...................................................................24

*Mirza v. Amar*,
513 F. Supp. 3d 292 (E.D.N.Y. 2021) ...................................................................16

*N. State Autobahn v. Progressive Ins.*,
953 N.Y.S.96 (App. Div. 2012) .......................................................................24, 25

*O'Keefe v. Ogilvy & Mather*,
2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006) .......................................................14

*Orlander v. Staples*,
802 F.3d 289 (2d. Cir. 2015) .................................................................................22

*Oswego Laborers' v. Marine Midland Bank*,
647 N.E. 741 (N.Y. 1995) .....................................................................................22

*Palin v. N.Y. Times*,
    940 F.3d 804, 816 (2d Cir. 2019)........................................................................8, 21

*People v. Couri*,
    2002 WL 31748585 (N.Y. Crim. Ct. Dec. 4, 2002) ........................................26, 27

*People v. Marquan M.*,
    19 N.E.3d 480 (N.Y. 2014)..........................................................................................27

*People v. Tiffany*,
    721 N.Y.S.2d 741 (App. Div. 2001) ..........................................................................27

*Poulos v. N.Y.*,
    2016 WL 224135 (S.D.N.Y. Jan. 19, 2016) ..............................................................26

*Press v. Primavera*,
    685 F. Supp. 3d 216 (S.D.N.Y. 2023)..........................................................................6

*Rapaport v. Barstool Sports*,
    2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021) ...........................................................12

*Restis v. Am. Coal.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014)..........................................................................16

*Richardson v. Brown*,
    104 N.Y.S.3d 132 (App. Div. 2019) ..........................................................................27

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007).........................................................................................18

*Samah DD. v. Mark VV.*,
    2025 WL 554478 (N.Y. Sup. Ct. Feb. 20, 2025)......................................................27

*Sandals Resorts v. Google*,
    925 N.Y.S.2d 407 (App. Div. 2011) ..........................................................................11

*Sheehy v. Big Flats*,
    541 N.E.2d 18 (N.Y. 1989)..........................................................................................25

*Spock v. U.S.*,
    464 F. Supp. 510 (S.D.N.Y. 1978)..............................................................................26

*Staeher v. Hartford Fin. Grp.*,
    547 F.3d 406 (2d Cir. 2008).........................................................................................15

*Steinhilber v. Alphonse*,
    501 N.E.2d 550 (N.Y. 1986)..........................................................................11, 15, 17

*Torain v. Liu*,
    2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007) ........................................................................19

*True v. N.Y. State Dep't of Corr. Servs.*,
    613 F. Supp. 27 (W.D.N.Y. 1984) ........................................................................................26

*Washington v. Washington*,
    70 N.Y.S.3d 560 (App. Div. 2018) ........................................................................................27

Plaintiff Aubrey Drake Graham ("Plaintiff" or "Drake") respectfully submits this Opposition to UMG Recordings, Inc.'s ("Defendant" or "UMG") Motion to Dismiss Plaintiff's Amended Complaint, ECF Nos. 42, 43 ("MTD"), and Request for Judicial Notice, ECF No. 44 ("RJN").

## PRELIMINARY STATEMENT

The primary question raised by UMG's MTD is whether Drake's Amended Complaint, ECF No. 41 ("AC"), plausibly alleges that "a reasonable [listener] *could* have concluded" that "Not Like Us" and its accompanying cover-art and music video "were conveying facts about" Drake. *Davis v. Boeheim*, 22 N.E.3d 999, 1005 (N.Y. 2014) (emphasis added). The AC does not just allege that reasonable listeners *could* have reached that conclusion—it plausibly alleges that millions in fact did so. As the AC alleges, the unmistakable message conveyed by the Recording,[1] Image, and Video is the indisputably false allegation that Drake is a "certified pedophile[]." The Recording calls for violence against Drake, and the Image offers aspiring assailants a map of where to strike: an overhead photograph of Drake's actual Toronto home, plastered with icons known to identify the location of child sex offenders.

UMG's theory is that all of this was "hyperbole"—a harmless joke that no reasonable person would take seriously because it was part of a "rap battle." But UMG's theory collides with the reality that the Recording's false allegations of pedophilia, broadcast to the entire world via the most powerful music company, have proven to be toxic and indelible. In other words, UMG's "just joking" narrative runs headfirst into the concrete facts alleged in the AC. Accepted as true (as they must be here), the AC's allegations establish that "Not Like Us" was *not* widely understood to be mere hyperbole: days after UMG published the Recording and Image, Drake's

---

[1] Terms not defined herein have the meaning in the AC.

home was attacked and his security guard was nearly murdered; in the weeks that followed, countless listeners showed that they believed the allegations to be true, as confirmed by the commentators and press that covered the song.  Nor can UMG hide behind its "hyperbole" mantra given its decision—long *after* the "rap battle" had ended and Drake had informed UMG of the substantial harm the Recording had caused—to transform false accusations of pedophilia into a de facto national anthem by using its massive resources to land the Recording as the centerpiece of the Super Bowl, the Grammys, and more.

Unable to address the actual facts Drake has alleged, UMG instead asks this Court to ignore them as "unreliable" and replace them with UMG's own (disputed) allegations, offered through a seventeen-exhibit RJN.  Through these cherry-picked exhibits—which include news articles, podcast transcripts, and lyrics dating back years—UMG paints a self-serving picture of the "context" in which the Recording was initially published, one that is irreconcilable with the "context" pleaded in the AC.  Unsurprisingly, courts do not permit these kinds of tactics at the motion-to-dismiss stage.  But even if the Court were to accept UMG's disputed construction of the context, there is no indication that the *average listener*—watching the Super Bowl or browsing top hits on Spotify—would have *any knowledge* of the nuances of a multi-year rap battle, let alone the subjective interpretation spun by UMG's lawyers here.

Even if this Court were inclined to agree with UMG's improper factual narrative, the MTD would still fail because the AC pleads facts showing that the Defamatory Statements imply that they are based upon undisclosed facts, rendering them "mixed" opinion at most.  In response, UMG argues, based again on extrinsic and disputed evidence, that listeners understood the Recording to be referring merely to "rumors" concerning "Drake's relationships with minors," which, like UMG's other arguments, cannot be squared with the AC's actual allegations, including

that listeners understood the Recording to be based upon *actual* and *undisclosed* information. Not only is this argument procedurally improper, and unsupported by UMG's own exhibits, it also disproves UMG's main argument: any listeners who were sufficiently clued-in to understand that the Recording was actually referencing prior questions raised about Drake's relationships with minors surely would have understood the lyrics as **factual**, not just hyperbolic name-calling.

