P6UHGraO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    AUBREY DRAKE GRAHAM,

4                      Plaintiff,

5              v.                              25 Civ. 399 (JAV)

6    UMG RECORDINGS, INC.,
                                              ORAL ARGUMENT
7
                     Defendant.
8
     ------------------------------x
9                                             New York, N.Y.
                                              June 30, 2025
10                                            2:00 p.m.

11

12   Before:

13                   HON. JEANNETTE A. VARGAS,

14                                            District Judge

15                         APPEARANCES

16

17   WILLKIE FARR & GALLAGHER LLP
          Attorneys for Plaintiff
18   BY:  MICHAEL GOTTLIEB
          BRADY SULLIVAN
19        ANNA GOTFRYD

20   SIDLEY AUSTIN LLP
          Attorneys for Defendant
21   By:  ROLLIN RANSOM
          NICHOLAS CROWELL
22        KATELIN EVERSON
          JAMES HORNER

23

24

25

P6UHGraO

```
 1              (Case called)
 2              MR. GOTTLIEB:  Good afternoon, your Honor.  Mike
 3    Gottlieb, from Willkie Farr & Gallagher, on behalf of
 4    plaintiff.  With me at counsel table are Brady Sullivan and
 5    Anna Gotfryd.
 6              MR. RANSOM:  Good afternoon, your Honor.  Rollin
 7    Ransom, from Sidley Austin, on behalf of defendant UMG.  And
 8    with me today from Sidley are Nicholas Crowell, Katelin
 9    Everson, and James Horner.
10              THE COURT:  Good afternoon, everyone.
11              We are here today to hear oral argument on defendant
12    UMG Recordings' motion to dismiss the complaint filed by Aubrey
13    Graham, popularly known as Drake.  So let me outline how I'd
14    like to proceed this afternoon.
15              Since this is UMG's motion, they're going to argue
16    first, and then I'll hear from plaintiff's counsel, and then
17    I'll allow UMG to have a rebuttal.  For the sake of the court
18    reporter, I would appreciate if counsel would speak at the
19    podium today.
20              I do want to let everyone know that I have reviewed
21    the amended complaint, the documents that were the subject of
22    the request for judicial notice, and the parties' memorandum of
23    law.  So you should assume in your arguments my familiarity
24    with of those materials and the arguments of the parties.
25              To preview for you my specific concerns and what it
```

P6UHGraO

1    would be most helpful for the Court for you to focus on, there

2    are a few issues that I would predominantly like to hear from

3    the counsel on today:

4            The first of those is whether or not I can make a

5    legal determination at this stage in the proceedings as to

6    whether or not the statements challenged as defamatory in

7    Kendrick Lamar's lyrics are fact or opinion;

8            Second, if it is appropriate for me to resolve that on

9    a motion to dismiss, whether and to what extent I should

10   consider the documents submitted by defendants in their request

11   for judicial notice in making that determination; and

12           Finally, applying the New York *Steinhilber* factors,

13   are the challenged statements fact or opinion within the

14   meaning of New York defamation law and the New York State

15   Constitution?

16           With that preview of the Court's particular concerns,

17   counsel, you may proceed.

18           MR. RANSOM:  Thank you very much, your Honor, and

19   thank you for the guidance, which is helpful.

20           I will focus my comments on Drake's defamation claim,

21   although I would like to address the other two claims as well,

22   and I'll focus on our primary argument which is also the

23   subject of the Court's questions, which is that the statements

24   at issue constitute non-actionable opinion rather than

25   statements of fact.  And to frame it, including in light of the

P6UHGraO

1    Court's questions, I want to start with a critical observation,

2    which is that under binding New York law, that issue, the fact

3    versus opinion issue, is a question of law solely for the

4    Court.  It is solely for the Court to decide as an issue of

5    law, which we believe makes it particularly suitable for a

6    determination on a motion to dismiss, and we see——and I will

7    address——a number of cases dismissing claims on this basis.

8    And it is amazing to me that not once in Drake's 27-page brief

9    does Drake acknowledge that this is, in fact, an issue of law

10   for the Court rather than a factual issue to be determined by a

11   jury.

12         THE COURT:  Well, let me stop you there, because you

13   are correct that there are a number of cases where courts have

14   decided this on a motion to dismiss.  The New York Court of

15   Appeals in *Brian* is one such case.  But then, subsequently,

16   following *Brian*, New York Court of Appeals had *Davis v.*

17   *Boeheim*, which was in the context of a motion to dismiss and

18   relied quite heavily on the early procedural posture of that

19   case in finding——or holding——that the standard that applied at

20   a motion to dismiss stage was whether or not the

21   communications, taken in their ordinary meaning and context,

22   are susceptible to a defamatory connotation, and suggested that

23   if they were, and that if they could be taken in such a light,

24   then the motion to dismiss should not be granted and discovery

25   should proceed, which strikes me as being somewhat in tension

P6UHGraO

1    with the Court's prior decision in *Brian*, which, as you have

2    observed in your brief, did permit a motion to dismiss because

3    it is an objective standard.  It's a reasonable listener

4    standard, a question of law, and applied a somewhat different

5    articulation of the test as to would the reasonable listener

6    have understood the allegedly defamatory comment as opinion

7    versus fact.

8        So I would like you to address that tension between

9    those two cases.  How do I reconcile them when I have to apply

10   New York law?

11       MR. RANSOM:  Of course.  Your Honor, two things about

12   *Davis v. Boeheim*, the first, including the way the Court

13   characterized it, the issue of whether a particular statement

14   is susceptible to a defamatory connotation is a distinct

15   element of the defamation claim from the question of whether it

16   is fact or opinion.  And I recognize that, on that

17   issue——whether a statement is susceptible to a defamatory

18   connotation——there are cases that suggest that where there's a

19   dispute as to whether statements could have a defamatory

20   connotation or not, might go to the jury.  That is treated

21   distinctly from fact versus opinion, and in fact, we see that

22   distinction in *Goldfarb*, the case that Drake primarily relies

23   upon and which, as we pointed out in our reply, they

24   misapprehend on this point, because the Court considers

25   separately and distinctly the question of defamatory

P6UHGraO

1    connotation, on the one hand, and fact versus opinion, on the

2    other.  And as to fact versus opinion, the Court expressly

3    notes that that is a pure question of law.

4              The second observation——

5              THE COURT:  That is true, but I do want to press back

6    on your reading of *Davis*, because *Davis* also does consider the

7    opinion versus fact distinction and says that they cannot state

8    as, a matter of law, that the statements are pure opinion

9    because there's a reasonable view of the claims that have been

10   asserted in the complaint, and that the court has to take that

11   reasonable view in light of the——in favor of the plaintiffs at

12   the motion to dismiss stage and, therefore, decides not to

13   dismiss it.

14             So, although, yes, they also discussed the defamatory

15   context, there is a portion of that opinion that is focused on

16   the opinion versus fact distinction, which is the one raised by

17   the defendants in this motion.

18             MR. RANSOM:  And I do think, in that respect, there's

19   a slight conflation, even in *Davis*.  That said, *Davis* continues

20   to apply the *Steinhilber* test, including the consideration of

21   the four——sometimes collapsed as three——elements of determining

22   fact versus opinion.  And I think what's, ultimately, critical

23   about *Davis* gets to the Court's final question of those that it

24   laid out, which is, is this fact versus opinion?  And what was

25   critical in *Davis* was the court's ultimate conclusion that the

P6UHGraO

1    nature of the statements in *Davis* strongly suggested that the

2    speaker had undisclosed information underlying his statements

3    that would lead a person to conclude that they were statements

4    of fact.

5            And as you walk through the ultimate conclusion of

6    *Davis*, in determining that it survived a motion to dismiss on

7    the fact versus opinion issue, it was ultimately driven, I

8    submit, in its entirety, by the Court's conclusion that there

9    were multiple factors that would lead a listener to believe

10   that the speaker there had undisclosed information unique to

11   him that led him to make the statements that he did.  That

12   included his reference to the fact that there was an

13   investigation at the university underlying his conclusion, that

14   his statements came out before the results of that

15   investigation were released, that he had held a position of

16   authority at the university about which he could speak with

17   authority and solemnity, and that the nature of his comments,

18   presented for an article and discourse on the issue were such

19   that they were not rhetorical hyperbole, they were not in

20   extremist or other consequences that lead one to conclude that

21   they are likely to be statements of opinion.  So that was the

22   ultimate conclusion reached by the Court, and we have none of

23   that here——none of the context, none of the indicia that

24   suggests a thoughtful statement of fact based upon some weighty

25   investigation as to which the speaker is privileged.

