UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                               :
AUBREY DRAKE GRAHAM,                                            :
                                                               :
                                       Plaintiff,              :            25-CV-0399 (JAV)
                                                               :
              -v-                                              :         <u>OPINION AND ORDER</u>
                                                               :
UMG RECORDINGS, INC.,                                          :
                                                               :
                                       Defendant.              :
------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

This case arises from perhaps the most infamous rap battle in the genre's history, the vitriolic war of words that erupted between superstar recording artists Aubrey Drake Graham ("Drake") and Kendrick Lamar Duckworth ("Lamar" or "Kendrick Lamar") in the spring of 2024. Over the course of 16 days, the two artists released eight so-called "diss tracks," with increasingly heated rhetoric, loaded accusations, and violent imagery. The penultimate song of this feud, "Not Like Us" by Kendrick Lamar, dealt the metaphorical killing blow. The song contains lyrics explicitly accusing Drake of being a pedophile, set to a catchy beat and propulsive bassline. "Not Like Us" went on to become a cultural sensation, achieving immense commercial success and critical acclaim.

Both Drake and Kendrick Lamar have recording contracts with Defendant UMG Recordings, Inc. ("UMG" or "Defendant"). Drake alleges that UMG intentionally published and promoted "Not Like Us" while knowing that the song's insinuations that he has sexual relations with minors were false and defamatory.

Drake has brought this action against UMG for defamation, harassment in the second degree, and violation of section 349 of the New York General Business Law. Before the Court is Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the Court concludes that the allegedly defamatory statements in "Not Like Us" are nonactionable opinion, the motion to dismiss is GRANTED.

## LEGAL STANDARDS

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff may not simply allege facts that are consistent with liability; the complaint must "nudge plaintiff's claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (cleaned up); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded allegations and draws all reasonable inferences in favor of the non-moving party. *Romanova v. Amilus Inc.*, 138 F.4th 104, 108 (2d Cir. 2025). The Court need not credit "legal conclusions couched as factual allegations," however. *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (quotation marks omitted).

The Court may also consider "documents incorporated in the complaint by reference[ ] and matters of which judicial notice may be taken." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 243 (S.D.N.Y. 2025) (citation omitted). Judicial notice is appropriate when a matter is not subject to reasonable dispute because it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).

## BACKGROUND

The following background is largely taken from the allegations in the Amended Complaint, which are assumed true for purposes of this motion. ECF No. 41 ("Am. Compl."). Additionally, Defendant requests the Court take judicial notice of certain extrinsic evidence pursuant to Rule 201 of the Federal Rules of Evidence. *See* ECF No. 44 ("Req. J. Not."). These exhibits include the lyrics of the songs released as part of Drake and Kendrick Lamar's rap battle. The dates on which these songs were released and the lyrics of these songs are not reasonably subject to dispute, *see Pickett v. Migos Touring, Inc.*, 420 F. Supp. 197, 207 (S.D.N.Y. 2019), and the songs themselves are (with one exception) all referenced in the Amended Complaint. Accordingly, the Court will take judicial notice of Exhibits H through I and Exhibits K through O to the Request for Judicial Notice to understand Defendant's alleged statements in their "necessary and proper context." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 545 (S.D.N.Y. 2020) (cleaned up); *see also Condit v. Dunne*, 317 F. Supp. 2d 344, 356-57 (S.D.N.Y. 2004) (taking

judicial notice of submissions that place defendant's comments "in the broader social context" to "aid the Court['s]" determination of the adequacy of plaintiff's defamation claims).

Exhibits B, J, and P are directly referenced and relied upon in Plaintiff's Amended Complaint, Req. J. Not. at 1-4, so those documents are likewise properly before the Court. *See Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003).[1]  And because the document "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), the Court also takes judicial notice of the search results from the *New York Times* website in Exhibit C.  The Court takes judicial notice of the existence of the listed articles, but not the truth of their contents.  *See Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, No. 11 Civ. 8921, 2013 WL 6670584, at *1 n.1 (S.D.N.Y. Mar. 29, 2013) (taking judicial notice of four websites on motion to dismiss because courts in this Circuit "generally ha[ve] the discretion to take judicial notice of internet material"); *see also Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y.2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet.").

## A.  Factual Allegations

Drake is a prominent recording artist and songwriter, among other public-facing endeavors.  Am. Compl., ¶ 26.  Drake has had a successful music career

---

[1] During oral argument, Plaintiff agreed that these exhibits were properly before the Court in its consideration of the motion to dismiss. ECF No. 64 ("Hr'g Tr.") at 39:11-41:16.

under Defendant UMG for at least 20 years. *Id.*, ¶¶ 26-27. UMG uses its brands and imprints, or labels, to provide its music artists with the means to create, promote, and distribute their music commercially. *Id.*, ¶ 27. Defendant, through Universal Music Publishing Group ("UMPG"), holds exclusive publishing and distribution rights to Drake's music as well as that of artist Kendrick Lamar. *Id.*

On April 19, 2024, Drake released a diss track directed at Kendrick Lamar called "Push Ups." Req. J. Not., Ex. H. In "Push Ups," Drake mocks Lamar's height and shoe size, Req. J. Not., Ex. H ("How the f*** you big steppin' with a size-seven men's on/. . . Pipsqueak, pipe down"), and questions Lamar's success, *id.* ("You ain't in no big three/. . . I'm at the top of the mountain, so you tight now/Just to have this talk with your a**, I had to hike down.").

A few days later, Drake released "Taylor Made Freestyle," in which he used artificial intelligence-generated voices of deceased rapper 2Pac and of rapper Snoop Dogg to goad Lamar. Req. J. Not. at 2. In the track, "2Pac" and "Snoop Dogg" share their disappointment that Lamar had not yet responded to "Push Ups." *See id.*, Ex. I ("Kendrick, we need ya, the West Coast savior/. . . You seem a little nervous about all the publicity/. . . you gotta show this f***in' owl[2] who's boss on the West."). Drake, in his own voice, further taunts Kendrick for failing to come up with a satisfactory response, saying, "I know you're in that NY apartment, you strugglin' right now, I know it/In the notepad doing lyrical gymnastics, my boy." *Id.* Drake

---

[2] Drake's clothing brand is October's Very Own, or OVO, which is represented by an owl. Am. Compl., ¶ 36.

also surmises that Kendrick was purposefully delaying his response because artist Taylor Swift had just released a new album.  *Id.* ("[S]hout out to Taylor Swift/Biggest gangster in the music game right now/. . . She got the whole pgLang on mute like that Beyoncé challenge, y'all boys quiet for the weekend.").