The AC also properly alleges a claim under Section 349 of the New York General Business Law. The AC pleads how UMG secretly paid, directly or indirectly, streaming and radio platforms and others to boost the Recording. UMG's failure to disclose these acts and practices deceived consumers of music in New York, and harmed Drake, both as an artist and consumer of music, because the "botting" and artificial streams that UMG funded diluted and diminished Drake's royalties. UMG's arguments mostly seek to impose pleading requirements that do not exist, such as a requirement to plead "actual knowledge," or that the deceptive acts and practices were the but-for cause of the Recording's success.

As for Drake's harassment claim, New York courts have long recognized that individuals may sue under Section 240.26 of the Penal Code. Drake sufficiently pleads that UMG intended to harass, annoy, or alarm Drake through its year-long publication and promotion of the Defamatory Material, especially *after* UMG knew about the violence and harm Drake was already experiencing.

For all of these reasons, the MTD and RJN should be denied.[2]

---

[2] The amicus brief, ECF No. 52-1, raises interesting academic issues but, particularly at the pleadings stage, offers no guidance for this Court. No authority supports the proposition that rap music can **never** defame a subject of that music, regardless of the actual words and imagery used in the music, the specific context of and around the song, or evidence of how listeners actually understood it, and in any event this MTD is not the appropriate vehicle by which to announce such a sweeping legal policy.

## BACKGROUND

The Recording, first published by UMG on May 4, 2024, accuses Drake of being a criminal pedophile.

- The Recording identifies Drake by name and states that, based on undisclosed facts and sources, Drake has a predilection for underage women: "***Say, Drake, I hear you like 'em young***." ¶¶60, 63.[3]

- The next line threatens that Drake should be careful not to go to prison, where child predators are targeted: "***You better not ever go to cell block one***." ¶60.

- The Recording says that women who fall in love with Drake should be careful to "***hide***" their "***lil' sister from***" Drake. *Id.*

- The Recording accuses Drake of being a convicted pedophile: "***Certified Lover Boy? Certified pedophiles***." ¶61.

- In a play on the dual meaning of the word "minor," the Recording says that Drake is "***Tryna strike a chord and it's probably A-Minor***." *Id.*

- Later, the recording refers to Drake as a "***predator***." *Id.*

- Having identified Drake as a pedophile, the Recording repeatedly calls for violence against Drake. ¶62.

The Image and Video unmistakably reinforce the defamatory allegations in the Recording. The Image features a satellite view of Drake's Toronto home, with location information, covered in 13 icons denoting convicted sex offenders. ¶¶65-66, 78. During the Video, the lyrics "***Tryna strike a chord and it's probably A-Minor***" play while Lamar is playing hopscotch—a game for children. ¶107. Later, during the lyrics stating that a "***predator move in flocks***," the Video shows large shipping containers—commonly associated with sex trafficking. ¶108. The portions of the Recording, Video, and Image accusing Drake of being a pedophile and/or reinforcing that accusation are referred to herein as the "Defamatory Statements." *See* ¶¶60-61, 66, 107-08, 110.

---

[3] All citations to ¶ __ are to the AC.

Notwithstanding that the Defamatory Statements were part of a "rap battle," millions of listeners understood them as statements of fact. This included social media users, ¶¶73-74 (*see also* MTD Ex. J at 3), NPR guests, ¶¶84-85, and the trade press, ¶¶86-87. Others understood the Defamatory Statements were based on *undisclosed* facts. ¶¶75-76. And many understood that the Image conveyed Drake as a sex offender. ¶78. All the while, UMG took unprecedented steps to ensure the broadest possible reach of the Recording, such as "whitelisting" the Recording to ensure content creators would republish it. ¶189. Foreseeably, *see* ¶¶19, 90-92, 125, violence against Drake ensued. ¶¶94-100.

Drake publicly denied the allegations, ¶102, and later explained in detail to UMG how the false Defamatory Statements were causing him severe harm. ¶¶205-07. In response to that plea from its own artist, UMG doubled-down on its promotional activities and effectively *dared* Drake to initiate legal action. ¶208. UMG campaigned to secure Grammy Awards for the Defamatory Material. ¶164. Then, after promoting Lamar as the headliner at the 2025 Super Bowl Halftime Show, UMG introduced the Recording to a new audience of more than 133.5 million people. ¶¶165-68.

The AC further alleges that UMG secretly promoted the Recording by paying, directly or indirectly, various platforms to promote, prioritize, and play the Recording. This included UMG's "pay-for-play" scheme to boost the Recording on the radio, including in New York. ¶¶184-88. UMG provided financial incentives to Spotify in exchange for Spotify affirmatively recommending the Recording to users who search for unrelated songs and artists. ¶¶179-81. UMG paid, or caused payments to be made to, third parties to use "bots" to artificially inflate the spread of the Recording on Spotify, which also took place (in part) in New York. ¶¶173, 261. A former "stream farmer" posted a video on X about "the Streaming Bot that UMG and Kendrick Lamar

use to boost Not Like Us." ¶178; *see also* ¶¶177, 182-83. UMG failed to disclose any of these tactics, and then touted the Recording's streaming and radio success. ¶¶130, 154-55, 257-58.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Burton v. Label*, 344 F. Supp. 3d 680, 691 (S.D.N.Y. 2018) (cleaned up). On a motion to dismiss, the court "draws all reasonable inferences in the plaintiff's favor, and accepts as true all non-conclusory allegations of fact." *Press v. Primavera*, 685 F. Supp. 3d 216, 223 (S.D.N.Y. 2023). "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials:" "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge*, 820 F.3d 554, 559 (2d Cir. 2016) (cleaned up).

## ARGUMENT

## I.    THE AC ADEQUATELY PLEADS DEFAMATION

A defamation plaintiff must plead: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting [defamation] *per se*, and (vii) not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001). A "public-figure plaintiff" must also plead actual malice. The MTD does not seriously dispute the sufficiency of the AC as pleaded. Instead, it challenges only two elements—defamatory statement

of fact and actual malice[4]—based almost entirely upon materials extraneous to the AC that, if relevant at all, should be introduced and tested through the adversarial process during discovery.

A.     The AC Adequately Alleges that the Defamatory Statements Are Statements of Fact

In determining whether allegedly defamatory material is fact or non-actionable opinion, the "dispositive inquiry . . . is whether a reasonable [listener] *could* have concluded that the statements were conveying facts about the plaintiff." *Davis*, 22 N.E.3d at 1005 (collecting cases) (emphasis added).  Thus, "while the question of *whether* the words *could* express the alleged defamatory meaning must be resolved by the court in the first instance, the actual meaning of those words must ultimately be determined at trial." *Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 297 (S.D.N.Y. 2023) (cleaned up) (emphasis added).  Courts in this Circuit analyze the "*Steinhilber*" factors to help distinguish between fact and opinion.  Those factors are: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact."  MTD 10.