P6UHGraO

         And I'll address that in greater detail.  But I think

it's critical, even under *Davis*, which continues to articulate

and apply the *Steinhilber* factors, to emphasize that context is

key.  In *Steinhilber*, here are the words:  "Even apparent

statements of fact may assume the characteristic of statements

of opinion when made in public debate, heated labor dispute, or

circumstances in which an audience may anticipate the use of

epithets, fiery rhetoric, or hyperbole*."  Steinhilber* was 40

years before its time.  Epithets, fiery rhetoric, or

hyperbole——it might as well have said "statements in a rap

battle."  And even *Steinhilber* and the subsequent cases,

including *Davis*, and as exemplified in *Davis*, recognize that

that contextual assessment of the context in which the

statements are made often, ultimately, determines whether one

would perceive these as fact versus opinion.  And that's what

was found in *Davis*, because of the context in which those

statements were made.  And, on the other hand, in *Steinhilber*,

because of the context the statements were made in *Steinhilber*,

the Court affirmed a motion to dismiss, dismissing the

complaint as a matter of law, concluding that, although the

statements may be perceived as factual, the context in which

they were made would lead a reasonable observer to conclude

that they were pure opinion, including because of the heated

nature of the communication.

         THE COURT:  Since you bring up context, isn't the

P6UHGraO

1    logical import of your argument that statements made in either

2    a rap battle or diss track, therefore, are categorically

3    opinion?  Isn't that the logical conclusion of what you are

4    saying?  And is that a fair reading of New York case law that

5    the——where the New York courts have said forum is not

6    necessarily dispositive?  But it does seem to me that you are

7    arguing that forum, here, is dispositive; a rap diss track just

8    can't be taken as fact.

9          MR. RANSOM:  Your Honor, the cases that say forum is

10   not dispositive, I don't dispute that proposition as a general

11   proposition.  It's typically raised in the context, for

12   example, of an op-ed page or a letter to the editor, where the

13   context would tend to suggest one of opinion, but the courts

14   say it's not dispositive.  And I suppose, in those

15   circumstances, that it's theoretically possible that the nature

16   of the communication, even in what is otherwise thought to be

17   an advocacy piece with heated rhetoric, may support a finding

18   of fact versus opinion.

19          Whether a diss track in a rap battle could ever cross

20   the line from opinion into fact is an interesting question.  I

21   would submit that the nature of the art is that that is, at

22   most, highly unlikely and may categorically be the case that it

23   doesn't.  But what we're dealing with are the facts in the case

24   here, and what we can see and what we can look at on the facts

25   here is that the nature of the lyrics clearly convey the sort

P6UHGraO

1    of rhetorical hyperbole, over-the-top trash-talking extremists

2    that, using the language of the Court of Appeal in New York and

3    the federal courts applying it here in the Southern District of

4    New York, are clear and, we submit, dispositive indicia of

5    rhetorical hyperbole and opinion rather than fact.  And you can

6    see that more pointedly in cases that are closer to this than

7    those that offer the reservation about the forum in which the

8    statement is made.

9           So, in *Hobbs v. Imus*, for example——again, affirming

10   the grant of a motion to dismiss——the Court relies on the fact

11   that these are shock jocks, and it's not just the limited

12   statement in which the alleged defamatory communications are

13   made.  The Court relies upon their notorious history and the

14   nature of shock jock journalism from these speakers in

15   particular as supporting its conclusion, on a motion to

16   dismiss, that the context tells you that these are statements

17   of opinion.  And it acknowledges, that if you just look at the

18   statements taken in isolation, one could argue that they have

19   the indicia of fact, but when you look at the shock jock

20   context, the Court ultimately concludes the claim must be

21   dismissed.

22          In *Rapaport*——

23          THE COURT:  Again, let me press you on this.  The

24   context here is the rap diss battle, and we're here on a motion

25   to dismiss.  When I'm considering that context, don't I need to

P6UHGraO

know more about whether the ordinary listener of——and maybe

there's a question as to who the ordinary listener.  Is it

someone who doesn't follow rap music and is just hearing it on

a radio?  Is it someone who's actually immersed in the

community and that type of music and has that background?

Those are questions that we could also discuss——but with

respect to the context on a motion to dismiss, how can I say

that the ordinary listener would——comparing this now to the

shock jobs.  Shock jobs say shocking things —— how do I,

sitting here as a judge, know that the ordinary listener of a

rap diss track would also have that same underlying assumption?

          Isn't it true, for example, that sometimes accusations

are made in rap battles that are true and turn out to be true?

And maybe listeners have that understanding.  And, sitting

here, as a matter of law, can I say that they would not?  Do I

need to have more discovery——potentially experts, potentially

more context, for this particular rap battle or rap battles

writ large——before I can make such a judgment as a matter of

law?

          MR. RANSOM:  There's no suggestion in any of the cases

that this is the subject of, for example, expert testimony or

otherwise.  What the Court is required to do under the

standard, as articulated in both the New York State and federal

cases, is to look at the material before it and reach that

determination based on its evaluation of the statements and the

P6UHGraO

1    surrounding context.  And we can again look to an example in

2    *Torain v. Liu*, and in *Torain v. Liu*——again, resolved on a

3    motion to dismiss——the Court did take into account the context.

4    And I do want to address the Court's question about whether it

5    can look at this material at this stage because I think *Torain*

6    is particularly probative of that point.

7            But the Court looks at the information and makes an

8    assessment on its own.  It did the same thing in *Rapaport*.

9    Now, admittedly*, Rapaport* was a summary judgment motion, but it

10   illustrates the nature of the information the Court is to

11   consider in reaching that determination, which is the language

12   used and the broader context in which it is provided.  That's

13   the universe of the material it looks at, and then it comes to

14   a judgment.

15           THE COURT:  But if the broader context——which is what

16   we're talking about——is, perhaps, a specialized world, then

17   perhaps the Court does need more information than is in the

18   four corners of the complaint, and even in the request for

19   judicial notice, to understand that context and correctly apply

20   the legal tests.  Do I have enough facts about that broader

21   context to come to a decision about what a reasonable listener

22   would conclude, whether or not the statements made in the song

23   are to be taken as fact or opinion?

24           MR. RANSOM:  Your Honor, again, what the cases do is

25   look strictly at the material that's presented, including the

P6UHGraO

1    context that's provided.  You do have additional information,

2    certainly, in the form of the amicus brief that was provided in

3    support of our motion, but also from the complaint itself.  And

4    what is interesting and notable in this case is that the

5    complaint not only includes the allegations but it cites and

6    references the fact of the rap battle, articles describing the

7    rap battle, articles describing the context of the rap battle

8    and the history between these particular artist, including the

9    rumors, innuendo, and controversies that have surrounded Drake

10    with respect to his relations with underage women for an

11    extended period of time.  The context is provided there.

12            There's no suggestion in the case law that the Court

13    needs to limit itself to a particular type of individual, a

14    particular type of listener, or that every listener has perfect

15    knowledge of all the information surrounding it.  That would

16    turn an objective test into a subjective test that's dependent

17    on individual particular listeners with very specific

18    information, and none of the cases suggest that that is

19    required.  In fact, all of the cases that talk about this issue

20    posit that the information is generally available and

21    considers, with that information that is available, what would

22    the objective listener reasonably understand.

23            And on the question of what the Court may consider and

24    evaluate, again, we *loot at Torain* in particular.  Here's a

25    case where the speaker made a statement and the plaintiff

P6UHGraO

disputed whether or not the Court could consider the

surrounding context, including earlier statements by the

plaintiff that prompted the defendant to make the challenged

remarks.  In footnote 1 of the circuit opinion——it's also in

footnote 1 of the district court opinion——the Court says:

          "Torain, the plaintiff, contends the district court

improperly considered the statements that he made during his

war of words because they were not included in his complaint.

That argument fails.  As noted above, in determining whether a

statement is actionable, the Court should look to the overall

context in which the assertions were made and determine on that

basis whether the reasonable listener would have believed that

the challenged statements were conveying facts about the

libeled plaintiff.  Torain himself introduced this context in

his complaint, noting that he was engaged in a war of words

with a rival disc jockey."