Lamar fired back at Drake in "Euphoria," which was released on April 30, 2024.  Req. J. Not. at 3.  In the track, Lamar claims, "I make music that electrify 'em, you make music that pacify 'em" and that he would "spare [Drake] this time, that's random acts of kindness."  Req. J. Not., Ex. K.  He accuses Drake of fabricating his claims:  "Know you a master manipulator and habitual liar too/But don't tell no lie about me and I won't tell truths 'bout you."  *Id*; *see also* Am. Compl., ¶¶ 14, 77.  He insults Drake's fashion sense, Req. J. Not., Ex. K ("I hate the way that you walk, the way that you talk, I hate the way that you dress"), further raps "I believe you don't like women, it's real competition, you might pop a** with 'em," and taunts Drake for being a coward with his responses, *id.* ("I hate the way that you sneak diss, if I catch flight, it's gon' be direct.").

On May 3, 2024, the feud between Drake and Lamar escalated, as they lobbed increasingly vicious, personal accusations at each other over the course of the day.  First, Lamar released "6:16 in LA," Req. J. Not. at 3, in which he calls Drake a "terrible person."  *Id.,* Ex. L.  Lamar accuses Drake of "playin' dirty with propaganda" and raps that if Drake was "street-smart" then he would have "caught [on] that [his] entourage is only [there] to hustle" him."  *Id.*

Drake's next response arrived later that day in "Family Matters."  Drake jabs at Lamar's relationship with his partner, Req. J. Not., Ex. M ("You the Black messiah wifin' up a mixed queen/And hit vanilla cream to help out with your self-esteem/On some Bobby sh\*\*, I wanna know what Whitney need") and implies that Lamar physically abused her, *id.* ("You a dog and you know it, you just play sweet/Your baby mama captions always screamin', 'Save me'/You did her dirty all your life, you tryna make peace.").  Moreover, Drake calls into question whether Lamar is the biological father of one of his children.  *Id.* ("I heard that one of 'em little kids might be Dave Free/Don't make it Dave Free's").

Almost immediately after the release of "Family Matters," Lamar unleashed the scathing "Meet the Grahams," Req. J. Not. at 3, in which he accuses Drake of being a "deadbeat" father and of hiding the existence of other children.  Req. J. Not., Ex. N ("You lied about your son, you lied about your daughter, huh/You lied about them other kids that's out there hopin' that you come.").  Lamar also alleges that Drake has "gamblin' problems, drinkin' problems, pill-poppin' and spendin' problems/Bad with money, wh\*\*\*house/Solicitin' women problems, therapy's a lovely start."  *Id.*  He further insinuates that Drake was a "predator" and that Drake "should die so all of these women can live with a purpose."  *Id.*

The next day, on May 4, 2024, Lamar released "Not Like Us."  Am. Compl., ¶¶ 6-7.  "Not Like Us" explicitly names Drake and his associates as pedophiles.  *Id.*, ¶¶ 60-62.  Specifically, the track contains the following lyrics:

> Say, Drake, I hear you like 'em young
> You better not ever go to cell block one

> To any b**** that talk to him and they in love
> Just make sure you hide your lil' sister from him
> They tell me Chubbs the only one that get your hand-me-downs
> And PARTY at the party, playin' with his nose now
> And Baka got a weird case, why is he around?
> Certified Lover Boy? Certified pedophiles
>
> Wop, wop, wop, wop, wop, Dot, f*** 'em up
> Wop, wop, wop, wop, wop, I'ma do my stuff
> Why you trollin' like a b****? Ain't you tired?
> Tryna strike a chord and it's probably A-Minor

Am. Compl., Ex. A.[3]

On May 5, 2025, Drake responded in "The Heart Part 6," Req. J. Not. at 3, directly denying Lamar's allegations of pedophilia, *id.*, Ex. O ("I never been with no one underage, but now I understand why this the angle that you really mess with/Just for clarity, I feel disgusted, I'm too respected/If I was f***ing young girls, I promise I'd have been arrested/I'm way too famous for this s*** you just suggested/. . . Drake is not a name that you gon' see on no sex offender list."); *see also* Am. Compl., ¶ 102. In the track, Drake further sneers that "[t]his Epstein angle was the s*** I expected" and accused Lamar of wanting to "misdirect." Req. J. Not., Ex. O. Drake also alleges that he had planted some of the information Lamar has used against him. *Id.* ("We plotted for a week, and then we fed you the information/. . . But you so thirsty, you not concerned with investigation/. . . You gotta learn to fact-check things and be less impatient.").

---

[3] Chubbs, Party, and Baka are associates of Drake's, while K. Dot is a nickname for Kendrick Lamar. Req. J. Not., Ex. J at 3-4.

"Not Like Us" was a huge commercial success.  It has gained immense popularity on streaming and social media platforms; it has been streamed globally more than 1.4 billion times on Spotify alone as of April 2025.  Am. Compl., ¶¶ 7, 10, 58.  On November 8, 2024, the Recording Academy nominated "Not Like Us" for several Grammy Awards, *id.*, ¶ 142, and in February 2025, it won Record of the Year, *id.*, ¶ 164.  A week later, on February 9, 2025, Kendrick Lamar performed "Not Like Us" live during the Apple Music Super Bowl LIX Halftime Show.  *Id.*, ¶ 165.  The performance is alleged to be the most-watched Super Bowl Halftime Show of all time with over 133.5 million views.  *Id.*, ¶ 168.

### B. Procedural History

Plaintiff brings claims for defamation, harassment in the second degree, and violation of New York General Business Law Section 349 based upon UMG's publication and promotion of "Not Like Us" (the "Recording").  Defendant has filed a motion to dismiss the Amended Complaint.  ECF No. 42.  On June 30, 2025, the Court heard oral argument from both parties concerning the motion to dismiss and the request for judicial notice.

Plaintiff contends that he was defamed when Defendant "decided to publish, promote, exploit, and monetize allegations that it understood were not only false, but dangerous."  Am. Compl., ¶ 8.  Plaintiff alleges that "[t]he Recording repeatedly accuses Drake of engaging in criminal acts, including pedophilia and/or other acts that would require registering as a sex offender and of being registered as a sex offender."  *Id.*, ¶ 59.

The Amended Complaint alleges that the song implies that Lamar has "*heard* (albeit from undisclosed sources and concerning undisclosed individuals) that Drake has a predilection for underage women." *Id.*, ¶ 60. According to the Amended Complaint, the reference to "cell block one" is "a thinly veiled threat that Drake should be careful that he never ends up in prison, a place where child predators are notoriously the targets of violence." *Id.* The line "Certified Lover Boy? Certified pedophiles" is a "perverse reference to Drake's 2021 album 'Certified Lover Boy.'" *Id.*, ¶ 61. Plaintiff argues that the use of the term "certified" "communicates that Drake has been ***found*** to be a pedophile." ECF No. 58 ("Opp'n Br.") at 9. And the final line of this passage plays on the "dual meaning of minor—a person under the age of 18 and a musical scale." Am. Compl.,. ¶ 61.