Even a cursory review of the allegations in the AC leaves no doubt that reasonable listeners ***could have concluded*** that the Defamatory Statements asserted factual allegations about Drake.  Indeed, unlike UMG's cases, here, the AC presents ***actual evidence*** that listeners, as well as commentators in the rap industry and the press, understood the Defamatory Statements as an attempt to convey a precise factual message (pedophilia) about Drake.  *See* ¶¶51-52, 72-89, 93-

---

[4] *See A.S.A.P. Logistics v. UPS Supply Chain*, 629 F. Supp. 3d 42, 48 n.7 (E.D.N.Y. 2022) (finding defendant conceded elements of claim when it failed to challenge elements on a motion to dismiss).

101, 170-71, 219-26. At the pleading stage, these allegations are more than sufficient. For example, in *Palin v. N.Y. Times*, the Second Circuit found that statements in a newspaper editorial were capable of being understood as statements of fact, in part because allegations of "social media backlash . . . further suggest[ed] that the Times' readers perceived the false statements as fact-based." 940 F.3d 804, 816 (2d Cir. 2019). Similarly, in *Feitosa v. Keem*, the court denied defendant's motion to dismiss because reasonable readers could have understood a tweet accusing plaintiff of grooming underage girls to be an actionable statement of fact, based on the complaint's allegations citing social media posts communicating such belief. 2023 WL 2267055, *2, *7 (W.D.N.Y. Feb. 28, 2023) (California defamation law). UMG's own authorities illustrate the same point. In *Bellavia Blatt & Crossett v. Kel & Partners*, 151 F. Supp. 3d 287, 296 (E.D.N.Y. 2015) (MTD 11, 13), after converting the motion to dismiss to a motion for summary judgment because defendant asked the court to consider extrinsic evidence, the court determined that an online comment constituted nonactionable opinion in part because of the "nature of the comments posted by *other participants*," which said things like "I respect your opinion[.]" (emphasis added). *See also Hazlewood v. Netflix*, 2023 WL 6771506, *2 (N.D. Tex. Oct. 11, 2023) (finding complaint's inclusion of "sample of messages from individuals expressing concern and confusion over [plaintiff's] involvement in the Film and his connection to the incident" relevant in deciding that complaint adequately alleged defamatory meaning).

The MTD also fails to grapple with the reality that the Recording, Image, and Video all work together to reinforce the unmistakable, and false, factual message that Drake is a pedophile. Accusations of sexual abuse are especially dangerous because modern listeners are so susceptible to believing them. ¶92. This is presumably why UMG and its Chairman reacted so swiftly, including with threats of legal action, when faced with similar accusations. ¶¶20, 125, 222-23.

Here, and unlike nearly every example UMG cites (including other songs within the "battle"), the Recording is myopically focused on ensuring that listeners take one message away from the song: Drake is a pedophile.  ¶¶72-83, 88-89, 104, 113-18, 170-71, 219-20.  For example, the line "Certified Lover Boy? Certified pedophiles" (which is so self-evidently defamatory that the corporations responsible for the Super Bowl Halftime Show censored it, ¶¶165-71) communicates that Drake has been ***found*** to be a pedophile, an assertion that UMG tacitly concedes Drake has adequately alleged (at the pleading stage) to be false.  The same can be said for all the Defamatory Statements that, read in context, raise the same allegation, such as "You better not ever go to cell block one," "Say, Drake, I hear you like 'em young," "Tryna strike a chord and it's probably A-Minor," and "predator move in flocks." ¶¶60-61.  And the AC pleads, in detail, how the associated Image and Video collectively reinforce that message.  ¶¶7, 11, 14, 65-66, 72-78, 105-10, 150.

Rather than challenging the sufficiency of what the AC actually alleges, UMG's "opinion" argument attacks an imagined version of a complaint that Drake did not file, and relies almost exclusively upon inappropriate uses of extraneous materials.

*First*, UMG tries to brush aside the public commentary expressing belief in the Defamatory Statements, claiming that the "subjective opinions of a handful of people do not factor in" to the Court's "objective assessment of what a reasonable person could have understood the Recording to mean."  MTD 15.  But the AC plausibly alleges that millions, not a "handful," of people understood the lyrics as factual, and at this stage the Court must make all reasonable inferences in Drake's favor, not UMG's.  ¶¶121, 219.  In any event, UMG cites no authority suggesting the Court *cannot* consider, at the pleading stage, real life examples of listeners believing the truth of

the Defamatory Statements in evaluating whether the statements *could* have been interpreted as fact. As illustrated above, courts have done exactly that.[5]

UMG likewise deems the public commentary cited in the AC "unreliable" because it comes from "anonymous" users and contains "grammatical errors, slang, and emojis." MTD 15. But the AC does not rely solely on "anonymous" social media users—instead, it cites numerous public statements expressing belief in the allegations from the press, commentators, and podcasts. ¶¶84-87. UMG's own extraneous exhibits are in accord. *See* MTD Ex. J at 3 (trade press: "Throughout 'Not Like Us,' Kendrick accuses Drake of having inappropriate sexual relationships with minors.").[6] Many of the AC's cited social media comments were not anonymous, ¶¶75-76, 81, 114, 171, and using "slang" and "emojis" in online posts about pop culture is hardly unusual. Regardless, UMG again offers no authority for the proposition that the Court should discredit the AC's cited online comments in this context,[7] and case law is to the contrary. *See, e.g.*, *Feitosa*, 2023 WL 2267055, *2, *7, Compl., ECF No. 11, 7 (relying on Twitter posts from users with handles such as "Memelin"); *E. Rémy Martin v. Sire Spirits*, 2022 WL 94882, *9 (S.D.N.Y. Jan 10, 2022) (relying on social media posts).

---

[5] UMG cites *Rapaport v. Barstool Sports* where, after losing summary judgment, plaintiff argued on appeal that the district court "overlooked evidence" relating to public comments accusing plaintiff of the misconduct raised in the allegedly defamatory material. MTD 15. The Second Circuit denied the appeal, but without referencing or discussing this particular argument in any way whatsoever. *Id.* Moreover, the public comments cited by the plaintiff in *Rapaport* are far less compelling than those alleged here. *Compare* Ex. Q at 50-51 *with* ¶¶72-89, 104, 113-18. And the plaintiff in *Rapaport* did not even argue on summary judgment that the allegedly defamatory material was factual based on the online comments, meaning the district court had no opportunity to consider plaintiff's theory. *See Rapaport* Memo. ISO MSJ, ECF No. 104.