          That's exactly what we have here.  Drake's complaint

identifies the rap beef, identifies a number of the tracks in

the rap beef, and then cites countless articles describing and

discussing the rap beef and all of its context.  And all of

that is properly before the Court and may properly be

considered by the Court in connection with a motion to dismiss.

And I think what's critical is that it includes, for example,

Drake's own statement in "Taylor Made Freestyle" in which he

specifically said and prompted to Kendrick Lamar, referring to

P6UHGraO

himself in the third person, "*Talk about him likin young girls;*

*that's a gift from me.*"  So when Kendrick Lamar then raps,

"*Hey, Drake, I hear you like 'em young*," there's no secret or

surprise or mystery of the context in which that statement is

made.  Again, these lyrics, this context, is all properly

before the Court, including because of the way the complaint is

pled and the abundant references not only to the lyrics

themselves and the beef itself but also to articles that

provide the context to the Court that allows it to make the

determination that it needs to make.

          I'd like to briefly address what seems to be the

primary argument that was raised by Drake, although I think not

necessarily specifically raised by the Court, but in the event

there's a question, there is heavy reliance on online

statements made after "Not Like Us" came out, which Drake says

suggests that members of the public believed that these were

statements of fact rather than opinion.  And this argument is

wrong for so many reasons.  It misstates the standard because,

again, you don't look at the subjective views of individuals.

It is an objective test based upon the reasonable listener.  So

it doesn't matter what 10 or 20 or 40 or 60 people say, because

that just reflects subjective views.  And that's even before

you get to the substance of the reviews, which themselves

reflect this rhetorical hyperbole, not to mention emojis, and

misspellings, profanity, and even racism and anti-Semitic

P6UHGraO

1    remarks.  Nothing of that informs the objective standard the

2    Court is to apply.

3           Second, it ignores the fact that this exact same

4    argument was raised and rejected in *Rapaport*, directly at the

5    district court, where evidence was submitted of all of these

6    statements of people, after the diss track was released by

7    Barstool, challenging Rapaport, and Rapaport argued this shows

8    that people thought it was fact.  And the Court rejected that

9    argument, and the Second Circuit affirmed.  And it ignores

10   Drake's own statement, Drake's own statement——which we've

11   attached as Exhibit A to the request for judicial notice——about

12   the pernicious danger of relying on statements in rap tracks

13   and rap lyrics as truth, as evidence of truth, as statements of

14   fact, about the chilling impact on this art form and the

15   chilling impact on artists, and I don't think that can be

16   overlooked.  Drake himself took the position that you shouldn't

17   do exactly what he's asking you to do right now.  He was right

18   then, and he is wrong now.

19          Finally, on defamation, Drake has also argued that

20   this is somehow mixed opinion, suggesting that somehow Kendrick

21   Lamar is uniquely and privately privy to undisclosed facts

22   about Drake's sexual proclivities.  I think just to say it

23   refutes it, but, again, Drake himself goaded Kendrick with

24   "*Talk about him likin young girls; that's a gift from me*," and

25   *Kendrick says, "Hey, I hear you like 'em young*," and goes from

P6UHGraO

1    there in "Not Like Us," no suggestion of some hidden, secret

2    information.  But, in any event, this is also an issue of law

3    for the Court——

4              THE COURT:  But there are lyrics that tend to suggest,

5    as plaintiff points out, that there is information that

6    Mr. Lamar is privy to——the reference to the rabbit holes and

7    other truths that he can tell——that one potentially could read

8    as suggesting that either his statements regarding Drake are

9    based on undisclosed information or that potentially there are

10   other secrets that he has not revealed.  There's some ambiguity

11   there, but on a motion to dismiss, I have to read the ambiguity

12   potentially in favor of the plaintiff.

13             MR. RANSOM:  And, again, the case law makes clear that

14   that is also an issue of law for the Court, and that the Court

15   is to require——is to consider context in that specific

16   circumstance as well.  We see that in *Cooper v. Templeton* and

17   in *Steinhilber* itself where the Court says, in evaluating this

18   question of whether there are undisclosed facts, the Court must

19   consider the context.  And so, for example, in *Woodbridge*, the

20   Court says, "Although some of the statements are based on

21   undisclosed, unfavorable facts known to the writer, the

22   disgruntled tone and anonymous posting, among other things,

23   point to opinion," and ultimately concludes, opinion rather

24   than fact.

25             We also see the same thing in *Torain*, which, although

1   it suggested some unknown fact, the Court said, look, I look at

2   the context as a whole, and this heated public statement tells

3   me that, notwithstanding this trash-talking, including about

4   putative undisclosed facts, ultimately, is one of opinion.

5           So, yes, when Kendrick refers to a rabbit hole, that

6   is part of the rhetorical hyperbole throughout "Not Like Us,"

7   and the Court must consider that context in evaluating that as

8   well.  It's the same way when Drake threatens that Kendrick's

9   darkest secrets are coming to light or that Drake dug up bones

10  in an excavation.  That context is part of the nature of the

11  rap battle, and we see that in the amicus brief as well.  It

12  does not save Drake's claim here.

13          THE COURT:  Let me challenge you on one specific lyric

14  from "Not Like Us," and that's the "Certified Lover Boy?

15  Certified pedophiles."  It does suggest, particularly the use

16  of the word "certified"——again, an ambiguous term——but paired,

17  as it is, with "certified pedophile," it could give the

18  listener, a reasonable listener, the impression that in some

19  way there's been some determination that, in some unspecified

20  official way, that Drake is a pedophile.  What is your response

21  to that argument?

22          MR. RANSOM:  So, two things about that:  First is I

23  think it's critical, in considering that particular passage, to

24  pair it to what proceeds it, which the Court quoted, *Certified

25  Lover Boy?  Certified pedophiles*," referring to Drake and his

P6UHGraO

1    crew.  The *Certified Lover Boy* is the name of a Drake album,

2    and so it is clearly and deliberately a play on those words.

3    And any more than the certification of lover boy status has

4    meaning, the reference to "certified pedophile" is more of the

5    rhetorical hyperbole that we see in this precise context.  It

6    also can't——

7        THE COURT:  This does bring me back a little bit to my

8    prior question, though, which is, who is the ordinary listener?

9    Is it someone who's going to catch all of those references and

10   all of these nuances between these two artists and the

11   community writ large so that they're going to understand that

12   Drake had a prior album called *Certified Lover Boy*, and this is

13   a play on the words, or is it the ordinary listener who may not

14   listen to either of these artists with any regularity and may

15   not have that familiarity?  Who is the ordinary listener, and

16   how do I apply that test when there's so much specialized and

17   nuance to a lot of these lyrics that does require in-depth

18   analysis to catch all of those references?

19       MR. RANSOM:  So, two things, your Honor:  One, on that

20   question, all of the cases, at least in the way they apply the

21   law, consider the entirety of the context.  They don't slice

22   and dice it down to what a particular listener of all of the

23   context may know and whether every listener knows every piece.

24   In every one of these cases, what the court looks at is the

25   context as a whole, not sliced and diced down to individual

P6UHGraO

1  listeners or assuming that it's limited to just people who

2  actually have specific knowledge of particular pieces of this.

3          The other comment I would make with respect to the

4  concerns regarding nuance or will someone get that is that

5  there is a danger to that approach that is at least warned in

6  *Brian v. Richardson*——and also in *Mann v. Abel*, another New York

7  Court of Appeal case——about sifting through communications and

8  picking particular words or phrases out and considering them in

9  isolation.  And what *Brian v. Richardson* says is that is

10 dangerous to do, because rather than sifting through a

11 communication for the purpose of isolating and identifying

12 assertions of fact, the court should look to the overall

13 context in which the assertions were made and determine, on

14 that basis, whether the reasonable reader would have believed

15 that the speaker was conveying statements of fact.  We see the

16 same thing in Mann v. Abel, another New York Court of Appeal

17 case.  Although one could sift through the article and argue

18 that false factual assertions were made by the author, viewing

19 the content of the article as a whole, as we must, it was

20 protected opinion, and in that case also the claim was

21 rejected.

22          So the notion of trying to look at a particular

23 phrase, tease it out, and not take into account the broader

24 context, the broader context of "Not Like Us" as a whole——*Hey,*

25 *Drake, I hear you like 'em young*," and Drake's statement, "*Talk*

P6UHGraO

1    *about him likin young girls*"——and then the broader context of

2    all the rumors and innuendos and controversy surrounding Drake,

3    young women, and girls, I believe, misses the thrust of the

4    cases that drive the Court's decision, particularly *Brian* and

5    *Mann*.