Plaintiff further cites as defamatory the Recording's descriptions of Drake as "Malibu most wanted" and a "predator," and that his name "gotta be registered and placed on neighborhood watch." *Id.*

The associated music video (the "Video") shows "images associated with sex trafficking" to reinforce the pedophilia accusation. *Id.*, ¶ 7. The Recording is also accompanied by an album image of Drake's home in Toronto (the "Image"), which is plastered in icons used by law enforcement and public safety applications to denote the residences of registered sex offenders. *Id.*, ¶¶ 65-66.

# DISCUSSION

## I.  Defamation Claims

"Under New York law, the elements of a defamation claim are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege."  *Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15 CV 4779-LTS-SN, 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016).  A defamatory statement is one that "exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society."  *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 690 (S.D.N.Y. 2022).

The issue in this case is whether "Not Like Us" can reasonably be understood to convey as a factual matter that Drake is a pedophile or that he has engaged in sexual relations with minors.  In light of the overall context in which the statements in the Recording were made, the Court holds that it cannot.

### A. Fact vs. Opinion

"Under the First Amendment, there is no such thing as a false idea."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).  [O]nly assertions of facts are capable of being proven false."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 460 (S.D.N.Y. 2012) (citation omitted).  Moreover, "the New York Constitution provides for absolute protection of opinions."  *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 178 (2d Cir.

2000).  Thus, courts must "distinguish[] between statements of fact, which may be defamatory and expressions of opinion, which 'are not defamatory'" and have the full protection of the New York Constitution.  *Live Face on Web, LLC*, 2016 WL 1717218, at *2 (quoting *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014)).

Whether a challenged statement is fact or opinion is a legal question.  *Celle*, 209 F.3d at 178.  Plaintiff argues that it is inappropriate for the Court to determine, at the pleading stage, whether a reasonable listener would perceive the Recording as fact or opinion.  Opp'n Br. at 13-14; Hr'g Tr. at 24:11-26:8.  Yet, because this is a question of law, New York courts routinely resolve this question at the motion to dismiss stage.  *See, e.g.*, *Brian v. Richardson*, 87 N.Y.2d 46, 52 (1995) (holding, on a motion to dismiss, that challenged statement constitutes opinion); *Dfinity Found. v. New York Times Co.*, 702 F. Supp. 3d 167, 174 (S.D.N.Y. 2023), *aff'd*, No. 23-7838-cv, 2024 WL 3565762 (2d Cir. July 29, 2024) ("Whether a statement is a "fact [or] opinion is 'a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean' and is appropriately raised at the motion to dismiss stage."); *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 385-86 (2d Dep't 2017) (holding that, because whether a statement is defamatory "presents a legal issue to be resolved by the court," defamation actions are particularly suitable for resolution on a motion to dismiss).  "There is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of

constitutionally protected freedoms." *Dfinity Found.*, 702 F. Supp. 3d at 173

(cleaned up); *accord Biro*, 963 F. Supp. 2d at 279.

In distinguishing between facts and opinion, three factors guide the Court's

consideration:

> (1) whether the specific language in issue has a precise
> meaning which is readily understood;
>
> (2) whether the statements are capable of being proven
> true or false; and
>
> (3) whether either the full context of the communication
> in which the statement appears or the broader social
> context and surrounding circumstances are such as to
> signal readers or listeners that what is being read or
> heard is likely to be opinion, not fact.

*Brian*, 87 N.Y.2d at 51 (cleaned up).  The Court conducts this inquiry through the

lens of a "reasonable" listener.  *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997).

Plaintiff's suit is focused on a single factual message conveyed by the

Recording, "the false allegation that Drake is a pedophile."  Hr'g Tr. at 36:16-19; *see

also* Opp'n Br. at 9 ("[T]he Recording is myopically focused on ensuring that

listeners take one message away from the song: Drake is a pedophile.").  This

statement has a readily understandable meaning, and it is capable of being proven

true or false.  But "even accusations of criminal behavior are not actionable if,

understood in context, they are opinion rather than fact."  *Hayashi v. Ozawa*, No.

17-CV-2558 (AJN), 2019 WL 1409389, at *2 (S.D.N.Y. Mar. 28, 2019).

Thus, the Court will focus its analysis on the third factor.  This inquiry is a

holistic one, which looks "to the over-all context in which the assertions were made,"

*Brian*, 87 N.Y.2d at 51, in order to assess "the impact that the statements would have on a reasonable [listener]," *Levin*, 119 F.3d at 197.  Context includes the forum in which the communication was published, the surrounding circumstances, the tone and language of the communication, and its apparent purpose.  *See Brian*, 87 N.Y.2d 51-52; *see also Hayashi*, 2019 WL 1409389, at *2.

### 1.    Forum

To start, the Court considers the forum in which the allegedly defamatory statements appear, as that is a "useful gauge" for determining whether the reasonable reader will treat it more readily as opinion than fact.  *Brian*, 87 N.Y.2d at 52.  For example, the average listener is more likely to understand statements made on a news program or in a journalistic piece to be factual, while statements made in the opinion page of a newspaper or on an internet comment page are generally perceived as opinion.  *See, e.g.*, *Millus v. Newsday, Inc.*, 89 N.Y.2d 840, 842 (1996) (appearance of statement on editorial page indicative of opinion); *Brian*, 87 N.Y.2d at 52 ("[T]he common expectation is that the columns and articles published on a newspaper's Op Ed sections will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion."); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415 (1st Dep't 2011) ("The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.'"); *Ganske*, 480 F. Supp. 3d at 553 ("[T]he fact that [the] allegedly defamatory statement . . . appeared on

14

Twitter conveys a strong signal to a reasonable reader that this was [d]efendant's opinion."); *Live Face on Web, LLC*, 2016 WL 1717218, at *3 ("[T]he media vehicles used to disseminate the [alleged defamation]—a Wordpress blog, social media posts, and an unsigned press release complaining about litigation tactics—suggest to readers that they contain opinions, not facts, and they are written in an amateurish fashion."). The forum in which a statement appears is not dispositive of the fact versus opinion inquiry, but it does provide contextual indicia that can inform the Court's analysis.

The forum here is a music recording, in particular a rap "diss track," with accompanying video and album art. Diss tracks are much more akin to forums like YouTube and X, which "encourag[e] a freewheeling, anything-goes writing style," than journalistic reporting. *Sandals Resorts*, 86 A.D.3d at 43 (quotation marks omitted). The average listener is not under the impression that a diss track is the product of a thoughtful or disinterested investigation, conveying to the public fact-checked verifiable content.