[6] Discovery, not this motion, is the appropriate time to consider UMG's arguments about what the relevant "context" shows about the public's understanding of the Defamatory Material.

[7] *SolidFX v. Jeppesen Sanderson* (MTD 15) is irrelevant because it concerns a motion in limine to exclude anonymous online reviews.

*Second*, UMG argues that the "tone" of the Defamatory Material "conveys hyperbole and opinion, not facts." MTD 11-13. That subjective assessment is belied by the countless listeners who think otherwise, but in any event, there is nothing "hyperbolic" about using mutually reinforcing lyrics, images, and video to brand someone as a "certified pedophile[]." Moreover, the fact that allegations of pedophilia can be understood to express "anger" or "vitriol," MTD 13, does not mean that no reasonable listener interprets those same allegations as factual—to the contrary, the AC alleges that allegations of pedophilia tap into a cultural phenomenon whereby listeners are primed simultaneously to believe and be enraged by such allegations. ¶¶19, 92, 125. The Defamatory Material is also unlike the types of communications courts have dismissed as non-actionable opinion. *See Steinhilber v. Alphonse*, 501 N.E.2d 550, 554-55 (N.Y. 1986) (MTD 13) (union recording, broadcast only to union members, was full of "nonsensical" and "juvenile" "humor," such as "'In Barbara's case, brains aren't everything . . . in her case they are nothing'" and "'in times of trouble, she is waiting to catch you . . . bent over at the right angle'"); *Brian v. Richardson*, 660 N.E.2d 1126, 1130-31 (N.Y. 1995) (MTD 13) (op-ed was "rife with rumor, speculation and seemingly tenuous inferences," relied on unnamed "sources" and "informants," and accusations were identified as "claims" where author "set out the basis for [his] personal opinion"); *Hayashi v. Ozawa*, 2019 WL 1409389, *3 (S.D.N.Y. Mar. 28, 2019) (MTD 13) ("heated" statements in personal blog post non-actionable because they went "back and forth as to whether it is criminal or fraudulent for Plaintiff to refer to herself as a doctor;" statements were caveated with qualifying language, such as "it *can be* considered fraud;" and accusations of "perjury" were "absurd" because statements had nothing to do with perjury); *Sandals Resorts v. Google*, 925 N.Y.S.2d 407, 410, 415-16 (App. Div. 2011) (MTD 13) (tone of anonymous email was "rhetorical" and laden with "rhetorical questions;" email constituted "pure opinion" because

11

"each remark [wa]s prompted by or responsive to a hyperlink" containing source material); *Bellavia*, 151 F. Supp. 3d at 294 (MTD 13) (online comment attacking law firm was "rhetorical opinion[]" because it was "full of qualifiers").  Here, the Defamatory Material does not cite sources, identify allegations as "claims," oscillate back and forth as to whether Drake is a pedophile, or express "rhetorical questions" with "qualifiers."  Pointedly, none of UMG's cases involved allegations of pedophilia, and none involved specific factual allegations demonstrating the public's belief in the truth of the allegations.

UMG relies heavily on the *Rapaport* summary judgment decision to support its flawed "tone" argument, MTD 10-16, but separate from the fact that *Rapaport* does not justify dismissal *at the pleadings stage*, the case is readily distinguishable.  There, the statements that the court found to be "obviously hyperbolic" included: the plaintiff was a "10 gallon drum of curdled milk," a "walking blob of jizz," and a "puddle of pudding," and that he looks like a "chemo Yertle the Turtle."  *Rapaport v. Barstool Sports*, 2021 WL 1178240, *16 (S.D.N.Y. Mar. 29, 2021).  But being repeatedly accused of pedophilia to billions of people is obviously different from being compared to a Dr. Seuss character or spoiled dairy; the former is a precise factual allegation that people immediately understand, the latter is literal name calling.

The same argument holds with respect to the images in *Rapaport*.  The *Rapaport* court determined that certain photos, including the cartoon of a life-size cracker walking down the sidewalk accompanied by the terms "YOU'RE THE CRACKER HONKEY," were "obviously doctored" and therefore "underscore[ed] the non-factual nature of the piece."  *Id*.  The court found the same for a cartoon in which the plaintiff was diagnosed with having "Ding Dongs for Brains" and had a "herpes" that worked as his manager.  *Id*. *17.

12




*"Not Like Us" Image*                              *Rapaport Image*

Unlike an anthropomorphized cracker sauntering down the street, the Image that appears alongside the Recording is an authentic aerial photograph of Drake's Toronto home, and the sex offender images attached to the home are likewise realistic reproductions of images commonly understood to signify the homes of registered sex offenders, which is why the average observer understood the image as conveying the false message that Drake is a sex offender.  ¶¶78-80, 234.  UMG's insistence that the Image is "doctored"—in the sense that it superimposes sex offender symbols on Drake's actual home—only confesses the falsity of the message conveyed, and UMG has cited ***nothing*** (particularly at the pleadings stage) to justify its subjective view that no reasonable observer would have interpreted the Image's inescapable message as factual.

*Third*, UMG asserts, with no support from the pleadings, that a "rap diss track" is not a forum reasonable people "expect to convey rigorous, factual content."  MTD 14.  Whatever weight UMG's argument might receive following cross-examination of whatever witness might offer it at trial, it should receive ***none*** here.  The AC alleges that UMG's standard exclusive recording contract includes a provision which permits UMG to eliminate material which, in UMG's judgment, constitutes defamation or libel, ¶¶50, 55—the necessary inference from that fact, which

13

must be drawn in Drake's favor, is that UMG itself understands that lyrics and other content within the music it publishes can defame. Moreover, UMG's "context" argument relies almost entirely on cherry-picked extrinsic evidence, such as lyrics and articles not referenced in the AC, that UMG repackages and weaves into its own subjective narrative. MTD 4-7, 14 (citing extraneous evidence). But UMG offers no authority for substituting well-pleaded allegations with extraneous evidence on a motion to dismiss. In *Feitosa*, 2023 WL 2267055, *7, the court denied defendant's request for judicial notice on similar facts. In response to a complaint alleging a defamatory tweet by a YouTube personality made during a "war of words" between the two influencers, *id.* *6, the defendant's motion to dismiss "submit[ted] his own selection of tweets [including from plaintiff] and a link to a podcast interview ***to support his version of the context*** this Court should consider." *Id.* *7 (emphasis added). The court held: "[defendant's] submissions are *far broader* than what courts normally consider in assessing a statement's context, let alone what courts consider on a motion to dismiss." *Id.* (emphasis added). The court "therefore decline[d] to consider the documents [defendant] submits and will consider the face of the complaint." *Id.* The same result should follow here. Specifically, the Court should decline to take judicial notice of UMG Exhibits A-I and L-N or, at the very least, consider only the "existence" of those exhibits and decline to consider UMG's "factual inferences based on the content of those" exhibits. *O'Keefe v. Ogilvy & Mather*, 2006 WL 3771013, *1 (S.D.N.Y. Dec. 18, 2006); *see also Glob. Network Commc'ns, v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).[8] UMG's alternative would require the Court to wade through entire bodies of literature, effectively fashioning its own expert testimony, addressing the appropriate "context" for understanding the lyrics of not just Drake and Kendrick

---

[8] Insofar as UMG offers other exhibits to "support [its] own version of the context," such as Exhibits J, K, O, and P, the Court should not give any weight to UMG's assertions. *Feitosa*, 2023 WL 2267055, *7.