6         THE COURT:  This brings me to my second question,

7    which is the question for judicial notice, because the rumors,

8    innuendo, etc., are not set forth in the four corners of the

9    complaint, except, perhaps, in some of the exchanges in the

10   song lyrics.  But, obviously, the defendants have submitted

11   articles that it wants the Court to take judicial notice of

12   that allude to those rumors.  And presumably, for the purpose

13   under Rule 201, it's not necessarily for the truth of those

14   rumors, but that those rumors existed and were present in the

15   world.

16        MR. RANSOM:  That is correct.  It is not for the truth

17   of the rumors; it is for the fact of their existence and the

18   context that it provides with respect to the statements in "Not

19   Like Us."  But as to whether the Court can take judicial

20   notice, the answer is, in that respect, certainly.  News

21   articles, well within the scope of judicial notice, as are song

22   lyrics.  And that is particularly true here, because of the

23   articles that we are citing and referencing come from Drake's

24   complaint.  They are referenced in, cited in, and——some of

25   them——discussed in Drake's complaint.  Now, not necessarily the

P6UHGraO

1    rumors portion, but the specific articles themselves are from

2    Drake's complaint.  And we cite them, just as Drake did, and in

3    our brief we identify——and in our request for judicial notice

4    we identify——where from the complaint they arise.

5          So this is not a scenario where we are going out and

6    finding third-party material that has not already been brought

7    into this case by Drake in his own pleading.  On the contrary,

8    when it comes to the question of rumors and the facts giving

9    rise to the statements that are at issue here, those are

10   included in articles that Drake himself cites and relies upon

11   in his complaint.  So we believe the Court could properly take

12   into account news articles under the standard RJN, request for

13   judicial notice, standard.  But, particularly in this case,

14   where they are referenced in the complaint and cited in the

15   complaint and relied upon by Drake, we think it's particularly

16   appropriate and the Court is well within its authority to do

17   so, and given the requirement that the Court consider context,

18   we think, respectfully, that the Court is obligated to do so

19   because that context has actually been provided——not just by

20   us, but by Drake in his own complaint.

21         THE COURT:  You said you also wanted to address the

22   other causes of action.  Let me give you a few minutes in which

23   to do so.

24         MR. RANSOM:  Thank you, your Honor.  I will be brief.

25         We've, obviously, briefed our challenges——and there

P6UHGraO

1    are many——to both the Section 349 claim and the Penal Code

2    claim.  On the 349 claim, we believe that both parties' cases

3    reflect that the information and belief form of pleading that

4    Drake is using is improper, and that's a sufficient basis

5    alone.  But I think what's been made clear from the briefing is

6    where that claim also and clearly fails is on the injury

7    element.  The New York Court of Appeal has clearly held that

8    standing under 349 requires a direct rather than derivative

9    injury.  You can't have the series of steps between the alleged

10   consumer deception and the claimed harm to Drake, and that's

11   exactly what we have here.  So many steps between the alleged

12   consumer deception through artificially increasing the number

13   of streams and any impact on Drake, under *City of New*

14   *York v. Smokes-Spirits* in the Court of Appeal, the New York

15   Court of Appeal, and *Frintzilas* in the Second Circuit, that

16   claim clearly fails.

17           On the Penal Code claim, we have multiple arguments,

18   but I think the easiest and first argument is there's simply no

19   private right of action.  All of the cases that Drake cites

20   don't grapple with the *Sheehy* standard from the New York Court

21   of Appeal, which is then rearticulated in *Ortiz*.  And the

22   existence of criminal enforcement mechanisms for that claim

23   really eliminates the prospect of a private right of action.

24   The cases we cite acknowledge the binding *Sheehy/Ortiz*

25   standard.  The cases that Drake cites largely don't and, in

P6UHGraO

 1    fact, are based on authority that predates that binding

 2    New York Court of Appeals authority.  So we think both the 349

 3    and Penal Code claim should be dismissed as well.

 4                THE COURT:  Thank you very much, Mr. Ransom.

 5                MR. RANSOM:  Thank you.

 6                THE COURT:  I'll give you an opportunity to argue in

 7    rebuttal at the end.  Let me hear now from plaintiff's counsel.

 8                Mr. Gottlieb, are you going to be presenting argument

 9    on behalf of plaintiff?

10                MR. GOTTLIEB:  Yes, your Honor.

11                Your Honor, I'd like to start, if I could, with a

12    discussion about the appropriate standard of review because I

13    think it cuts across all of UMG's arguments in this case, and

14    it is important to have a reminder, both from the federal

15    standard and the state standard, of why we're here today.

16                Under binding Second Circuit authority, the *Global

17    Network Communications* case that we cite in our papers, a

18    complaint may not be dismissed pursuant to Rule 12(b)(6) unless

19    it appears beyond doubt, even when the complaint is liberally

20    construed, that the plaintiff can prove no set of facts in

21    support of his claims which would entitle him to relief.  *Davis

22    v. Boeheim* is the only opinion doctrine case cited by either of

23    the parties in this case that remotely touches on the

24    appropriate standard of review at the pleading context for

25    evaluating an opinion defense, and it is utterly devastating to

P6UHGraO

1    UMG's entire argument in this case.

2            As we explain on pages 1 and 7 of our brief, the

3    question on a Rule 12 motion, when considering an opinion

4    doctrine defense, is not what this Court thinks or what

5    Mr. Ransom thinks a reasonable listener should have concluded

6    when it heard the lyrics in question; the question is whether a

7    reasonable listener "could have concluded" that the statements

8    were conveying facts about the plaintiff.  *Davis v. Boeheim* is

9    the controlling authority.  There's no other case that either

10   party cited that even purports to interpret the standard at the

11   pleading stage.

12           At page 268 of the opinion, the *Davis* court explained

13   that, at the pleading stage, we "limit our inquiry to the legal

14   sufficiency of plaintiff's claim without evaluating the

15   'sufficiency of the parties' evidence, as would happen at the

16   summary judgment phase."  *Davis* expressly argued in this case

17   that the Court should reject the plaintiff's  interpretation

18   that were contained in the allegations in the complaint, and

19   instead hold, using the objective standard— which we don't

20   dispute applies—that the reasonable reader would be likely to

21   interpret this statement as pure opinion.  The Court rejects

22   that—and this is the most important part of the opinion—the

23   Court says:

24           "On a motion to dismiss, we consider whether any

25   reading of the complaint supports the defamation claim.  Thus,

P6UHGraO

1    although it may well be that the challenged statements are

2    subject to defendant's interpretation, the motion to dismiss

3    must be denied if the communication at issue, taking the words

4    in the ordinary meaning and context, is also susceptible to a

5    defamatory connotation."

6          Meaning, if it's susceptible to a connotation that

7    it's fact and it's susceptible to a connotation that it's

8    opinion, the plaintiff wins at the motion to dismiss stage.

9          THE COURT:  As I asked Mr. Ransom earlier, though, how

10   do I square that with other Court of Appeals decisions,

11   including *Brian*, which was also a motion to dismiss decision,

12   in which they do not purport to overrule, so therefore remains

13   good law, still cited by New York courts, but did not use this

14   "could" standard, did not say "is susceptible to a defamatory

15   connotation," but says, instead, the question is whether or not

16   it would be understood by a listener as opinion or fact and

17   presents it as a question of law?

18         MR. GOTTLIEB:  So, your Honor——

19         THE COURT:  I take you that *Davis* definitely throws a

20   wrench in the argument, but there seems to be some tension.

21   How do I reconcile that tension?

22         MR. GOTTLIEB:  So, your Honor, I don't think there's

23   tension.  So, first of all, *Davis* is the subsequent and most

24   recent opinion, so it would be controlling for this purpose.

25   The *Brian* court doesn't purport to interpret the pleading

P6UHGraO

1      standard.  So there was no dispute between the parties as to

2      what the Court's inquiry ought to be in evaluating the

3      pleadings is one point.

4             The second is there's no discussion or suggestion in

5      the *Davis*——the *Brian* opinion anywhere that there was a

6      challenge to the actual content of the allegations in the

7      complaint, which is what we had in *Davis*, and it is what we

8      have here, where you have the defendants essentially saying:

9      Don't credit or believe or draw inferences from the allegations

10     in the complaint in the plaintiff's favor; instead, accept this

11     other evidence that we're presenting to you and draw inferences

12     in order to determine what the appropriate social context is so

13     you can make your decision as a matter of law.