### 2.    Surrounding Circumstances

Next, the Court considers the "full context of the communication in which the statement appears," including the "setting surrounding the communication." *Steinhilber v. Alphone*, 68 N.Y.2d 283, 294 (1986). The fact that the Recording was made in the midst of a rap battle is essential to assessing its impact on a reasonable listener. "Even apparent statements of fact may assume the character of statements of opinion . . . when made in public debate, heated labor dispute, or

other circumstances in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." *Id.* (cleaned up); *see also Jacobus v. Trump*, 51 N.Y.S.3d 330, 336 (N.Y. Sup. Ct.), *aff'd*, 64 N.Y.S.3d 889 (1st Dep't 2017) ("As context is key, defamatory statements advanced during the course of a heated public debate, during which an audience would reasonably anticipate the use of epithets, fiery rhetoric or hyperbole, are not actionable." (cleaned up)).

The decision by the New York Court of Appeals in *Steinhilber* is instructive in this regard. In *Steinhilber*, the allegedly defamatory statements were published in a tape-recorded telephone message that was played automatically to anyone dialing the private phone number that was given to labor union members. 68 N.Y.2d at 287. The union had assessed a fine against Plaintiff after she had defied a strike order, and the phone message appeared after she had failed to pay the fine. *Id.* at 294. The New York Court of Appeals found that "the most significant circumstance" was "that the message was prepared and played as part of the union's effort to punish a former member." *Id.* The court highlighted that, in "the emotional aftermath of a strike when animosity would be expected to persist— particularly against a former member who was seen as a 'traitor' to the cause," that a listener would not expect that any insults lobbed would be factual in nature. *Id.*

Similarly, in *Torain v. Liu*, the Second Circuit affirmed the dismissal of a complaint at the pleading stage, holding that as a matter of law, comments that the plaintiff was a "sick racist pedophile," a "loser pedophile," a "broadcaster pedophile," a "child predator," a "lunatic," and that he "must be put behind bars" were

16

expressions of opinion.  279 F. App'x 46, 46 (2d Cir. 2008).  In reaching this

conclusion, the Second Circuit relied upon the context in which these statements

were made.  Specifically, the comments were part of a "war of words" between disk-

jockeys at rival radio stations that received "extensive media coverage and

commentary."  *Id.* at 47.  As part of that feud, the plaintiff made comments on air

suggesting that he would sexually abuse the minor daughter of the defendant.  *Id.*

The Second Circuit concluded that, in this context, no reasonable listener

could have perceived the defendant's responses to "state or imply assertions of

objective fact."  *Id.*

       In *Rapaport v. Barstool Sports, Inc.*, the district court found that an audience

would not reasonably conclude that statements suggesting that the plaintiff had

herpes and had abused his ex-girlfriend constituted assertions of facts when

published in a six-minute diss track music video.  No. 18-CV-8783 (NRB), 2021 WL

1178240, at *15 (S.D.N.Y. Mar. 29, 2021), *aff'd*, No. 22-2080-CV, 2024 WL 88636 (2d

Cir. Jan. 9, 2024).  The district court observed that the statements were "delivered

in the midst of a public and very acrimonious dispute between [the parties] that

would have been obvious to even the most casual observer."  *Id.*  The video in

question reviewed the "recent history of the acrimonious dispute that resulted in

Rapaport's termination just days before the video's publication," and also included a

photoshopped photo of the defendant in a derogatory manner.  *Id.*  That clear

background "contextualize[d] for the audience that the statements in the video are

being offered in the midst of a hostile public feud between Rapaport and Barstool." *Id.*

Just as in *Steinhilber*, *Rapaport*, and *Torain*, the Recording was published as part of a heated public feud, in which both participants exchanged progressively caustic, inflammatory insults and accusations. This is precisely the type of context in which an audience may anticipate the use of "epithets, fiery rhetoric or hyperbole" rather than factual assertions. A rap diss track would not create *more* of an expectation in the average listener that the lyrics state sober facts instead of opinion than the statements at issue in those cases.

For example, in "Euphoria" Lamar calls Drake a "master manipulator and habitual liar" and "a scam artist." Req. J. Not., Ex. K. Drake responds in "Family Matters" by heavily implying that Lamar is a domestic abuser. *See id.*, Ex. M. He also raps that he "heard" that one of Lamar's sons may not be biologically his. *Id.* ("Why you never hold your son and tell him, 'Say cheese'?/We could've left the kids out of this, don't blame me/. . . I heard that one of 'em little kids might be Dave Free").

In "Meet the Grahams," Lamar takes issue with Drake involving his family members in their feud. Req. J. Not., Ex. N ("Dear Aubrey/I know you probably thinkin' I wanted to crash your party/But truthfully, I don't have a hatin' bone in my body/This supposed to be a good exhibition within the game/But you f***ed up the moment you called out my family's name/Why you had to stoop so low to discredit some decent people?"). In that same track, Lamar alleges that Drake uses

the weight loss drug Ozempic.  *Id.* ("Don't cut them corners like your daddy did, f***
what Ozempic did/Don't pay to play with them Brazilians, get a gym
membership.").  Lamar also insinuates that Drake knowingly hires sexual
offenders.  *See id.* ("Grew facial hair because he understood bein' a beard just fit
him better/He got sex offenders on ho-VO that he keep on a monthly allowance.").

Of particular relevance, in "Taylor Made Freestyle," Drake challenged Lamar
to make the pedophilia accusations at issue.  Using the artificially generated voice
of deceased rapper 2Pac, Drake goads Lamar:

> Kendrick, we need ya, the West Coast savior
> Engraving your name in some hip-hop history
> If you deal with this viciously
> You seem a little nervous about all the publicity
> F*** this Canadian lightskin, Dot
> We need a no-debated West Coast victory, man
> Call him a b**** for me
> Talk about him likin' young girls, that's a gift from me
> Heard it on the Budden Podcast, it's gotta be true

*Id.*, Ex. I.  It is in this context in which such lyrics as "Say, Drake, I hear you like
'em young" from the Recording must be assessed.  The similarity in the wording
suggests strongly that this line is a direct callback to Drake's lyrics in the prior
song.

Plaintiff argues that the Court should ignore the songs that came before and
assess "Not Like Us" as a "singular entity."  Hr'g Tr. at 39:14-15; *see also* Opp'n Br.
at 15-17.  Plaintiff argues that the average listener is not someone who is familiar
with every track released as part of the rap battle before listening to the
Recording.  Hr'g Tr. at 32:17-33:2; 35:9-19.  Because the Recording has achieved a

level of "cultural ubiquity" far beyond the other seven songs, Plaintiff contends that Court should not consider those other tracks in assessing how the average listener of the Recording would perceive the allegations regarding Drake.  Hr'g Tr. at 36:10-19; *id.* at 39:11-17; *see also* Opp'n Br. at 15.