Lamar, but of other artists, rap tracks, and articles omitted from UMG's self-serving collection. None of this is remotely appropriate given the Court's task: to determine whether the AC states a claim upon which relief may be granted under Rule 12(b)(6).[9]

To the extent the Court assesses "context" at this stage, UMG has done nothing to justify its assertion that the relevant "context" for all reasonable listeners would be its hand-selected examples from what it describes as a *years-long* "rap battle" involving multiple tracks from Drake and Kendrick Lamar.  MTD 13-17.  Nowhere does UMG explain why the *average* or *reasonable* listener would not only understand all of the nuances of this saga, but also understand it in the same way that UMG's lawyers do.  As alleged, the Recording has been played billions of times to people globally, ¶¶10-11, 168, 194-202, including to audiences and viewers of the Super Bowl and Democratic National Convention.  Thus, as alleged in the AC, the relevant "reasonable" listener cannot be artificially limited to devoted fans of Kendrick Lamar's music, or those who carefully followed each step of the battle.  *See Lindell v. Mail Media*, 575 F. Supp. 3d 479, 489 (S.D.N.Y. 2021) (rejecting argument that relevant audience for the purpose of evaluating defamatory meaning was limited to the public familiar with plaintiff's life and non-profit, rather than entire public that saw the at-issue statements); *cf. Steinhilber*, 501 N.E.2d at 555 (private union recording was non-actionable when played only to members of union, who would have understood it "was prepared and played as part of the union's effort to punish" plaintiff).  UMG utterly ignores the AC's well-pleaded allegations that UMG took steps to ensure that the Defamatory Material became

---

[9] UMG's authorities are in accord.  *See Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 171, 173 (S.D.N.Y. 2024) (MTD 8) (where alleged defamatory comments concerned a hearing before House Oversight Committee, and the complaint quoted from the hearing, taking judicial notice of hearing transcript); *Staehr v. Hartford Fin. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) (MTD 8) (taking judicial notice of news articles for purposes of deciding whether "storm warnings" were adequate to trigger inquiry notice for statute of limitations).

ubiquitous in the general population, ¶¶128-71, 194-202, while not doing so for any of the other songs in the "rap beef," ¶202. Thus, *by its own actions*, UMG ensured that the relevant audience for the Recording would be different, and much more expansive, than the traditional audience for a typical rap track.

Furthermore, UMG's "context" argument ignores that most of the AC's allegations of actionable defamation occurred *after* (according to UMG) the rap battle *ended*. MTD 8. UMG published and promoted the Defamatory Material long after it knew how the public was consuming and reacting to that material, which makes this case unlike heated or one-time statements made during a union labor dispute, a public meeting, or by "shock talk" hosts during a show.[10] UMG's repeated conduct, including licensing deals, social media posts, and agreements to stream and play the Recording, are more like the "pre-planned" and "pre-scheduled" statements made during "a sophisticated and coordinated international campaign," which courts have found to be actionable. *See, e.g.*, *Restis v. Am. Coal.*, 53 F. Supp. 3d 705, 721 (S.D.N.Y. 2014); *McNamee v. Clemens*, 762 F. Supp. 2d 584, 604 (E.D.N.Y. 2011).

Courts have rejected "context" arguments in similar circumstances. In *Feitosa*, the court found actionable a tweet by one YouTube personality directed at another—which stated: "DefNoodles has allegedly groomed girls from ages 12-15"—even though it was made during a "war of words" between the two internet personalities. 2023 WL 2267055, *1-2, 6. In *Delgado v. Sonnen*, the court held that statements that plaintiff was a "stalker" made during an "intentionally

---

[10] UMG's other "context" cases are similarly inapposite. *See Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991) (MTD 10 n.7, 14) (letter to the editor in scientific journal was qualified by "prefatory editorial note" signaling "that the letter was to be given only the weight its readers chose to accord"); *Mirza v. Amar*, 513 F. Supp. 3d 292, 298 (E.D.N.Y. 2021) (MTD 12 n.8) (addressing statements made on Yelp, which is specifically "used by consumers to provide their positive or negative opinions of businesses").

comedic podcast" published to the internet, were actionable.  2025 WL 1042343, *6, 8 (S.D.N.Y. Feb. 18, 2025).  The court explained that the "context" relevant to its analysis did not include all previous episodes of the podcast or even the entire podcast episode, but rather, the specific podcast segment during which the at-issue statements were made.  *Id*. *6-7.  Even assuming the entire podcast series constituted the relevant context, the statements would still be actionable because, the court reasoned, the defendant could not "expect to be protected solely because it is an internet publication with a foolhardy reputation" that was "known for 'loose,' 'irreverent,' 'juvenile,' and 'crass' behavior."  *Id*. *10.

## B.    The AC Adequately Alleges that the Defamatory Statements Are Mixed Opinion

Dismissal is likewise unwarranted because a statement of opinion is actionable so long as it "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it."  *Steinhilber*, 501 N.E.2d at 552-53; *see, e.g.*, *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 462 (S.D.N.Y. 2012).  The AC alleges just that.

Here, the Defamatory Material and pleaded context imply that the allegations of pedophilia against Drake in the Defamatory Statements have a factual basis that is not disclosed in the Recording itself.  ¶¶59, 61, 75-77, 114, 121.  In the Recording, Kendrick Lamar says that the allegations are based on undisclosed information: "Say, Drake, ***I hear*** you like 'em young"; and "***Rabbit hole is still deep, I can go further, I promise***."  ¶¶60, 63; *see also* ¶¶77.  The AC alleges concrete examples of listeners who understood the Recording in these precise terms, ¶¶75-76, 114, notwithstanding UMG's claim that the statements are "too vague" or sound in "hyperbole."  MTD 13, 16.