14            In *Brian*, the only thing that the court considers——at

15     least from what one can tell from reading the opinion——is the

16     four corners of the op-ed that was being considered.  The Court

17     was merely analyzing an op-ed and talking generally about what

18     op-eds are.  There's no suggestion in *Brian* that there was an

19     attempt to insert extrinsic evidence into the record.  There's

20     no suggestion that there was any challenge to the inferences

21     that the plaintiff was being asked to draw of the complaint,

22     and the *Brian* court makes clear that, in the text of the

23     article itself, the author made clear that the purpose of the

24     article was to advocate for an independent investigation, and

25     in support of the argument, the defendant marshaled all of the

P6UHGraO

1    relevant materials included within the text of the article.  So

2    the Court had, basically, everything it needed in order to

3    analyze both whether it was capable of a defamatory meaning,

4    whether it can be proven true or false, and what the context

5    immediately of the article in the broader social context were.

6    There simply is no indication that there was any dispute before

7    the court as to any of that.

8          In this case, what we have, by contrast, is an express

9    request for judicial notice that I want to address before I get

10   into the sufficiency of our allegations, if I could.  That

11   request for judicial notice asks the Court to accept 17

12   exhibits into the record and to use evidence contained in the

13   exhibits to draw inferences that directly attack, contradict,

14   or undermine the allegations in Drake's complaint.  Now, there

15   is a time and a place for the weighing of evidence, but that is

16   either at trial or the Rule 56 stage.  It is not here.  And UMG

17   has no answer whatsoever to the binding Second Circuit

18   authority that we cite at page 14 of our brief, which is the

19   *Global Network Communications* case, in which the Second Circuit

20   makes clear that the conversion requirement of Rule 12(b) is

21   mandatory, not discretionary.  And under that rule——

22         THE COURT:  Rule 201 allows me to take judicial notice

23   at any stage of the proceedings.  That's explicit in the rule.

24   And, certainly, ample cases take judicial notice in the context

25   of a motion to dismiss.  That doesn't convert it to a summary

P6UHGraO

1    judgment motion.  By definition, it doesn't, because I am

2    permitted to consider both materials within the four corners of

3    the complaint, matters that are incorporated by reference or

4    that are integral to the complaint, and facts that are

5    judicially noticed through Rule 201.  And if I do, then that

6    doesn't convert it to a summary judgment motion.

7            MR. GOTTLIEB:  That's correct, your Honor.  We don't

8    dispute that.  What we dispute is UMG's suggestion that the

9    Court can either use the materials for either the truth of the

10   matter asserted——which they're disclaiming here——but also can

11   use the materials to make factual inferences based on the

12   content of what the Court finds within those exhibits.

13           THE COURT:  Well, let's just talk about the song

14   lyrics in the rap battle.  There's an argument that they're

15   already incorporated by reference——except, perhaps, one, the

16   "Taylor Made Freestyle," which was notably omitted in the

17   amended complaint by reference——but the others, the other songs

18   in the rap battle, are referenced and linked to their Spotify

19   or——I think it was their Spotify listing.  So I'm not even sure

20   that I need to take judicial reference that they're not

21   incorporated by reference into the complaint, but certainly

22   there can't be dispute about what the lyrics are.  The lyrics

23   are what they are.

24           MR. GOTTLIEB:  So, to make this easy, we don't

25   challenge that the Court can take notice of the fact that

P6UHGraO

1    lyrics exist in a song out in the world.  The question is how

2    one interprets those lyrics and what meaning is given to those

3    lyrics in the context of evaluating the rap battle.  Similarly,

4    of course, we don't challenge that there was a rap battle.  We

5    plead that in our complaint.  What we take issue with is UMG

6    using lyrics to draw inferences about what reasonable listeners

7    and reasonable viewers would have understood about the song in

8    question.  That is where the argument strays from what is

9    permissible under the Court's judicial notice authority, and it

10   also strays——

11        THE COURT:  Once the lyrics are in evidence, then, of

12   course, I can draw inferences from them.  They're in evidence.

13   They've been judicially noticed.  The lyrics exist.  They have

14   the meaning that they have.  They're words.  And I don't

15   understand your argument that I could take judicial notice of a

16   song lyric, but I'm not allowed to consider what the lyric

17   means or says.

18        MR. GOTTLIEB:  Because, at the pleading stage, the

19   Court is not allowed to make inferences against the plaintiff.

20   The Court is required to draw all reasonable factual inferences

21   in plaintiff's favor, and the Court's not allowed to take

22   materials from outside of the complaint and use it to discredit

23   or undermine or question the allegations that have been

24   plausibly alleged in the complaint.  And I think this argument

25   around context is——this is an important example.  So, for

P6UHGraO

example, we have alleged throughout the complaint what the

appropriate context for the understanding of the lyrics, the

cover art, the video, and the song are.  We have alleged that

the full context includes the lyrics of the song, the cover

art, and the video, and we have explained, in numerous

allegations throughout, why a reasonable listener or reader or

observer would have interpreted those songs as conveying a

singular and precise factual message that Drake──and false

message──that Drake is a pedophile.

        THE COURT:  But isn't that a legal argument, that I

don't have to draw an inference in your favor?  Because whether

a reasonable listener would have drawn that inference is a

question of law, which you've already agreed is question of

law, and legal assertions or arguments made in a pleading do

not have to be credited by the Court.

        MR. GOTTLIEB:  The question, though, is not what a

reasonable listener would have interpreted the lyrics to mean;

the question is whether a reasonable listener could have

interpreted the lyrics to mean──in other words, is it

reasonably susceptible to a defamatory connotation?  That's the

*Davis* standard, and we think that we have more than adequately

alleged that.

        But, more to the point, we have specific factual

allegations in the complaint that UMG engaged in a coordinated,

covert, and unlawful scheme to remove "Not Like Us" from the

P6UHGraO

```
1   rap subgenre and turn into a de facto national anthem.  That's
2   alleged at paragraphs 10 and 11 and 128 through 202 of our
3   complaint.  The complaint alleges facts showing that UMG wanted
4   to and succeeded in making the song culturally ubiquitous.  And
5   this means that the audience——to answer one of the Court's
6   questions to my friend——the audience by which to evaluate
7   defamatory meaning in this case is not the people who would be
8   dialed in to every back-and-forth between Kendrick Lamar and
9   Drake in the rap battle, but the audience is everyone exposed
10  to the lyrics and imagery, not just those sort of there in the
11  moment.  We cite the Lindell v. Mail Media case in the Second
12  Circuit that stands for that proposition.
13          This is particularly important because we also allege,
14  with specific numbers, that this song achieved a cultural
15  ubiquity unlike any other hip-hop song in history, not just
16  unlike the other songs in the rap battle, but unlike any other
17  song in history.  More than 9 billion streams at the time of
18  the filing of our last brief have been——9 billion times have
19  been streamed on this song.  Every other track in this rap
20  battle pales in comparison to that.  So the relevant audience
21  member, if the Court is trying to understand the objective
22  listener, objective viewer, cannot be the person who listened
23  to every single track in the rap battle.  The relevant person
24  is probably your average 13-year-old who's alleged to be
25  dancing to the song at a bar mitzvah, who may not have heard
```

P6UHGraO

1    any of these other songs before or may not even be that much of

2    a rap fan.

3            THE COURT:  That would be a very interesting bar

4    mitzvah that played that song.

5            MR. GOTTLIEB:  That is apparently very popular at bar

6    mitzvahs, your Honor.

7            THE COURT:  I'll take your word for it.

8            MR. GOTTLIEB:  There's a separate set of factual

9    allegations in the complaint that add to this that UMG also

10    doesn't add, and that's contained at paragraphs 90 through 92

11    of the complaint.  We alleged that, in sort of the modern

12    social media environment, allegations of pedophilia are of the

13    far more relevant social context, and whatever might have been

14    true when Judge Daniels with considering these issues in

15    *Torain*, today, given the massive global audience for this

16    song—that it reached the entire world—and the social media

17    environment in which allegations of pedophilia land, today,

18    audiences are simultaneously primed to believe and primed to

19    react with outrage to allegations of harming children.  And

20    that is a direct response to many of the generalizations

21    contained in the cases that UMG cites and many of the arguments

22    they're making.  These are specific allegations at

23    paragraphs 90 to 92 of our complaint.