There are a number of flaws with this argument.  "Not Like Us" cannot be viewed in isolation but must be placed in its appropriate factual context.  *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) ("[S]tatements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts.").  Here, that factual context is the insults and trash talking that took place via these diss tracks in the days and weeks leading up to the publication of "Not Like Us."  The songs released during this rap battle are in dialogue with one another.  They reference prior songs and then respond to insults and accusations made by the rival artist.  *See, e.g.*, Am. Compl., ¶ 63.  The songs thus must be read together to fully assess how the general audience would perceive the statements in the Recording.  *See, e.g.*, *Celle*, 209 F.3d at 187 (holding that two newspaper articles had to be read together to understand full context).

Notably, the Second Circuit rejected a similar argument in *Torain*.  There, the plaintiff argued "that the district court improperly considered the statements that he made during his 'war of words' because they were not included in his complaint."  279 F. App'x at 47 n.1.  The Second Circuit held that, because the court must look at the overall context in which a statement was made in order to

determine if it is actionable, the district court properly considered all statements made during the feud between the disk jockeys, regardless of whether they were included in the complaint. *Id.*

Moreover, while Plaintiff is correct that the intended audience for the Recording is the general public, and not a subset of rap devotees or Kendrick Lamar fans, Opp'n Br. at 15, the recordings in the rap battle were likewise released to the general public. These were not songs accessible to a select niche few, but tracks released by commercially successful artists. While "Not Like Us" may be the most popular of the diss tracks, the other songs were hits in their own right, with streams in the tens of millions or hundreds of millions. Am. Compl., ¶ 202 n.280.

Additionally, it was not just the Recording which gained a cultural ubiquity, but the rap battle itself. In deciding this motion to dismiss, the Court need not blind itself to the public attention garnered by this particular rap battle. The Court takes judicial notice of the extensive mainstream media reporting that surrounded the release of "Not Like Us" and the associated feud between Drake and Lamar. *See, e.g.*, Req. J. Not., Exs. B, C, P.[4] Accordingly, the Court must consider the entire

---

[4] *See also* Mark Savage, *Drake and Kendrick Lamar beef explained—what has happened and why?*, BBC NEWS (May 9, 2024), accessed at https://www.bbc.com/news/entertainment-arts-68739398 [https://perma.cc/AT4M-S3GH]; Dani Di Placido, *Drake vs. Kendrick Lamar—Who Won?*, FORBES (May 6, 2024), accessed at https://www.forbes.com/sites/danidiplacido/2024/05/06/drake-vs-kendrick-lamar---who-won/ [https://perma.cc/668W-3YVL]; Janay Kingsberry and Herb Scribner, *Kendrick Lamar and Drake's feud got heated and ugly. Here's what happened.*, WASHINGTON POST (May 6, 2024), accessed at https://www.washingtonpost.com/style/2024/05/06/drake-kendrick-beef-diss-tracks/ [https://perma.cc/GD95-2CJ4]; Neil Shah, *Kendrick Lamar vs. Drake: A New Rap Beef for the Streaming Era*, WALL ST. J. (May 7, 2024), accessed at

rap battle to assess whether the average listener would take Lamar's statements as objective fact or opinion.

Perhaps most fatally for Plaintiff's argument, it would render protection for artistic expression dependent upon an impermissible retroactive analysis. At the time he released "Not Like Us," Kendrick Lamar could not have been aware that it would break streaming records, win Record of the Year at the Grammys, or be featured at the Super Bowl Halftime Show. Yet Plaintiff would have the Court divorce the Recording from the context in which it was created because of these subsequent events. Whether publications constitute actionable fact or protected opinion cannot vary based upon the popularity they achieve. Constitutional guarantees do not rest on such a flimsy foundation.

Plaintiff counters that, even if the Recording was protected opinion at the time of its initial publication, UMG's republication of "Not Like Us" in the months following, after it achieved unprecedented levels of commercial success, exposes it to liability. Hr'g Tr. at 37:20-38:17. This argument is logically incoherent. If the Recording was nonactionable opinion at the time it was initially produced, then its republication would not expose UMG to liability. Republication cannot transform Lamar's statement of opinion into UMG's statement of fact.

---

https://www.wsj.com/arts-culture/music/kendrick-lamar-vs-drake-rap-beef-diss-tracks-e346839d?mod=Searchresults&pos=5&page=1 [https://perma.cc/77XG-9EX6].

### 3.    Tone and Language

That the Recording can only reasonably be understood as opinion is reinforced by the language employed in the song.  *Steinhilber*, 68 N.Y.2d at 293 (The Court examines the "tone and its apparent purpose.").  "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff," *Brahms v. Carver*, 33 F. Supp. 3d 192, 198 (E.D.N.Y. 2014) (cleaned up), and "imaginative expression," *Levin*, 119 F.3d at 196, cannot constitute actionable defamation.  *See Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000) ("A court may also consider whether the 'general tenor' of the publication negates the impression that challenged statements imply defamatory facts about the plaintiff.").

In *Rapaport*, for example, the court concluded that the "tone and apparent purpose of the diss track," especially considering its use of hyperbolic and vitriolic words and imagery, further "reinforce[d] for the audience that the video is not intended to reflect an accurate factual assessment of Rapaport."  2021 WL 1178240, at *16.  The district court faced "no difficulty concluding that the context of this 'diss track' video reasonably signals to viewers that the challenged statements are the prejudiced, opinionated viewpoints of the Barstool Defendants."  *Id.*  The Second Circuit affirmed the district court's analysis, concluding that "[t]he nature and tone of the surrounding language can function as a strong indicator to the reasonable reader that the statement is not expressing or implying any facts."  2024 WL 88636, at *4.

"Not Like Us" is replete with profanity, trash-talking, threats of violence, and figurative and hyperbolic language, all of which are indicia of opinion.  A reasonable listener would not equate a song that contains lyrics such as, "Ain't no law, boy, you ball boy, fetch Gatorade or somethin', since 2009 I had this b**** jumpin'," with accurate factual reporting.  Accordingly, the reasonable listener of "Not Like Us" would conclude that Lamar is rapping hyperbolic vituperations.

Plaintiff contends that, in determining if the lyrics in "Not Like Us" express fact or opinion, the Court must consider the subjective views of listeners, "as well as commentators in the rap industry and the press," who understood the Recording, Video and Image as an attempt to "convey a precise factual message (pedophilia) about Drake."  Opp'n Br. at 7, 9; *see also* Am. Compl., ¶ 219.  The Amended Complaint cites extensively to comments and posts from YouTube and Instagram that expressed the belief that the Recording had exposed the truth and that Drake truly was engaged in "pedophilia and sexual violence against children."  Am. Compl., ¶ 219; *see also id.*, ¶¶ 73-76, 78-82, 220.