UMG suggests that the Defamatory Statements were not mixed opinion because Drake previously "goaded" Lamar.  MTD 16-17 (citing Ex. I).  However, this argument depends entirely

on UMG's self-serving and disputed interpretation of the meaning of one of Drake's songs that is not referenced in the AC, *see id.*, and is therefore improper at the pleadings' stage, *Roth v. Jennings*, 489 F.3d 499, 509-11 (2d Cir. 2007). Even if this Court were inclined to consider this evidence without the vital witness testimony that would inform it at trial, as a legal matter, consent for defamation requires far more than a plaintiff expressing an expectation that another party will make a defamatory statement or even encouraging a defendant to "do what [they] had to do." *McNamee*, 762 F. Supp. 2d at 604 (collecting cases). And, of course, none of this would erase UMG's liability for continuing its relentless promotional campaign after Drake explained to UMG the harm he was suffering and made his retraction demand. ¶¶21-22, 126-69, 172-85, 189-93, 202, 204-15. In sum, there are no allegations that Drake consented to, or invited, UMG to publish defamatory statements about him to millions of people over the course of a year.

Finally, UMG argues that the Defamatory Statements are non-actionable because "facts and circumstances concerning Drake's relationships with minors . . . have been widely reported" and therefore the Defamatory Statements "relate to controversies that are widely known." MTD 17-18 (relying exclusively on Exs. B, J, O, and P).[11] This argument says more about UMG than it does about any legal issue in this case. For starters, as alleged in the AC, UMG does not truly believe that there were serious questions "concerning Drake's relationships with minors" predating its publication of the Recording, MTD 18, because, if it did, UMG surely would have discontinued promoting Drake as one of its most prominent artists. ¶¶51, 122, 238. Even taking UMG at its word, its cited exhibits do not come close to demonstrating that Drake was "widely reported" (or reported at all) as having engaged in conduct that would make him a "pedophile" or a registered sex offender—namely, UMG cites no reporting, let alone "widespread" reporting, that Drake

---

[11] As noted *supra*, the Court should decline to take judicial notice of Exhibit B.

engaged in sexual relations with minors, such that any reasonable listener would have understood the Defamatory Statements to be based upon those nonexistent reports. *Compare, e.g.*, *Gisel v. Clear Channel Commc'ns*, 942 N.Y.S.2d 751, 752 (App. Div. 2012) (MTD 18) (finding on summary judgment motion that radio show host's statements were non-actionable opinion because they were "*based on* facts that were widely reported by Western New York media outlets and were known to his listeners") (emphasis added); *Torain v. Liu*, 2007 WL 2331073, *1-3 (S.D.N.Y. Aug. 16, 2007) (MTD 18) (finding it "impossible that an informed listener would think" that statement made during press conference describing plaintiff radio DJ as a "sick pedophile loser" was "based on some undisclosed information known only to [defendant]" when plaintiff had recently made public comments, widely reported in the media, that he "wanted to rape" the child of a rival disk jockey, and so, clearly, the impugned statement was based on *those reports*, not undisclosed facts). If anything, UMG's exhibits reinforce that commentators understood the Recording as making allegations against Drake, not merely repeating prior rumors. *See, e.g.*, Ex. P at 4 ("I don't know if there's ever been a time where a rap superstar, where two rap superstars are contemporaries, and one is **accusing the other of pedophilia**, like, in the loudest possible way. . . . And we all know the stories of him going to girls' basketball games. . . . But contemporaries, people who are making their record label millions of dollars, right? - that doesn't usually happen. And so **this level of allegation – maybe it should inspire some sort of investigation**.") (emphases added).[12]

---

[12] Discovery is the appropriate mechanism by which to test UMG's arguments about what the "context" shows about the public's understanding of the Defamatory Material. For the purposes of the MTD, it is more than enough that the AC's allegations contradict UMG's characterization of the public's understanding.

### C.    The AC Adequately Alleges Actual Malice

UMG addresses actual malice in a single paragraph that merely repackages its "opinion" and "hyperbole" arguments.  Its argument is meritless.

The actual malice standard requires that the plaintiff show the defendant made the statements at issue "with knowledge that the statements were false or with reckless disregard as to their falsity."  *Biro v. Condé Naste*, 807 F.3d 541, 544 (2d Cir. 2015).  At the pleadings, "malice must be alleged plausibly in accordance with Rule 8."  *Id.* 545.  Therefore, plaintiff "must plead plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice."  *Id.* 546.

The MTD does not dispute that the AC pleads actual malice under these standards.  UMG does not contest that it knew the allegations were false, and to this day, UMG does not claim that any of the allegations are true.  ¶238; *see generally* MTD.  UMG had a financial interest in knowing Drake's liabilities—including charges or convictions.  ¶122.  And UMG would have never contracted with Drake had it believed that any of the Defamatory Material was true in any respect.  *Id.*  The AC further pleads actual malice based on the *different points in time* when UMG published (and continued to publish) the Defamatory Statements, including:  (1) after Drake publicly denied the allegations one day after the initial publication, ¶102; (2) after Drake's security guard was shot three days after the initial publication, ¶95; (3) after listeners, music publications, and industry podcasts confirmed the public's understanding of the factual nature of the allegations (*see supra*); and (4) after Drake issued a formal retraction demand, detailing the harm caused by the Recording's continuous publication, three months after the initial publication, ¶207.

UMG argues that Plaintiff must identify specific individuals at UMG that acted with actual malice.  MTD 19.  UMG cites no Second Circuit authority for this proposition.  It relies on *Hughes v. Twenty-First Century Fox*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018), but that case cites to a

summary judgment holding (*Dongguk*) and a post-trial holding (*Sullivan*).  The Second Circuit in *Palin* merely observed that "the critical question is the state of mind of those responsible for the publication," it did not create a separate pleading standard when the defendant is a corporation. 940 F.3d at 810.  This makes sense because discovery is essential to permit Plaintiff to confirm which individuals at UMG were responsible for (a) greenlighting the Recording, notwithstanding its lyrics; (b) greenlighting the Image and Video, notwithstanding their offensive imagery; and (c) deciding to continue to promote the Recording, notwithstanding the known harm it was causing to Drake.

In any event, the AC adequately pleads plausible grounds to infer the requisite mental state of each of Lucian Grainge (UMG CEO), John Janick (Interscope CEO), Monte Lipman (Republic CEO), and Avery Lipman (Republic President).  ¶¶69, 120-27.  The AC pleads that Sir Grainge and Mr. Janick "were involved in the initial publication of the Recording and Image" despite knowing that the allegations were unsupported by any evidence and understanding their inherent improbability.  ¶¶69, 120-27.  The AC further pleads that Sir Grainge, Mr. Janick, Monte Lipman, and Avery Lipman "played a key role in the initial publication of the Video either in directing or approving the publication and/or failing to prevent its publication" knowing that Drake's Toronto home was attacked, knowing that the allegations were unsupported by any evidence and were being believed by the public, and despite the inherent improbability of the allegations.  ¶¶112, 120-27; *see also* ¶189 (Ramon Alvarez-Smikle).  These allegations, combined with other well-pleaded allegations demonstrating that UMG knew the Defamatory Statements were false, plead plausible grounds to infer actual malice on the part of UMG.  ¶¶122-24.