24            UMG is asking you, based on their sort of own spin of

25    exhibits, to disregard these well-pleaded factual allegations

P6UHGraO

1    in the complaint about how——how sort of the world today

2    receives these type of allegations, and we just don't think

3    that can possibly be appropriate at the motion to dismiss

4    phase.

5            THE COURT:  Let me go back, because we were addressing

6    the various inferences that can be drawn from the lyrics, and

7    one question I have for you is, do I have to draw an inference

8    from the lyrics?  Don't they speak plainly?  So, for example,

9    let's go back to the Taylor Freestyle lyric, which is, "*Talk*

10   *about him likin young girls; that's a gift from me*," and in the

11   context, with the AI voice of Tupac, it's clearly——one can

12   clearly read it to be a goad from Drake to Kendrick, as part of

13   their back-and-forth in the rap battle, to bring up rumors

14   regarding pedophilia and Drake.  I don't know how else one

15   could logically read that.  If you have an alternate reading,

16   I'd like to hear it.  But I don't think I have to draw an

17   extreme inference to understand what that line is.

18           MR. GOTTLIEB:  Well, your Honor——

19           THE COURT:  What would be the inference that would be

20   favorable to plaintiff of that line, other than the one that

21   I've just put forward?

22           MR. GOTTLIEB:  Because, your Honor, you would have to

23   consider, as Mr. Ransom says, black-letter law and opinion

24   doctrine, you don't slice out a single line or a single

25   statement from a song in order to ascertain its meaning.  You

P6UHGraO

1    consider the entire song and the entire lyrics in context.

2            THE COURT:  But I'm asking you about this line in this

3    song.  How would I read it?  You said I can't draw inferences

4    from these song lyrics; I can just consider their existence.

5    But do I have to draw an inference?

6            MR. GOTTLIEB:  Yes, you ——

7            THE COURT:  The words are the words.  "*Talk about him*

8    *likin young girls*," how else would I read that?

9            MR. GOTTLIEB:  Your Honor, I don't understand what

10    legal relevance that has to the question of how a reasonable

11    audience member would have understood the lyrics in "Not Like

12    Us."  Before you even get to talking about the lyrics in his

13    prior song, you would have to come to the conclusion that your

14    average listener to "Not Like Us" came into the song with that

15    lyric in mind, had heard that song, had been exposed to it, had

16    understood the lyrics in the same way that your Honor is

17    reading them, and there's simply no basis on which to make that

18    determination at the pleading stage in this case.  They may

19    come forward with evidence——

20            THE COURT:  Let me have you pause there.  I understand

21    that a lot of these cases arise in a very traditional context

22    of a newspaper article or an op-ed or a single communication,

23    but, here, we have songs that are in communication with each

24    other, a dialogue with one another.  One artist releases a

25    song, a few hours later another song is released that responds

P6UHGraO

to that song, and back and forth.  That is the context in which
these lyrics arise.

So to take "Not Like Us" as the specific example and
just to isolate it, isn't that taking it out of the broader
context in which it existed?  It would almost be like taking a
single paragraph out of an op-ed and not looking at the
headlines and the remainder of the article.  Because you can't
look at "Not Like Us" in isolation.  It's a response to what's
come before.

MR. GOTTLIEB:  So, your Honor, we're not advocating
for the Court to not consider the context, that this song was
the penultimate track in a rap battle.  That's not our
argument.  Our argument is this song in particular, both in
this rap battle and in the history of music, is different.  It
is different in ubiquity it achieved, so its audience was
different.  It was different in the fact that it was
immediately understood, in the allegations of our complaint, to
contain a precise factual allegation and a single factual
allegation, the false allegation that Drake is a pedophile.  We
allege——

THE COURT:  At the time Kendrick Lamar released this
song, there was no ubiquity, and there was——obviously, he's not
a fortune teller.  He wasn't going to understand that, at the
moment that he released this song, it was going to have eight,
9 billion streams, and he would be singing it at the Super

P6UHGraO

1    Bowl.  He was releasing it as part of this back and forth that

2    occurred over the matter of days.  And isn't that the context

3    in which I need to understand the assertions made, not six

4    months later that millions and billions of people have now

5    listened to it and may not have that understanding, but at the

6    time the statement was made, it was in direct response?

7         And let me give you a hypothetical.  If two people are

8    arguing on the street and throwing insults back and forth, and

9    then later on one of them says, "OK.  That particular statement

10   was slander.  You've defamed me," I'd have to know what the

11   interchange between those two individuals were that were

12   throwing insults to understand the full context in which

13   whatever statement was made.

14        Isn't that comparable here: someone insults, the other

15   person responds with further insults, the other person responds

16   with other insults?  How can I just take one of these songs in

17   isolation and apply a completely different standard to it

18   because three months later billions of people have now listened

19   to it?

20        MR. GOTTLIEB:  Your Honor, I appreciate the question.

21   I think it stems from a lack of grappling with the——and perhaps

22   due to imprecise briefing on our part——the nature——the role

23   that republication plays in this case.  We have alleged in our

24   complaint, I believe in 11 separate paragraphs in the amended

25   complaint, that UMG was responsible for republication of the

P6UHGraO

defamatory material.  That's paragraphs 13, 21, 120, 121, 157,
191, 192, 232, 241, 246, and 266.  The standard for
republication is that a defamatory statement is republished
whenever it is intended to and actually reaches a new audience.
That's the New York Court of Appeals decision in
*Firth v. State*.

       We allege this throughout our complaint.  UMG said
nothing about it until their reply brief in this case.  So we
have alleged that UMG took steps at multiple times post-May to
republish the material and introduce it to new audiences, and
each time it did that, it was liable for that republication.
And each time it did that, its knowledge at that point in time
becomes relevant.  And we have pleaded that knowledge in the
complaint, including what it knew in July, what it knew in
August based on retraction demand letters that we sent to it,
what it knew when it launched the Grammy's campaign, what it
knew when it launched the Super Bowl campaign.

       But, even if you don't agree with us on that, we
allege in the complaint, before you get to republication, that
the defamatory material includes the song, the cover art——both
of which were released on May 4——and the video, and the video
was not released until July, two months after the release of
the song.  And UMG's knowledge at the time that it released the
video included all of the information that we have alleged in
the complaint, including the attacks on Drake's home in

P6UHGraO

1  Toronto——three separate attacks on his home in Toronto——the

2  attack on his OVO business in London, the fact that users all

3  over the United States were commenting on him being a

4  pedophile, and the fact that Drake had denied, factually, the

5  allegations in "The Heart Part 6." We make all of those

6  allegations in the complaint about UMG's knowledge at the time

7  of the publication of the video, so that's the latest

8  point——that's the earliest or latest. But their knowledge,

9  clearly, at the July point in time, before you even start

10  talking about liability for republication, comes into play.

11       And then, your Honor, with respect to your question

12  before about sort of removing the song from the factual context

13  of the battle and doesn't it sort of have to be understood that

14  way, we have alleged that this song was actually understood as

15  a sort of singular entity because of its cultural ubiquity, and

16  even the exhibits that UMG has put into its requests for

17  judicial notice, they prove this. So, for example, UMG has

18  Exhibit P, which is a podcast transcript that we cite a piece

19  of in the amended complaint. At pages 4——page 4 of that

20  podcast transcript, there is a discussion about how Kendrick is

21  making allegations about Drake: "Some of these things have

22  been fact-checked." And then later on down, one of the

23  commentators says: "I don't know if there's ever been a time

24  when a rap superstar——or two rap superstars are contemporaries

25  and one is accusing the other of pedophilia, like, in the

P6UHGraO

loudest possible way." It continues, "Contemporaries, people

who are making their record label billions of dollars, right,

that doesn't usually happen, and this level of

allegation——maybe it should inspire some sort of

investigation."

Later, on page 5, it says that——one of the

commentators says, "It unclear right now if the claims of

Kendrick Lamar's domestic abuse are true, but let's talk more

about these allegations around Drake. No one has previously

called out Drake in this way. Now it's being raised to a more

mainstream conversation because it's a hit that Kendrick is

making."

Your Honor, Exhibit B to UMG's request for judicial

notice, page 10, the commentators describe Kendrick Lamar in

this song as "indicting Drake for years of rumors and

speculation." "Indicting," meaning a specific factual charge

being made in a song based on rumors and speculation. Notably,

"Not Like Us" doesn't include the rumors and speculation in it.