But "distinguishing between fact and opinion is a question of law for the courts, to be decided based on 'what the average person hearing or reading the communication would take it to mean.'"  *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014) (citation omitted).  "The dispositive inquiry is whether a reasonable [listener] could have concluded that the statements were conveying facts about the plaintiff."  *Id.* at 269-70 (citation omitted).  Courts make that determination by looking at the

24

full context and surrounding circumstances of the challenged communication.  *Id.* at 270.

The Court holds, based upon a full consideration of the context in which "Not Like Us" was published, that a reasonable listener could not have concluded that "Not Like Us" was conveying objective facts about Drake.  The views expressed by users @kaioken8026, @mrright8439, and @ZxZNebula, and the other YouTube and Instagram commentators quoted in the Complaint, Am. Compl., ¶¶ 73-74, do not alter the Court's analysis.  In a world in which billions of people are active online, support for almost any proposition, no matter how farfetched, fantastical or unreasonable, can be found with little effort in any number of comment sections, chat rooms, and servers.  "[T]hat some readers may infer a defamatory meaning from a statement does not necessarily render the inference reasonable under the circumstances."  *Jacobus*, 51 N.Y.S.3d at 336.

The artists' seven-track rap battle was a "war of words" that was the subject of substantial media scrutiny and online discourse.  Although the accusation that Plaintiff is a pedophile is certainly a serious one, the broader context of a heated rap battle, with incendiary language and offensive accusations hurled by both participants, would not incline the reasonable listener to believe that "Not Like Us" imparts verifiable facts about Plaintiff.

### 4. Image and Video

To the extent that Plaintiff alleges that the Image and Video are independently actionable, Am. Compl., ¶¶ 7, 8, 65-66, 105-112, the Court holds that

they too constitute opinion. The Image is the album cover art for "Not Like Us." It thus shares the same overall context as the Recording itself. The Image is "designed to reinforce" the message of the Recording. Am. Compl., ¶ 7. And as the Court has already found, that message is protected opinion. Additionally, the Image itself, with its overlay of more than a dozen sex offender markers, is obviously exaggerated and doctored. No reasonable person would view the Image and believe that in fact law enforcement had designated thirteen residents in Drake's home as sex offenders.

The figurative imagery accompanying the music video also constitutes protected opinion. Plaintiff alleges, for example, that the "Video depicts a prolonged shot of a live owl in a cage," projecting the message that "Drake belongs behind bars." Am. Compl. ¶ 110. An image of a caged owl cannot reasonably be understood to convey a factual message. Similarly, depicting Kendrick Lamar playing hopscotch while singing the "A-minor" lyric is not suggestive of objective reporting. *Id.* ¶ 107.

### B.    Mixed Opinion

Although pure opinion cannot constitute actionable defamation, "mixed opinion," which is an opinion that "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it," is actionable. *Steinhilber*, 68 N.Y.2d at 289; *see also Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014). "Mixed opinion" holds "the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the

person about whom he is speaking." *Steinhilber*, 68 NY.2d at 290.  Whether statements constitute mixed opinion presents a legal question, "which must be answered by considering, in the context of the entire communication and of the circumstances in which they were spoken or written, whether the average listener would reasonably understand the opinion as implying the assertion of undisclosed facts justifying the opinion." *Cooper v. Templeton*, 629 F. Supp. 3d 223, 235-36 (S.D.N.Y. 2022) (citation omitted).

Just as the overall context of "Not Like Us" forecloses the argument that its lyrics can be read as factual assertions, that same context negates any implication that Lamar's lyrics are based upon undisclosed facts.  *See LaNasa v. Stiene*, No. 24-1325, 2025 WL 893456, at *3 (2d Cir. Mar. 24, 2025) (holding that, where statements are made in circumstances "where an audience may anticipate the use of epithets, fiery rhetoric or hyperbole," inference could not reasonably be drawn that assertions were based on undisclosed facts).  In the context of this rap diss battle, no reasonable person would listen to "Not Like Us" and assume that Lamar uniquely had access to credible, provable facts that revealed Drake to be a pedophile.

Plaintiff's arguments that the lyrics to "Not Like Us" can be read to suggest Lamar's reliance upon undisclosed facts is unavailing.  Plaintiff first posits that the line, "Say Drake, I ***hear*** you like 'em young," indicates that Lamar had "heard" from outside sources evidence confirming that Drake is a pedophile.  Opp'n Br. at 17.  As discussed *infra*, however, that ignores that this line is reasonably understood to be

a direct response to Drake's challenge to Lamar in "Taylor Made Freestyle" to
"[t]alk about [Drake] likin' young girls/. . . Heard it on the Budden Podcast, it's gotta
be true." Req. J. Not., Ex. I. This lyric clearly prods Lamar to discuss preexisting
rumors about Drake's interest in minors.[5] Lamar's responsive lyrics are thus akin
to the accusation of pedophilia in *Torain* that the Second Circuit concluded
constituted pure opinion. There, the Second Circuit concluded that a reasonable
person would understand based on the context that the defendant disk jockey was
using the term "pedophile" in response to directly pertinent comments made by
plaintiff during their "war of words," and was not relying upon undisclosed facts.
279 F. App'x at 47.

Plaintiff next points to the lyrics, "Rabbit hole is still deep, I can go further, I
promise." Opp'n Br. at 17. Plaintiff argues that a reasonable listener could view
this lyric as suggesting that Lamar has specific evidence to back up his assertions of
pedophilia. *Id.* It is not at all clear that this is a natural reading of this lyric. Even

---

[5] Plaintiff claims that this interpretation is "disputed" and that the Court would
require "vital witness testimony" in order to properly understand this lyric's
meaning. Opp'n Br. at 18. Yet at oral argument, Plaintiff's counsel could not
provide the Court with any alternative understanding of this lyric. Hr'g Tr. at 34:5-
35:19. Furthermore, in "The Heart Part 6," Drake confirms that he understands
Lamar to be referring to these preexisting rumors when Drake rapped, "Only f***in'
with Whitneys, not Millie Bobby Browns, I'd never look twice at no teenager." Req.
J. Not., Ex. O. To understand the relevant context for these back-and-forths, the
Court takes judicial notice of the fact that Millie Bobby Brown is a well-known
actress, and that she has given interviews stating that she and Drake formed a
friendship when she was 14 years old and he was 32 years old. *See, e.g.*, Lynn
Hirschberg, *Millie Bobby Brown Is Already an Icon For Her Generation*, W
MAGAZINE, accessed at https://www.wmagazine.com/story/millie-bobby-brown-w-
magazine-cover-interview [https://perma.cc/R8GR-CW5S].

if this line was susceptible to such an interpretation standing alone, however, no reasonable listener could understand it in this way given the overall context. Indeed, during this rap battle, Drake and Lamar each used similar hyperbolic threatening language. *See, e.g.*, Req. J. Not., Ex. K ("But don't tell no lie about me and I won't tell truths 'bout you"); Ex. M ("Your darkest secrets are comin' to light"); Ex. N ("I been in this industry twelve years, I'ma tell y'all one lil' secret/It's some weird s*** goin' on and some of these artists be here to police it"); Ex. O ("I got your f***ing lines tapped, I swear that I'm dialed in/ . . . What about the bones we dug up in that excavation?"). This kind of posturing in a rap diss track does not make such lines more likely to be understood by the ordinary listener to be anything but pure opinion.