## II.    THE AC ADEQUATELY PLEADS A CLAIM UNDER NEW YORK GENERAL BUSINESS LAW § 349

In order to plead a violation of New York General Business Law Section 349, Plaintiff must allege that the defendant "engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Casper Sleep v. Mitcham*, 204 F. Supp. 3d 632, 642 (S.D.N.Y. 2016).

UMG does not dispute the first element.  The AC alleges that UMG's scheme to promote the Recording and Video was directed at consumers of music.  ¶¶173-85, 229, 257-60; *see Oswego Laborers' v. Marine Midland Bank*, 647 N.E. 741, 744 (N.Y. 1995).

With respect to the second element, conduct is materially misleading when it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Orlander v. Staples,* 802 F.3d 289, 300 (2d. Cir. 2015) (cleaned up).  This is "generally a question of fact not suited for resolution at the motion to dismiss stage." *Duran v. Henkel,* 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (collecting cases).  Here, the AC alleges that UMG financially incentivized third parties, including streaming platforms and radio stations, to recommend, prioritize in searches, promote as top-rated or most-popular, and ultimately play, the Recording, all without disclosing its conduct.  ¶¶128-42, 144-59, 172-93, 202, 204, 227-29, 256-63.  These deceptive acts and practices, at the very least, raise a "prospect" that reasonable music consumers would be misled in a material way. *Gaidon v. Guardian Life*, 725 N.E.2d 589, 604 (N.Y. 1999).  That is because reasonable music consumers do not assume that recommended songs, search results, and promoted playlists are the result of the artist's label funneling payments or other consideration to the platform through a series of clandestine, back-channel payments.  *See* ¶181; *see also* ¶130.  Indeed, when the New York Attorney General previously charged UMG with payola violations, he explained: "Consumers have a right not to be misled about the way in which the music they hear on the radio

is selected." ¶186; *see also Himmelstein v. Matthew*, 171 N.E.3d 1192, 1197 (N.Y. 2021) ("Put simply, [Section 349] seeks to secure an honest marketplace where trust, and not deception, prevails.") (cleaned up).

UMG criticizes Plaintiff for pleading on "information and belief" without "a statement of the facts upon which the belief is founded."  MTD 22-23.  That is not the rule: "*Twombly*'s plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Asset Co. v. Katzoff*, 2025 WL 919489, *11 (S.D.N.Y. Mar. 26, 2025) (cleaned up).  Both conditions are satisfied here.  The AC pleads that UMG concealed its promotional scheme by making indirect payments through a network of unknown third parties.  ¶¶173, 184, 228; *see Katzoff*, 2025 WL 919489, *11 (permitting information and belief pleading where defendant's "precise role in the alleged scheme perpetrated by the web of interrelated Defendant LLCs—would be facts peculiarly within the possession and control of [defendants]").  The AC also pleads sufficient "factual information" concerning UMG's scheme, including examples thereof, contemporary reports, as well as UMG's past practices.  ¶¶172-88.

UMG then argues that Plaintiff "fails to plausibly allege that UMG had actual knowledge of any conduct or accusations concerning Lamar," citing a case analyzing common law fraud. MTD 23.  But there is no requirement under Section 349 that Plaintiff plead "actual knowledge" of anything on the part of UMG.  Even if there were, the AC alleges that UMG had actual knowledge of its own deceptive acts or practices.  ¶¶173, 182-85.

Next, UMG attempts to challenge materiality, arguing that "Drake does not (and cannot) allege that 'Not Like Us' would *not* have been an immense success had it not been for the alleged

'financial incentives' at issue." MTD 23-24. That is a non-sequitur.[13] Drake does not allege, nor was he required to as a matter of law, that UMG's deceptive acts or practices were the ***sole cause*** of the Recording's "immense success." Plaintiff need only allege deceptive acts or practices that raise a prospect of materially deceiving consumers, which the AC plainly does, ¶¶173, 179-85, 228-29, rendering irrelevant the question whether that deception was the but-for cause of the Recording's success.[14]

With respect to the third element, the AC alleges that UMG's promotional scheme and failure to disclose the same injured Drake. As an artist, Drake suffered pecuniary harm. Artificial streams decrease the unit value of a stream and therefore decrease the amount of royalties paid to rights-holders, including Drake. ¶¶229, 262. UMG's failure to disclose its scheme—along with its own false statements, ¶¶130, 154-55—fueled the fire: artificial streams boosted the Recording's status on Spotify, causing consumers to listen to and prioritize the Recording under false pretenses, ¶¶173, 181, which, in turn, tainted the "streaming data" used to "proportionally allocate and

---

[13] Nor is there any requirement that Plaintiff plead specific "transactions that caused cognizable harm to consumers in New York." MTD 24 n.20. "The phrase 'commercial transaction' can be found nowhere in the plain language of the statute, and section 349(h) specifically empowers 'any person who has been injured by reason of any violation of this section' to bring an action." *In re Methyl Tertiary*, 175 F. Supp. 2d 593, 630-31 (S.D.N.Y. 2001). UMG cites *Goshen v. Mut. Life*, but that case analyzed the question of *where* the consumer deception must occur, holding that the "transaction in which the consumer is deceived must occur in New York." 774 N.E.2d 1190, 1195-96 (N.Y. 2002). Here, the AC alleges that UMG's failure to disclose payments to streaming platforms and radio stations harmed music consumers in New York by interfering with their "ability to evaluate [their] market options and to make a free and intelligent choice." *N. State Autobahn v. Progressive Ins.*, 953 N.Y.S.96, 102 (App. Div. 2012); ¶¶173, 177, 179-86, 228-29, 258-61. Plaintiff need not allege *pecuniary* harm to consumers in New York. *Id.*

[14] By contrast, in *Dwyer v. Allbirds*, 598 F. Supp. 3d 137, 151 (S.D.N.Y. 2022) (MTD 24), the defendant's alleged failure to disclose information about its environmental impact was not materially misleading because much of it was publicly available and no reasonable consumer would expect a company's carbon-footprint calculation to include non-atmospheric effects.

disburse payments," causing Drake additional pecuniary harm.  ¶229; *see also* ¶263.  Drake was also harmed as a consumer of music.  ¶229.