It doesn't talk about any of the underlying rumors that

Mr. Ransom was talking about that Drake allegedly had to deal

with in his past. It only includes the indictment——the

specific charge that he is a certified pedophile——the cover

art, which is his actual Toronto home, which, by the way, is

also validated by the other exhibit that UMG wants you to take

notice of, Exhibit J. Page 4 describes the content of the song

P6UHGraO

as "Sex Offense Allegation:  "Throughout 'Not Like Us,'

Kendrick accuses Drake of having inappropriate sexual

relationships with minors.  This is also a topic Drake has had

to debunk in the past.  However, Kendrick doesn't shy away from

blowing up the rumors surrounding Drake's personal life with

his lyrics."

         Later down, the predator accusations include the cover

art for the track; in fact, an aerial picture of Drake's

mansion, allegedly dotted with sex offender location tags.

These are their exhibits from commentators interpretating the

lyrics of the song contemporaneously, understanding it with a

precise meaning that can be fact-checked, that can be proven

true or false.  So if these things are in the record, we're

fine with it, because they all prove that there is a

susceptible connotation that can be drawn that the song had a

precise meaning.

         Your Honor, I don't know if the Court——

         THE COURT:  Let me ask you this, though:  Your client

also in the course of this rap battle leveled accusations

against Mr. Lamar as well:  That he's not the biological father

of his child; that he beats his girlfriend.  Are those facts or

opinion?

         MR. GOTTLIEB:  Are those——I'm sorry, your Honor?

         THE COURT:  Are they fact or opinion, those lyrics?

         MR. GOTTLIEB:  I don't know that the Court has a

P6UHGraO

1    record sufficient to be able to make that determination because

2    the Court doesn't have the context behind all the different

3    allegations in the song.  There isn't a complaint with 250

4    allegations giving meaning to the lyrics.  We don't know, was

5    there cover art?  We don't know, was there a video?  We don't

6    know, was there a singular message?  We don't know how people

7    understood it.

8            So that is both a determination that the Court doesn't

9    need to make here, nor is there one that the Court has a record

10   to make here.  That could be the subject of questions that, I

11   imagine, UMG will want to get into in discovery in this case,

12   but it is certainly not a reason to find that the pleadings

13   fail to state a claim on which relief can be granted.

14           I don't know if the Court wants me to address the

15   actual malice arguments that have been made.

16           THE COURT:  I do not need to hear arguments on the

17   actual malice.

18           MR. GOTTLIEB:  OK.

19           THE COURT:  If you would like to briefly address the

20   other two causes of action in the complaint, however.

21           MR. GOTTLIEB:  Sure.  So with respect to the——with

22   respect to the Section 349 claim, your Honor, Mr. Ransom made

23   essentially two arguments.  The first is he made an argument

24   about information and belief pleading, and the second is about

25   the injury element.  So let me address the information and

P6UHGraO

1    belief pleading.

2           I think this argument just simply misunderstands the

3    nature of the allegations that we make in the complaint, and so

4    we don't think it actually matters whether the Court concludes

5    what the standard on information and belief pleading is.  Even

6    under the standard that UMG articulates, we believe our

7    allegations meet that for purposes of Section 349.  So we

8    essentially made four arguments that support the underpinning

9    factual allegations of materiality and consumer harm under

10   Section 349.  The first argument we've made is that UMG misled

11   streaming consumers by paying or by causing payments to be made

12   to third parties to have bots artificially stream the recording

13   on Spotify to boost streaming numbers, and that's

14   paragraphs 173 to 178 of the amended complaint.

15          Now, UMG says that this is based on information and

16   belief, but the standard here is plausibility under *Iqbal* and

17   *Twombly*.  And we more than meet that standard for the following

18   reasons:  So, under paragraph 174, we allege that fake streams

19   are a huge problem in the music industry, and that UMG hasn't

20   disputed that up to 10 percent of all music streams are false.

21   And in 2021 alone, 1 to 3 billion fake streams across popular

22   music platforms were fraudulent.

23          If that's the only allegation we have, we agree, we'd

24   be in a bad place on information and belief pleading.  But we

25   continue that, in paragraph 175, fake and manipulated streams

P6UHGraO

are significant problems for Spotify, which invests heavily in

their reviews on it.  It is a reasonable inference that Spotify

would not make heavy investments in a nonexisting problem.  We

also allege that "Not Like Us" set records on numerous

streaming platforms.  It was the fastest song ever to reach

300 million Spotify streams in just 35 days, which is

paragraph 130.  And one possible inference of this which we

believe the Court must draw at this stage is that this

unprecedented rocketing up the streaming chart that UMG was

using a technique that is evidently used on 10 percent of all

music streams to manipulate stream totals.

Now, UMG does not dispute any of the paragraphs from

paragraphs 129 to 171, addressing its completely unusual and

unprecedented tactics in promoting the popularity of "Not Like

Us."  That includes things like whitelisting agreements with

other parties.  All of those allegations I just referenced are

the background for the pleadings——for the allegations that UMG

describes as "information and belief."

That background supplies the context for

paragraphs 176 to 178, which are based on three things:  One, a

popular podcast host who insists that he knew that "Not Like

Us" used bots; second are users on social media claiming to be

music industry whistleblowers who witnessed the buying of

promotion through a digital marketer; and, third, a

self-proclaimed retired stream farmer who posted a video in

P6UHGraO

1    which he claimed to show how a streaming bot had UMG and

2    Kendrick Lamar used to boost "Not Like Us" streams in their

3    beef with Drake.  These are individuals who purport to have

4    firsthand knowledge.  They're included in our complaint, and

5    they are all consistent with the underlying and background

6    allegations that precede it.  This is an entirely appropriate

7    allegation on information and belief.

8         And under the authority that we've cited, these are

9    particularly appropriate information-and-belief allegations

10   when you're dealing with a covert scheme where, in order to

11   complete our proof of the claim, we rely upon evidence that is

12   in the possession of the defendant.  That is in the authority

13   that we cited, which also cites cases from the Second Circuit

14   on this point.

15        We make three other arguments on this that I'll only

16   mention very briefly.  The second is that UMG provided

17   financial incentives to streaming platforms to promote the

18   recording and recommendations playlist and search results, and

19   in particular this is important because it relates to the

20   injury argument, which I'm about to get to.  We allege that UMG

21   charged lower than usual license rates in order for Spotify to

22   recommend "Not Like Us."  And we allege in paragraphs 180 and

23   183 numerous examples of users who described searching for

24   other music, including searching for Drake's music, and being

25   directed to "Not Like Us," both on the Spotify platform and on

P6UHGraO

1    the Apple platform, and that's quite important in the injury

2    allegation.

3         The last two allegations in this are the pay-for-play

4    Payola allegations at paragraphs 184 to 188 of the complaint

5    and the misleading statements that UMG made about the

6    recording, streaming, and radio successes, while knowing that

7    such success was inflated by its deceptive scheme, and that's

8    paragraphs 130, 154 to 155, and 257 of the amended complaint.

9    All of that is entirely appropriate under any pleading standard

10   when considered in context.

11        The second argument that Mr. Ransom made was about the

12   injury element.  Mr. Ransom argues that the injury is too

13   attenuated; there are too many steps in between Drake suffering

14   harm and the alleged harm to consumers.  That's simply not the

15   case.  So, as I just explained, as we've alleged in

16   paragraphs 180 and 183, the scheme that we have alleged

17   misdirected consumers away from Drake's music as a result of

18   manipulation of the search functions on Spotify and Apple, and

19   the result is that consumers were misled into streaming "Not

20   Like Us" rather than Drake's music.  We have also alleged that

21   this caused direct financial harm to Drake, not indirect

22   financial harm to Drake, in paragraph 229 of the complaint,

23   where we explain that reduced streaming rates translates into

24   reduced royalties.

25        So before you get to any argument about——

P6UHGraO

1          THE COURT:  Can you just explain to me——and I'll

2    express some ignorance as to how whatever algorithm applies to

3    Apple Music and Spotify work——but how is this either the

4    streaming bots or the pay-for-play related to the notion that

5    if one went on to Spotify and tried to play Drake's music,

6    you'd be redirected to "Not Like Us"?  The connection between

7    those two things is not entirely clear to me, and perhaps it's

8    because of my lack of familiarity with how those platforms

9    work.