## II. Second Degree Harassment

New York does not recognize a civil cause of action for harassment. *Ralin v. City of New York*, 844 N.Y.S.2d 83, 84 (2d Dep't 2007) ("New York does not recognize a cause of action to recover damages for harassment."); *Wells v. Town of Lenox*, 974 N.Y.S.2d 591, 593 (3d Dep't 2013) ("With regard to the alleged harassment, New York does not recognize a common-law cause of action to recover damages for harassment" (cleaned up)). Notwithstanding this precedent, Plaintiff attempts to bring a claim for harassment under section 240.26(3) of the New York Penal Code. A person commits harassment in the second degree when they hold the "intent to harass, annoy or alarm another person" and "engage[] in a course of conduct or repeatedly commit[] acts which alarm or seriously annoy such other

person and which serve no legitimate purpose." N.Y. Pen. Law § 240.26(3).

Plaintiff alleges that the Recording, Video and Image "individually and collectively

provide a call to target Drake, including through violence," Am. Compl., ¶ 249, and

that Defendant's "course of conduct in publishing specific and unequivocal threats of

violence has placed Plaintiff in reasonable fear of physical harm," *id.*, ¶ 250. This

state criminal statute does not provide a private right of action, however.

Accordingly, Plaintiff fails to state a claim for harassment.

     Under New York law, "[w]here a penal statute does not expressly confer a

private right of action on individuals pursuing civil relief, recovery under such a

statute 'may be had only if a private right of action may fairly be implied.'"

*Hammer v. Am. Kennel Club*, 1 N.Y.3d 294, 299 (2003). To determine whether a

criminal statute gives rise to a private right of action, courts look at three factors:

"(1) plaintiff must be one of the class for whose benefit the statute was enacted; (2)

recognition of a private right of action must promote the legislative purpose; and (3)

creation of such a right must be consistent with the legislative scheme." *Id.*

(cleaned up).

     The third factor's bar is high because, "[a]s a general rule, when a statute is

contained solely within the Penal Law Section, the [New York] legislature intended

it as a police regulation to be enforced only by a court of criminal jurisdiction."

*Casey Sys., Inc. v. Firecom, Inc.*, No. 94 CIV. 9327 (KTD), 1995 WL 704964, at *3

(S.D.N.Y. Nov. 29, 1995). Thus, "[r]arely is there a private right of action under a

criminal statute." *Senese v. Hindle*, No. 11-CV-0072 (RJD), 2011 WL 4536955, at

*11 (E.D.N.Y. Sept. 9, 2011); *see also Watson v. City of New York,* 92 F.3d 31, 36 (2d Cir. 1996) ("In the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes.").

In *Hammer*, the New York Court of Appeals concluded that there was no private right of action under animal protection criminal statutes because "enforcement authority lies with police and societies for the prevention of cruelty to animals and violations [are] handled in criminal proceedings." *Id.* at 300.   In light of this "comprehensive statutory enforcement scheme," recognizing a private right of action would be inconsistent with legislative intent. *Id.*; *see also Golden v. Diocese of Buffalo, NY*, 125 N.Y.S.3d 813, 816 (4th Dep't 2020) ("[R]ecognizing a private right of action [for criminal nuisance] would not be consistent with the existing mechanism for enforcing the statute, i.e., criminal prosecution.").

Consistent with this precedent, courts routinely dismiss civil harassment claims as not cognizable under New York law. *See, e.g., Cablevision Sys. Corp. v. Communic'ns Workers of Am. Dist.*, 16 N.Y.S.3d 753, 754 (2d Dep't 2015) (applying *Hammer* to uphold dismissal of harassment claim based on Penal Law); *Broadway Cent. Prop. Inc. v. 682 Tenant Corp.*, 749 N.Y.S.2d 225, 227 (1st Dep't 2002) ("New York does not recognize a civil cause of action for harassment."); *see also Masic v. Town of Franklinville, New York*, No. 1:24-CV-18-GWC, 2025 WL 2480898, at *16 (W.D.N.Y. Aug. 27, 2025) (applying *Hammer* to find there is no implied right of action under section 240.26); *Stathatos v. William Gottlieb Mgmt.*, No. 18-CV-03332 (KAM) (RER), 2020 WL 1694366, at *4 (E.D.N.Y. Apr. 6, 2020) ("[P]laintiff's

allegations of perjury, witness intimidation, witness or evidence tampering, and harassment are criminal charges without a private right of action.").

While Plaintiff cites cases in which courts have recognized a private right of action for criminal harassment under New York law, *see* Opp'n Br. at 26 n.15, most of this authority predates *Hammer*.  As for the two cited cases that post-date *Hammer*, *Baiqiao Tang v. Wengui Guo*, No. 17 Civ. 9031 (JFK), 2019 WL 6169940, at *6 (S.D.N.Y. Nov. 20, 2019), and *Blasetti v. Pietropolo*, 213 F. Supp. 2d 425, 428 (S.D.N.Y. 2002), neither of those cases mention *Hammer* or engage in the analysis required by the New York Court of Appeals to imply a private right of action from a provision of the Penal Law.[6]

There is nothing to distinguish criminal harassment from other provisions of the New York criminal code for which there is no implied private right of action. The New York legislature conferred authority to enforce the criminal harassment statute upon local law enforcement.  *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 71 (2013) ("We have therefore declined to recognize a private right of action in instances where the Legislature specifically considered and expressly provided for enforcement mechanisms in the statute itself." (cleaned up)).  There are no indications in the statutory scheme that the legislature intended to confer a civil

---

[6] For example, *Baiqiao Tang*'s discussion of this issue is limited to a single sentence, a quotation from *Blasetti v. Pietropolo*.  *Blasetti*, in turn, simply states that an implied cause of action exists without engaging in further analysis and cites as support for this proposition cases that predate *Hammer*.  Further, an examination of the cases on which *Blasetti* relies likewise finds that none conducted the analysis required under New York law.  The Court does not find these authorities persuasive.

cause of action for violation of section 240.26.  Plaintiff's claim for harassment must therefore be dismissed.