UMG contends that Drake's theories of harm are "purely contingent on harm to" consumers and are therefore not cognizable.  MTD 24.  Not so.  While courts have held that a plaintiff lacks standing to bring Section 349 claims where plaintiff's claimed loss "arises solely as a result of" injuries "suffered by misled consumers"—*see N. State Autobahn*, 953 N.Y.S.2d at 105—that bar does not apply where, as here, "plaintiffs' alleged injury *did not require a subsequent consumer transaction*; rather, it was sustained when [consumers] were unfairly induced into taking their [business] from [plaintiff] to a [competitor] regardless of whether the [consumers] ultimately ever suffered pecuniary injury as a result of the . . . defendants' deception." *Id.*  (emphasis added).  That is, Drake suffered harm through diversion of royalties irrespective of whether Spotify users or radio listeners also suffered specific pecuniary harm.  *See also M.V.B. Collision v. Allstate*, 728 F. Supp. 2d 205, 217, 221 (E.D.N.Y. 2010); *Casper Sleep v. Mitcham,* 2016 WL 7188788, *2 (S.D.N.Y. Nov. 17, 2016).

## III.    THE AC ADEQUATELY PLEADS SECOND DEGREE HARASSMENT

Although there is a split in authority as to whether New York law recognizes a civil claim for Second Degree Harassment, application of the relevant test and the weight of authority favor implying a private right of action for Section 240.26.  New York courts use "a very permissive standard" to determine whether a private right of action exists.  *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 429 (S.D.N.Y. 2006).  The test is "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." *Sheehy v. Big Flats,* 541 N.E.2d 18, 20 (N.Y. 1989).  That test is met here because Drake is a victim of harassment, and allowing him to seek civil relief against UMG both

promotes the legislative purpose while complementing criminal enforcement.  UMG's argument is entirely circular: because Second Degree Harassment "is included in the Penal Law" and therefore police may enforce it, "a private right of action is inconsistent with the legislative scheme."  MTD 20.  But that argument, if correct, would defeat *every* implied private right of action in a criminal statute.

The weight of authority also favors finding a private right of action for Section 240.26.[15] None of the cases UMG cites analyzes Section 240.26 under the appropriate private-right-of-action standard or acknowledges the Second Circuit's decision in *Galella* sustaining a civil claim for harassment.  MTD 20 n.17.

As for the claim itself, Drake sufficiently pleads that UMG (1) engaged in a course of conduct or repeatedly committed acts which alarmed or seriously annoyed Drake, (2) with the intent to harass, annoy, or alarm Drake, and (3) which served no legitimate purpose.  ¶¶56-69, 93-101, 105-12, 128-212, 216-26, 248-50.  UMG challenges the intent element, arguing that Drake pleads that UMG acted only with an intent to devalue Drake's music.  MTD 21.  But intent "can only be evaluated by a trier of fact after the record has been fully developed at trial and not in the context of a motion to dismiss at the pleadings stage."  *People v. Couri*, 2002 WL 31748585, *3 (N.Y. Crim. Ct. Dec. 4, 2002).  At this stage, the AC sufficiently pleads UMG's intent to harass based on (a) the volume and, importantly, timing of publications, (b) the harmful nature of the Defamatory Material, and (c) UMG's relationship to Drake.  ¶¶51-52, 60-67, 72-89, 93-101, 113-

---

[15] *See, e.g.*, *Galella v. Onassis*, 487 F.2d 986, 994 n.11 (2d Cir. 1973); *Baiqiao Tang v. Wengui Guo*, 2019 WL 6169940, *6 (S.D.N.Y. Nov. 20, 2019); *Poulos v. N.Y.*, 2016 WL 224135, *3 (S.D.N.Y. Jan. 19, 2016); *Blasetti v. Pietropolo*, 213 F. Supp. 2d 425, 428 (S.D.N.Y. 2002); *Daniel v. Safir*, 175 F. Supp. 2d 474, 481 (E.D.N.Y. 2001); *Spock v. U.S.*, 464 F. Supp. 510, 516 (S.D.N.Y. 1978); *Delong v. Bell*, 2022 BL 550806, *2 (N.Y. Sup. Ct. July 7, 2022); *True v. N.Y. State Dep't of Corr. Servs.*, 613 F. Supp. 27, 33 (W.D.N.Y. 1984); *Long v. Beneficial*, 330 N.Y.S.2d 664, 665 (App. Div. 1972).

19, 128-69, 172-93, 205-12.  *See People v. Tiffany*, 721 N.Y.S.2d 741, 744 (App. Div. 2001);

*Couri*, 2002 WL 31748585, *2; *Richardson v. Brown*, 104 N.Y.S.3d 132, 134 (App. Div. 2019);

*Washington v. Washington*, 70 N.Y.S.3d 560, 561 (App. Div. 2018).

With respect to legitimate purpose (MTD 22) to the extent UMG's actions ever had a

legitimate purpose—such as financial gain—that purpose was "corrupted" by at least July 24,

2024, when Drake's counsel directly informed UMG of the violence and harassment Drake was

experiencing as a result of UMG's conduct, harm that UMG to this date ***has never disputed***.  *Couri*,

2002 WL 31748585, *2; ¶¶126-27, 205-12.

Finally, UMG's argument that Drake's harassment claim runs afoul of the First

Amendment (MTD 21) fails.  False speech is not protected, as reflected by the continued viability

of the ancient tort of defamation centuries after ratification of the Bill of Rights.  *See, e.g.*, *People*

*v. Marquan*, 19 N.E.3d 480, 483 (N.Y. 2014); *Friend v. Gasparino*, 61 F.4th 77, 87-88 (2d Cir.

2023).  And New York courts often deny motions to dismiss harassment claims involving speech.

*See, e.g.*, *Samah v. Mark*, 2025 WL 554478 (N.Y. Sup. Ct. Feb. 20, 2025); *C.F. v. J.D.*, 2024 WL

5279215, *7 (N.Y. Sup. Ct. Dec. 17, 2024); *Kritzia v. Onasis*, 978 N.Y.S.2d 846 (App. Div. 2014);

*Blasetti v. Pietropolo*, 213 F. Supp. 2d 425 (S.D.N.Y. 2002).

## <u>CONCLUSION</u>

For the foregoing reasons, Drake respectfully requests that the Court deny UMG's MTD

and RJN.

Dated: May 28, 2025

Respectfully submitted,

By: /s/ Michael J. Gottlieb
Michael J. Gottlieb
Meryl C. Governski (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC  20006
Tel: (202) 303-1000
mgottlieb@willkie.com
mgovernski@willkie.com

Brady M. Sullivan
M. Annie Houghton-Larsen
WILLKIE FARR & GALLAGHER LLP
787 Seventh Ave.
New York, NY  10019
Tel: (212) 728-8000
bsullivan@willkie.com
mhoughton-larsen@willkie.com

Word Count: 8,748