10         MR. GOTTLIEB:  So the streaming and bot farm is

11   distinct from that claim, your Honor.  So the streaming

12   and——the streaming fraud allegation was sort of the first set

13   of allegations I listed out.  The payment of financial

14   incentives to promote the recording and recommendations in

15   playlists and in search results was the second.  Those are

16   contained in separate allegations in the complaint.  And the

17   allegation there is that——

18         THE COURT:  So then what is the injury with respect to

19   the bot-streaming allegations?  What would Drake's injury be?

20         MR. GOTTLIEB:  The injury in bot streaming is there is

21   a dilution argument, and there is a sort of

22   streaming-to-get-streaming argument.  So the dilution argument

23   is the larger the number of fake streams that exist in the

24   platform, the lower the royalty rate that goes to artists that

25   are not involved in streaming.

P6UHGraO

1      THE COURT:  So what you're saying is every single

2   artist on Spotify would have this exact same cause of action

3   against UMG?

4      MR. GOTTLIEB:  Yes.  And that's entirely consistent

5   with Section 349.  In the Northern Auto Mart——*Autobahn* case

6   that we cite in our papers, along——there's two cases that we

7   cite in our papers on the injury requirement, recognizing that

8   by giving——"any person" is the language of Section 349——by

9   giving any person who is aggrieved by an injury to a consumer

10   standing under Section 349, there's potentially a large number

11   of businesses, particularly in competitive situations, that can

12   bring claims.  But those——but the court has held that that was

13   the intent of Section 349.

14      If you give me one minute, your Honor, I'll get the

15   case so I make sure I cite it correctly.

16      THE COURT:  Sure.

17      MR. GOTTLIEB:  It's the *North Shore*

18   *Autobahn v. Progressive Insurance Group* case from 2012.  And it

19   explains in the section on direct injury how the statute allows

20   for any person to bring a claim, and the question is whether

21   the business that is asserting the claim suffered an injury as

22   a result of the consumer deception.  The claim in the *North*

23   *Shore Autobahn* case, as well as in the *M.V.B. Collision* case

24   that we cite, was essentially that consumers had been deceived

25   or misled by insurance companies in a scheme to take their

P6UHGraO

1    business to other businesses that happened to be competitors.

2    And as a result of those consumers being misled to go to other

3    businesses, North Shore Autobahn suffered harm as a result of

4    having fewer——sort of less foot traffic or less traffic into

5    its business.  That's essentially the argument that we're

6    making here.  When consumers were misled into——consumers are

7    misled into listening to a song when they're searching for

8    Drake's music, he is injured both directly, but then he's also

9    injured as a result of dilution, because of less compensation

10   that occurs in the formula from Spotify for its artists.

11           Your Honor, with respect to civil harassment, we can

12   rest on our papers and the authorities cited therein, unless

13   the Court has questions for me.

14           THE COURT:  That would be great.  Thank you.

15           Mr. Ransom, I'll give you a brief period for rebuttal.

16           MR. RANSOM:  Thank you very much, your Honor.  I will

17   endeavor to be brief.  I'm sure you will hold me to it.

18           Let me start, if I could, with Exhibits B, J, and P to

19   our request for judicial notice.  Those, again, are articles

20   that are cited in Drake's complaint.  And if I heard

21   Mr. Gottlieb correctly, after discussing them, he said these

22   things in the record:  "If the Court wants to consider them"——I

23   think this is a quote——"we're fine with it."  So I believe that

24   addresses, in large part, one of the Court's first questions as

25   to whether and how it can consider these materials that have

P6UHGraO

1    been submitted.  I believe he said the same as to the song

2    lyrics.

3            When I look, for example, at Exhibit P and I think

4    about Mr. Gottlieb's characterization of it, I think it also

5    resonates with the Court's comments that if the Court has these

6    materials in front of it, it can look at them and can look at

7    the entirety of them.  So Mr. Gottlieb invoked in Exhibit P the

8    statement, "and some of these things have been fact-checked,"

9    suggesting that tended to convey a finding of fact versus

10   opinion.  That——

11           THE COURT:  Page 4 of Exhibit P?

12           MR. RANSOM:  This is page 4 of Exhibit P.  And he

13   quoted solely the portion that some of these things have been

14   fact-checked.  He failed to read the rest.  This illustrates

15   why context is so important.  It says:  "And some of these

16   things have been fact-checked, like Baka Not Nice, who's a

17   rapper in Drake's crew who was convicted of assaulting a young

18   woman and who was accused of running a prostitution ring."

19   That's the fact-check reference.

20           He also overlooks the fact that this article, which

21   they're fine with the Court considering, in talking about Drake

22   and in talking about the references in "Not Like Us," say

23   things like, these are the speakers' quote:  "We all know the

24   stories of him going to girls' basketball games, and it's in

25   our faces.  Let's talk more about these allegations"——that's on

P6UHGraO

1  page 4 and page 5:  "Let's talk more about these allegations

2  around Drake.  Tirhakah, as you mentioned, there are some

3  things we've seen and heard over the years," and then it refers

4  to the discussion——or the history with Millie Bobby Brown and

5  her relationship with Drake when she was 13 and he was 30 or

6  31.  So these articles provide the context that the Court can

7  and should consider in our motion to dismiss.

8        So true with respect to the lyrics.  And, again, the

9  Court asked the question about "Taylor Made Freestyle," and

10  you're right, it is conspicuous that "Taylor Made Freestyle" is

11  not included in the footnote in Drake's complaint, but it is

12  referenced in these articles that Drake is fine with the Court

13  considering, and there's no real question that it's part of the

14  battle.  And, again, I think it speaks to the question of

15  context.  Because, yes, I focus on the line "*Talk about him*

16  *likin young girls*; that's a gift from me" from Drake, but the

17  context of that is not even limited to that line.  And your

18  Honor, I'm going to read it verbatim.  Please excuse the

19  profanity.  This is the entirety of the statement from Drake:

20        "*Kendrick, we need ya, the West Coast savior,*

21  *engraving your name in some hip-hop history.  If you deal with*

22  *this viciously, you seem a little nervous about all the*

23  *publicity.  Fuck this Canadian light-skin, Dot.  We need a*

24  *no-debated West Coast victory, man.  Call him a bitch for me.*

25  *Talk about him likin young girls; that's a gift from me.*"

P6UHGraO

1          That's the context in which "Not Like Us" appears.

2     That's the background, that's the history, and that's what

3     clearly conveys this rhetorical hyperbole that what you hear in

4     these rap battles is trash-talking in the extreme and is not

5     and should not be treated as statements of fact.

6          Very briefly, your Honor, Mr. Gottlieb says there's no

7     indication of a dispute in *Brian* as to the context or

8     connotation of the statements. *Brian* is a New York Court of

9     Appeals decision. I'm pretty confident there was a dispute in

10    *Brian*. And if the Court looks at it, the Court reflects that

11    the parties vigorously disputed all issues, but that context

12    was key and that the motion to dismiss was properly granted.

13         Mr. Gottlieb also invokes *Global Networks*, which is in

14    their brief, albeit not for the point that he cites, and with

15    good reason. On the pleading standard, motion to dismiss

16    standard, *Global Networks* was effectively overruled by *Twombly*

17    and *Iqbal*. So it doesn't actually state the correct standard.

18         Very briefly on the Section 349 claim, I think what

19    the discussion with counsel illustrates is the fundamentally

20    indirect nature of any injury or harm that Drake claims. It

21    requires consumers doing a thing, Spotify doing a thing,

22    royalty streams doing a thing——multiple steps, and that is not

23    what 349 is intended for. It is not intended to permit any

24    person who claims——in this case as Drake does——that they were

25    effectively indirectly impacted by some purported consumer

P6UHGraO

```
1    deception to bring a claim.  That would, frankly, flood and

2    overwhelm the courts in a way that is unsupported by the Court

3    of Appeals requirement that the injury be both tangible,

4    nonspeculative, and direct.

5            THE COURT:  Thank you very much.

6            MR. RANSOM:  Unless the Court has questions, I will

7    rest.

8            THE COURT:  Thank you very much, counsel, for your

9    arguments today.  They were very helpful.

10            The Court is going to request that the parties order

11    the transcript and split the cost among them.  I'm going to

12    reserve decision on the motion to dismiss, so an opinion will

13    ultimately follow.

14            Are there any other issues that the Court needs to

15    take up today?

16            MR. GOTTLIEB:  None for plaintiff, your Honor.

17            MR. RANSOM:  No, your Honor.

18            THE COURT:  Thank you very much.  Court is adjourned.

19            (Adjourned)

20

21

22

23

24

25
```