## III.  New York General Business Law Section 349

Plaintiff's final cause of action, brought under section 349 of New York General Business Law ("GBL"), fares no better.  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  Plaintiff alleges that, "on information and belief," Defendant "engaged in deceptive acts and practices in the conduct of business, trade, and commerce by covertly financially incentivizing third parties—including music platforms and social media influencers—to play, stream, and promote the Recording."  Am. Compl., ¶ 256; *see also id.,* ¶¶ 13, 148, 152, 182-83.  As one example, Plaintiff alleges that he "understands" that UMG covertly paid a popular NFR Podcast to promote the Recording and publish podcast episodes and other content about the Recording.  *Id.,* ¶ 182.  On information and belief, Plaintiff further claims that UMG used its resources to incentivize third parties to use bots to stream the Recording and subsequently extolled the Recording's streaming numbers on Spotify while knowing that millions of the streams were false and fraudulent.  *Id.,* ¶¶ 227-29, 257.  Lastly, the Amended Complaint alleges that UMG paid at least one radio promoter to engage in pay-for-play arrangements, or "payola," of the Recording on New York radio stations.  *Id.,* ¶¶ 184-85, 258.

To successfully state a claim under section 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are

misleading in a material way, and (3) the plaintiff has been injured as a result." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020) (quotations and citations omitted).  Plaintiff asserts that Defendant's deceptive acts and practices were intended to inflate the public's view of the Recording's popularity and success, which would lead a reasonable consumer of music to be materially misled.  Am. Compl., ¶ 259.

Defendant first argues that Plaintiff uses an improper pleading device, as his section 349 allegations all rest upon information and belief and do not go beyond "pure conjecture and speculation."  ECF No. 43 at 22-23 (quoting *Boehm v. Sportsmem, LLC*, No. 18-CV-556 (JMF), 2019 WL 3239242, at *2 n.1 (S.D.N.Y. July 18, 2019)).  Plaintiff counters that the applicable standard is plausibility under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Opp'n Br. at 23; *see also* Hr'g Tr. 43:15-22.

"*Twombly* does not prevent a plaintiff from pleading facts 'on information and belief' in appropriate circumstances," *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 526 (S.D.N.Y. 2013), but the plaintiff may only do so "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (cleaned up).  In that scenario, the allegations "must be accompanied by a statement of the facts upon which the belief is founded."  *Pakter*, 931 F. Supp. 2d at 527 (cleaned up).

34

Plaintiff argues that both *Pakter* conditions are satisfied because the Amended Complaint alleges that UMG made indirect payments to a wide array of unknown third parties and also "pleads sufficient 'factual information' concerning UMG's scheme, including examples thereof, contemporary reports, as well as UMG's past practices." Opp'n Br. at 23. At oral argument, Plaintiff stressed that "Not Like Us" was the fastest song to reach 300 million streams on Spotify within just thirty-five days, which Plaintiff argues is a sufficient basis for the Court to infer that Defendant implemented a technique to manipulate stream totals, among other "unprecedented tactics," to reach "unprecedented rocketing up the streaming chart." Hr'g Tr. 43:23-44:18.

The Court disagrees. To allege that UMG implemented covert practices to manipulate streams of "Not Like Us" and inflate the Recording's perceived popularity, Plaintiff relies on Tweets[7] by individual users and reporting from fans to allege that UMG utilized covert tactics to manipulate streams of "Not Like Us." Am. Compl., ¶¶ 180-183; *see also* Hr'g Tr. 45:22-46:2. The Court finds Plaintiff's reliance on online comments and reporting insufficient to meet the plausibility standard. *See Castenada v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 750-51 (N.D. Ill. 2023) (finding that "[w]hen it comes to particularity (and plausibility, too), the experience of a no-name person" from a small set of anonymous customer reviews "does not add much heft to the complaint"); *Doe v.*

---

[7] Tweets are now known as Posts on X. X was formerly known as Twitter, where users could post their writings and media as a "Tweet."

*Kamehameha Sch./Bernice Pauahi Bishop Estate*, Civ. No. 08–00359 JMS–BMK, 2008 WL 5423191, at *3 (D. Haw. Dec. 31, 2008) (finding a lack of probity from anonymous online comments that "invite[] commentators to make outrageous statements under a veil of secrecy").  A small sample of users' possible experience, communicated through Tweets and other anonymized commentary, fails to establish a plausible inference that UMG manipulated listeners into streaming "Not Like Us" instead of Drake's music.

While these covert practices of providing financial incentives to undisclosed third parties and leveraging of business relationships, if they exist, may be facts that are "peculiarly within the possession and control of" UMG, Plaintiff's allegations —based on what boils down to unreliable online commentary —do not form a "sufficient factual basis such that there is a 'reasonable expectation that discovery will reveal evidence of illegality.'"  *Asset Co IM Rest, LLC v. Katzoff*, No. 23 Civ. 9691 (JPC), 2025 WL 919489, at *11 (S.D.N.Y. Mar. 26, 2025) (quoting *Arista Records*, 604 F.3d at 120).  Ultimately, Plaintiff fails to provide any facts or circumstances that would make it "highly plausible" that UMG conducted such covert business tactics.  *Moraes v. White*, 571 F. Supp. 3d 77, 103 (S.D.N.Y. 2021).

Even if the Court accepted Plaintiff's pleadings on information and belief, Plaintiff still has not stated a claim for relief under section 349.  Plaintiff has not sufficiently alleged deceptive practices that are consumer oriented.  "Under New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for personal,

family or household purposes." *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 46 (W.D.N.Y. 2015) (cleaned up). "A defendant engages in 'consumer-oriented' activity if the company's actions cause any consumer injury or harm to the public interest. *Anderson v. Unilever U.S., Inc.*, 607 F. Supp. 3d 441, 451 (S.D.N.Y. 2022) (cleaned up). While section 349 does not preclude an action brought by one business competitor against another, it is at its core a "consumer protection device." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

The Amended Complaint does not indicate how any of the deceptive practices allegedly utilized by UMG harmed consumers. For example, the Amended Complaint does not allege that consumers paid more than they otherwise would have for a product, purchased a product that they otherwise would not have because of misrepresentations regarding the product, or otherwise received less in value for any purchases that they did make. *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 102 (2d Dep't 2012) (holding that section 349 is limited to deceptive practices that "pertain[] to an issue that may bear on a consumer's decision to participate in a particular transaction" or which "undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice"). The Amended Complaint is somewhat vague as to who the class of consumers is and what product, goods, or services they are purchasing. It is not clear how the alleged redirection of Spotify "users who are searching for other unrelated songs and artists" to the Recording would amount to actual harm of consumers or any limitation of their choices. At most, the allegations suggest that

UMG engaged in practices to make "Not Like Us" seem more popular than it actually was, without connecting that activity to any consumer harm. Such practices, without more, do not state a claim under section 349 of the GBL.

## CONCLUSION

Defendant's motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate ECF Nos. 42, 78, and 81, and to close the case.

SO ORDERED.

Dated: October 9, 2025
    New York, New York

                                            JEANNETTE A. VARGAS
                                            United States District Judge